# Bobbie Adams v. Rankin County, MS, et al.

**Bobbie Adams**

**April 17, 2025**

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

Bobbie Adams 4/17/2025

UNITED STATES DISTRICT COURT
SOUTHERN DIVISION OF MISSISSIPPI
NORTHERN DIVISION


BOBBIE ADAMS

                                                PLAINTIFF


V.                          CAUSE NO. 3:24CV236-KHJ-MTP


RANKIN COUNTY, MISSISSIPPI; ET
AL.
                                                DEFENDANTS


DEPOSITION OF BOBBIE ADAMS


Taken at the instance of the Defendants at the South
     Mississippi Correctional Institute, 22689
Mississippi Highway 463 N, Leakesville, Mississippi
  39451, on Thursday, April 17, 2025, beginning at
                   11:05 a.m.




REPORTED BY:

Kaitlyn Etherton, CCR #1963

Bobbie Adams 4/17/2025

```
 1     APPEARANCES:

 2

 3     ROBERT MOAK, ESQ.
       Law Office of Bobby Moak PC
 4     402 Monticello Street
       Bogue Chitto, Mississippi 39629
 5     bobbymoak402@att.net

 6
            COUNSEL FOR BOBBIE ADAMS
 7

 8
       JASON DARE, ESQ.
 9     Biggs, Ingram & Solop, PLLC
       Post Office Box 14028
10     Jackson, Mississippi 39236
       jdarebislawyers.com
11

12          COUNSEL FOR RANKIN COUNTY

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Bobbie Adams 4/17/2025

```
 1                          INDEX

 2   Style.............................................1

 3   Appearances.......................................2
     Index         ....................................3
 4   Certificate of Court Reporter .................132

 5                       EXAMINATION

 6   Examination By Mr. Dare ..........................4
     Examination By Mr. Moak ........................114
 7   Examination By Mr. Dare ........................128

 8                        EXHIBITS

 9   Exhibit 1........................................21
           Re-notice of Deposition
10   Exhibit 2........................................22
           Pictures taken at Jail
11   Exhibit 3........................................22
           Order of Sentence
12   Exhibit 4........................................25
           Map of Outpost and Road
13   Exhibit 5........................................73
           RC 22-49
14   Exhibit 6........................................92
           First Complaint
15

16

17

18

19

20

21

22

23

24

25
```

Bobbie Adams 4/17/2025

```
 1                    BOBBIE ADAMS,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4    EXAMINATION BY MR. DARE:
 5         Q.   State your full name for the record,
 6    please, sir.
 7         A.   Bobbie Adams.
 8         Q.   Have a middle name?
 9         A.   No, sir.
10         Q.   All right.
11              B-o-b-b-i-e; correct?
12         A.   Yes, sir.
13         Q.   Mr. Adams, have you ever given a
14    deposition like we're here on today?
15         A.   No, sir.
16         Q.   Let me go through a couple of ground rules
17    with you for a deposition.  It's kind of like Court
18    in that everything that you say is sworn to, that
19    it's the truth, the whole truth, and nothing but the
20    truth.  But unlike Court, we don't have a judge or a
21    jury sitting around here.  So if you need to take a
22    break at any point in time today, tell me.  Go out
23    and get someone to escort you where you need to go.
24              All right?
25         A.   All right.
```

Bobbie Adams 4/17/2025

```
 1        Q.   But similar to Court, we got a court
 2   reporter over here taking down everything that I
 3   say, everything that you say.  In order to make that
 4   easier on the court reporter, in order for it to
 5   show up correct on a sheet of paper, I'm gonna have
 6   to ask you to not say, "uh-huh" and "uh-uh".
 7        A.   Yes, sir.
 8        Q.   Because that doesn't come out too well.
 9   If you do that, I'm gonna get you to verbalize it in
10   a "yes" or "no."
11             All right?
12        A.   Yes, sir.
13        Q.   Second, if I'm asking a question, if I'm
14   in the middle of a question, don't start answering
15   yet.  Even though you know what I'm gonna ask you,
16   wait until I finish so that the court reporter can
17   get everything down correctly.
18        A.   All right.
19        Q.   And lastly, attorneys have a tendency of
20   asking really confusing questions.
21        A.   All right.
22        Q.   If I do that, and I have done that in the
23   past, if I do that, if you don't understand one of
24   my questions, ask me to rephrase it.  I will not get
25   offended by that.  All right?  But if you answer,
```

Bobbie Adams 4/17/2025

```
1      I'm going to assume that you understood the question
2      and you answered truthfully and honestly.
3              Okay?
4         A.    Yes, sir.
5         Q.    This is a question I ask everybody.  If
6      the answer is "yes" to it, I don't want to know what
7      it is, but have you taken anything today that would
8      impair your ability to understand my questions or
9      answer truthfully and honestly?
10        A.    No, sir.
11        Q.    Perfect.  All right.
12              So we're taking your deposition here today
13     at the South Mississippi Correctional Institute.
14     How long have you been here?
15        A.    Gonna be three years.
16        Q.    When were you first transferred over here?
17        A.    I'm really not sure.  Probably about five
18     months ago, six months ago.
19        Q.    I guess another one of the initial things
20     I should say.  If you don't know, tell me "I don't
21     know."  That's perfectly fine.  If you answer a
22     question, it's going to be assumed that that's 100%
23     accurate.  So let me know if you don't know
24     something.
25        A.    Yes, sir.
```

Bobbie Adams 4/17/2025

```
 1          Q.   Before being incarcerated, where were you
 2     living?
 3          A.   Pearl, Mississippi.
 4          Q.   Where in Pearl?  What was the address?
 5          A.   104 Chinkapin Cove.
 6          Q.   How long did you live at 104 Chinkapin
 7     Cove?
 8          A.   A couple years.
 9          Q.   Approximately how long?  More than five
10     years?
11          A.   About two years.
12          Q.   About two years.
13               Who was living there with you, let's say
14     back in May of 2021?
15          A.   My girlfriend, her kids.
16          Q.   What was the girlfriend's name?
17          A.   Cassandra Armstrong.
18          Q.   Any of her children above the age of 18?
19          A.   Yeah.
20          Q.   All right.
21               So how many children did she have?  And I
22     need the names of all the ones that are over the age
23     of 18.
24          A.   All the ones over 18?
25          Q.   Yes, sir.  It was a -- let me rephrase
```

Bobbie Adams 4/17/2025

```
 1    that.  That was a double question and I shouldn't do
 2    that.  How many children did she have living there
 3    in May of 2021?
 4         A.   Two.
 5         Q.   And was only one of them above the age of
 6    18?
 7         A.   Yes, sir.
 8         Q.   And what was his or her name?
 9         A.   Kaderius (phonetic).  Kaderius Walker.
10         Q.   Where does Cassandra live now?
11         A.   Still in the same spot.
12         Q.   Still in Pearl?
13         A.   Yes, sir.
14         Q.   Prior to 104 Chinkapin Cove, where were
15    you staying?
16         A.   I'm from Louisiana.
17         Q.   What parts?
18         A.   Lake Providence.
19         Q.   So did you move to Pearl from Lake
20    Providence?
21         A.   Yes, sir.
22         Q.   That's north of Monroe?
23         A.   Yes, sir.  Right there.
24         Q.   Where in Lake Providence did you live?
25         A.   1107 Gould Street.
```

Bobbie Adams 4/17/2025

```
 1          Q.    Spell the --
 2          A.    Gould, G-o-u-l-d.
 3          Q.    Why'd you move from Lake Providence to
 4     Pearl?
 5          A.    I met her.  I was a truck driver.
 6          Q.    All of your family in and around the Lake
 7     Providence area?
 8          A.    Yes, sir.
 9          Q.    Do you have any family that lives in the
10     central Mississippi area?
11          A.    I don't have no people in Mississippi.
12          Q.    Provide me the benefit of your educational
13     background.
14          A.    If you could say that one more time.
15          Q.    Give me the benefit of your educational
16     background.  High school, college.
17          A.    High school.  Got kicked out my 12th grade
18     year.
19          Q.    Where was that?
20          A.    East Carroll.
21          Q.    Did you get your GED?
22          A.    I'm working on -- I'm in the process of
23     getting it now.
24          Q.    How long have you been working on getting
25     it while incarcerated?
```

Bobbie Adams 4/17/2025

```
 1          A.    Oh, I just started since they pulled me
 2    over here to this reentry program.
 3          Q.    And you said you were a truck driver?
 4          A.    Yes, sir.
 5          Q.    Do you have your CDL?
 6          A.    Yes, sir.
 7          Q.    Where'd you get that?
 8          A.    Why did I get them?
 9          Q.    Where?  Initially in Louisiana?
10          A.    Yes, sir.
11          Q.    And where'd you do your training?
12          A.    I used to work for the town and they -- I
13    went through them and got them within a couple
14    weeks.  I've been driving trucks, so it wasn't
15    nothing for me to just go take test the test and do
16    it.
17          Q.    When you said you worked for the town,
18    that was Lake Providence?
19          A.    Yes, sir.  East Carroll Parish.
20          Q.    East Carroll Parish?
21          A.    Yes, sir.
22          Q.    Starting from when you first went into
23    prison, immediately prior to that, where were you
24    working?
25          A.    Say that one more time.
```

Bobbie Adams 4/17/2025

```
 1          Q.   Let's go with May of 2021.  Who were you
 2    working for?
 3          A.   May '21?  I was -- I wasn't working then.
 4    I was doing off and on, mainly working for myself
 5    then hauling.  Yeah.  Hauling scrap iron.
 6          Q.   Who would you primarily haul for?
 7          A.   Myself.
 8          Q.   And you pick this up in, what, your own
 9    personal vehicle?
10          A.   Yes, sir.
11          Q.   How long had you been -- let's strike
12    that.
13               Prior to May of '21 was the -- what was
14    the next person that you worked for?  Business wise,
15    and not just yourself.
16          A.   Kel-sa-rah Transportation.
17          Q.   Where are they?
18          A.   In Louisiana.
19          Q.   And spell that for me.
20          A.   K-e-l-s-a-r-a-h.  Kel-sa-rah.
21          Q.   And when did you leave Kel-sa-rah
22    Transportation?
23          A.   I left there -- let me see.  I don't know.
24    I don't remember the day.  I can't think of the
25    date.  It was right before I caught that charge.  I
```

Bobbie Adams 4/17/2025

```
1    don't know.  I can't think of the date.
2         Q.   My next question's gonna be, why did you
3    leave Kel-sa-rah?
4         A.   Relocate.  Come to Mississippi.
5         Q.   Were you terminated or did you resign?
6         A.   That's family business.  Family owned
7    business.
8         Q.   Gotcha.
9              You said it was right before you caught a
10   charge.  Were you charged with something over in
11   Louisiana?
12        A.   I ain't been in trouble in Louisiana in
13   almost 20 years.
14        Q.   Was that about the same time that you left
15   Kel-sa-rah Transportation?
16        A.   Kel-sa-rah, that was in '21.  I mean,
17   that's about '21.  Yeah.
18        Q.   So you moved from Louisiana to Mississippi
19   in '21?
20        A.   No.  I moved in -- I'm trying to see when
21   I moved to Mississippi, man.  I caught my charge in
22   '21.  I was in Mississippi probably about '19 -- '18
23   or '19, so...
24        Q.   And you stayed full-time in Mississippi
25   from 2018, 2019 to 2021?
```

Bobbie Adams 4/17/2025

```
 1          A.   Yes, sir.
 2          Q.   And the entire time between 2018 and 2021
 3     that you were in Mississippi, you didn't work for
 4     any businesses?
 5          A.   Yeah.  UPS.  Yeah.  UPS.  Somebody else.
 6     I was doing a lot of painting and stuff for people.
 7     Painting.  Let's see.  Something else I worked at.
 8     UPS.  Oh, what the name of this place?  The Climate
 9     Masters.  Heating -- they do, you know, central air.
10     Yeah, I worked for them.  Climate Masters, UPS, and
11     hauling scrap iron.
12          Q.   When did you work for UPS?
13          A.   '19, '20.  I'm not sure.
14          Q.   When did you work for Climate Masters?
15          A.   Around that time, '19.  Yeah.  Around that
16     time.  '21.
17          Q.   Why'd you leave UPS?
18          A.   Oh, they taking too long to give me a job
19     driving.  They had me working on a floor instead of
20     just letting go and put me in a driving position
21     like I applied for.
22          Q.   So it was a disagreement on your position
23     with them?
24          A.   Yes, sir.
25          Q.   Why'd you leave Climate Masters?
```

Bobbie Adams 4/17/2025

```
 1          A.   I found something else.  I think I found
 2    something else.  Started on something else.
 3          Q.   What'd you find?
 4          A.   I think I started scrap iron, man.
 5    Hauling scrap iron or something.
 6          Q.   Are you still dating Cassandra Armstrong?
 7          A.   No, sir.
 8          Q.   When did y'all stop dating?
 9          A.   When I come to jail.
10          Q.   Who was she working for in '21?
11          A.   She a RN.  She a nurse.  I think she
12    worked for -- I forgot the name of the place.
13          Q.   Hospital or clinic?
14          A.   She at a hospital now, but she was at
15    Lakeland Rehabil -- Lakeland.  She was at a clinic
16    when I was with her.
17          Q.   You think she was working for Lakeland
18    Rehabilitation?
19          A.   Yeah.  She was working there when I was
20    with her.  She's at the hospital now, though.
21          Q.   You said that you had caught a charge in
22    Louisiana 20 years prior.  What was that?
23          A.   A drug charge.  2003.
24          Q.   2003?  Where was that out of?
25          A.   Louisiana.  East Carroll.  Lake
```

Bobbie Adams 4/17/2025

1    Providence, Louisiana.

2        Q.   And what were you sentenced to as a result

3    of that charge?

4        A.   Five years probation.  And I violated it.

5        Q.   How did you violate it?

6        A.   I don't know.  Not reporting or showing or

7    something.  Not -- no.  I don't really know.  Not

8    reporting.  I mean, showing up or something.  I'm

9    not sure.

10       Q.   And then when you violated probation, what

11   happened?

12       A.   I ended up doing 18 months to two years

13   off that five years.

14       Q.   Did you say you did 18 months or two

15   years?

16       A.   Eighteen months to two years off the five

17   years.

18       Q.   Well, where'd you spend that time?

19       A.   All over the place.

20       Q.   Within the Louisiana correctional system?

21       A.   Yeah.

22       Q.   Other than this May 21 charge, had you

23   been charged anywhere else?

24       A.   No, sir.  Just some of that bullshit in

25   Rankin County.

Bobbie Adams 4/17/2025

1        Q.   And making sure my question was clear, and
2   I'm not even referring to specifically drug charges,
3   but anything other than, let's say, a traffic
4   ticket.  Had you been charged with anything else
5   other than this 2003 charge from East Carroll Parish
6   and the May 21 charge from Rankin County?
7        A.   2003 I had -- yeah.  I caught some more
8   charges in 2003, but they weren't no felonies.  They
9   was little simple misdemeanors or whatever.
10       Q.   All right.
11            So mine wasn't specific to felonies.  Tell
12   me about all the misdemeanors that you have.
13       A.   Flight charges.  Let me see.  That's been
14   so long ago.  Running from the police, pulled over
15   with open container, something like that.
16       Q.   When did you -- when were you charged with
17   running from the police?
18       A.   (Indiscernible) whatever time -- I'm
19   trying to see.
20       Q.   Was it after the 2003 --
21       A.   It's after that.  It's way years after
22   that.  Probably around about 2016, 2017.  No.  About
23   2013 or '14 in the end, the misdemeanor.
24       Q.   Where was that?
25       A.   Louisiana.  East Carroll.

Bobbie Adams 4/17/2025

```
1          Q.   The open container charge, where was that
2     and about what time?
3          A.   That was in Louisiana.
4          Q.   East Carroll as well?
5          A.   Yes, sir.
6          Q.   Were all of your charges with East Carroll
7     Parish Sheriff's Department --
8          A.   Yeah.
9          Q.   -- or did you have any charges through
10    Ouachita Parish or anywhere else?
11         A.   No.  Just down there.
12         Q.   Have you ever filed for bankruptcy?
13         A.   No, sir.
14         Q.   You ever filed for any form of disability?
15         A.   No, sir.
16         Q.   All right.
17              So are there any other misdemeanor charges
18    that you recall, other than the running from the
19    police and the open container charges?
20         A.   No, sir.
21         Q.   Getting to the May 21 charge specifically.
22    Do you recall what date that was, that charge or
23    that arrest occurred?  What was the date?
24         A.   May the 1st.
25         Q.   2021, right?
```

Bobbie Adams 4/17/2025

```
 1          A.    2021.

 2          Q.    What had you been doing that day?

 3          A.    Fixing on TVs.

 4          Q.    So -- and I'm gonna approach this from the

 5    premise that you pled guilty to selling

 6    methamphetamines to a CI; correct?

 7          A.    Yeah.  I was forced to plead guilty.  I

 8    ain't have no choice.

 9          Q.    And so I'm gonna approach this from the

10    perspective that since you pled guilty, the Courts

11    assume that you did in fact do that.

12          A.    Sir?

13          Q.    Since you pled guilty and you're serving

14    time for it, I'm approaching it from the fact that

15    you did in fact sell meth.  But I'm not asking you

16    if you did or you did not.  What I would ask,

17    though, is had you sold meth before May 1, 2021?

18               MR. MOAK:  Object to that.

19               THE WITNESS:  No one sell meth in

20          Louisiana, down my way.  They don't do that.

21          Q.    (By Mr. Dare)  Do they do it in Pearl a

22    lot?  Do they do it in Rankin County?

23          A.    I was trying to trade for some weed, man.

24    I don't know what -- that's a bunch of

25    misunderstanding.
```

Bobbie Adams 4/17/2025

1        Q.    Were you -- in leading up to you being

2    arrested on May 1, how did the -- how did you either

3    contact the CI or how did the CI get in touch with

4    you?

5        A.    I met him at the store.  I met him a month

6    prior to before that happened at the store.

7        Q.    So you knew him from beforehand?

8        A.    Yes, sir.  I met him.  Actually, I walked

9    in the store -- how I met him was, to be honest, I

10   walked in the store and I had just smoked a blunt

11   and I was smelling like weed.  And when I walked in

12   the store, he told me I smell good.  That's how I

13   met him.  Yeah.

14       Q.    And that was about -- approximately, about

15   a month before?

16       A.    A month before.  That's how I met him.

17       Q.    On May 1, 2021, let me make sure that this

18   is kind of clear, was there any arrangements for you

19   to meet this CI at the Outpost on that day?

20       A.    Can you say that again?

21       Q.    Did you make arrangements to meet that CI

22   for this sale beforehand?

23       A.    No.

24       Q.    Walk me through how the -- how you recall

25   the sale going down.

Bobbie Adams 4/17/2025

```
1          A.   Shit, he called me and said he was at the
2     store, that he wanted some weed.  We were gonna
3     trade or whatever.
4          Q.   What were y'all gonna trade?
5          A.   I was gonna give him some weed for some
6     ice.
7          Q.   Making sure the record's clear, what's
8     ice?
9          A.   Crystal meth.
10         Q.   So you were trying to give him some weed
11    and you wanted in return crystal meth from him?
12         A.   Yeah.
13         Q.   Did you make that exchange?
14         A.   No.  No.  I ended up I'm running from him.
15         Q.   So the law enforcement came in before you
16    had the opportunity to make the exchange?
17         A.   Yeah.
18         Q.   So you never got the crystal meth in your
19    possession?
20         A.   They lied.  They lying.
21         Q.   My ques -- yes or no, did you ever get it
22    in your possession?
23         A.   No.
24         Q.   Now, during the criminal proceedings, you
25    had a pretty good --
```

Bobbie Adams 4/17/2025

```
 1          A.    No.

 2          Q.    -- defender.  Didn't like your -- was that

 3     a public defender?

 4          A.    Yeah.  He sold me out.  Yeah.  He sold me

 5     out.  He knew they --

 6          Q.    Who was your public defender?

 7          A.    John Holaday.

 8          Q.    Before I forget, so what we had marked as

 9     Exhibit 1 to your deposition was the re-notice of

10     deposition just to be here today.  I'm going to have

11     marked as Exhibit 2 the pictures that we took before

12     this deposition.

13                          (Exhibit No. 1 was marked for

14                           identification.)

15          Q.    (By Mr. Dare)  Remember the court reporter

16     came into the infirmary and took some pictures of

17     your legs and of your foot?

18          A.    Yes, sir.

19          Q.    Specifically of, I believe, it was your

20     left foot.  Is that right?

21          A.    Yes, sir.

22          Q.    And they're the scars on your left foot.

23     You remember her taking those?

24          A.    Yes, sir.

25          Q.    And that was you that she took pictures
```

Bobbie Adams 4/17/2025

```
 1    of; correct?

 2         A.   Yes, sir.

 3         Q.   And every last one of those pictures that

 4    the court reporter took of your legs and of your

 5    foot, I'm going to have marked as Exhibit 2 to your

 6    deposition.

 7              MR. MOAK:  Grouping?  All of them?

 8              MR. DARE:  The group.  Yeah.  In

 9         composite.

10                        (Exhibit No. 2 was marked for

11                         identification.)

12              Off the record.

13                        (An off-the-record discussion

14                         took place.)

15                        (Exhibit No. 3 was marked for

16                         identification.)

17              MR. DARE:  I hand you Exhibit 3 to your

18         deposition.  We can go off the record and you

19         can take your time to read that if you haven't

20         seen it a bit.

21         Q.   (By Mr. Dare)  Have you had a chance to

22    look over that order of sentence again, dated and

23    filed November 9, 2022?

24         A.   Yes, sir.

25         Q.   And that's why you're currently locked up
```

Bobbie Adams 4/17/2025

1    in South Mississippi Correctional Institute;

2    correct?

3         A.    Yes, sir.

4         Q.    On this charge.  And you did plea guilty,

5    correct, to crimes of sale of 2 grams or more, but

6    less than 10 grams of methamphetamine, a Schedule 2

7    controlled substance, did you not?

8         A.    Yes, sir.

9         Q.    And it says in here that, "questions and

10   comments from all interested parties were invited

11   and those submitted were received and considered."

12   The Defendant," that was you, "and Defendant's

13   Attorney were given an opportunity to address the

14   court on all matters relevant to these proceedings,

15   including the presentation of circumstances in

16   extenuation and mitigation."  That was C and D.

17             Did I read those correctly?  And that was

18   the order that was entered; correct?

19        A.    Yes, sir.

20        Q.    And this order hadn't been set aside or --

21   it's still in full force in effect as of today's

22   date; correct?

23        A.    Yes, sir.

24        Q.    Once the sale occurred -- I guess when did

25   you first notice that there were law enforcement in

Bobbie Adams 4/17/2025

```
 1    the area?
 2         A.   Shit, after I ran.
 3         Q.   After you ran?
 4         A.   Yeah.
 5         Q.   You didn't run because of the law
 6    enforcement?
 7         A.   No.  I thought they were trying to rob me.
 8    They weren't in no police cars.  They didn't come --
 9    they lied.  They didn't come in no damn police cars.
10    I didn't know who they was.  If they come in police
11    cars I never -- probably would have never ran.
12         Q.   And where were you when these vehicles
13    drove up?
14         A.   I was just about to get into my car, my --
15    Cassandra car.
16         Q.   Was Cassandra there with you?
17         A.   No, sir.  I was by myself.
18         Q.   Was this in the parking lot of the
19    Outpost?
20         A.   Yes, sir.
21         Q.   So when you took off, did you take off
22    across 468 or 469?
23         A.   468.
24         Q.   I'm going to have marked as Exhibit 4 to
25    your deposition a -- well, I'll let you identify
```

Bobbie Adams 4/17/2025

```
 1    what it is.
 2                        (Exhibit No. 4 was marked for
 3                        identification.)
 4          Q.   (By Mr. Dare)  I'm going to hand you
 5    what's been marked as Exhibit 4 to your deposition.
 6    Do you recognize that as being the Outpost?
 7          A.   Yes, sir.
 8          Q.   And you see that there's 468 going there,
 9    Whitfield Road, there's also 469 on the other corner
10    of the Outpost.  You see that?
11          A.   Yes, sir.
12          Q.   I'm going to hand you a Sharpie.  And
13    since I only have this one, we only got one color,
14    I'm gonna have to ask you to put -- we're gonna go
15    with different shapes on where to mark things.  I'm
16    going to hand you this black Sharpie, though.  I
17    want you to put where Cassandra's car was parked
18    when you were about to get in it.  And I want you to
19    mark that with an X.
20          A.   That's Winfield Road.  18 --
21          Q.   You'll have to mark that with a bigger X.
22    There you go.  All right.  So you've marked with an
23    X an area pretty much on the side of the pumps, but
24    right in front of the Outpost; is that right?
25          A.   Yes, sir.
```

Bobbie Adams 4/17/2025

```
 1              Q.    Where did the law enforcement vehicle or
 2    vehicles come from that you saw?
 3              A.    Whitfield Road, 468.
 4              Q.    How many vehicles were there?
 5              A.    Man, it's about three or four shot through
 6    the parking lot.  Trucks and -- them big trucks.
 7              Q.    Three or four?
 8              A.    Three or four vehicles was approaching it
 9    in the gas parking lot, you know.
10              Q.    So if I represent to you that according to
11    dispatch records and according to all records at the
12    sheriff's department, there were only two officers
13    that were working this incident.
14              A.    Did you say two?
15              Q.    Two.
16              A.    Oh, that's a lie.
17              Q.    Well, with the K9.  So if you count the
18    K9, that would be three.  Not when you were brought
19    back to the Outpost, but initially.
20              A.    No.  There was more officers than that.
21              Q.    How many officers were there?
22              A.    There was -- I'm talking about more
23    vehicles than that.  It was more trucks that pulled
24    in.  When I jumped in my vehicles there was more
25    trucks.  More than that pulled in.
```

Bobbie Adams 4/17/2025

```
1           Q.    How many?
2           A.    About four or five vehicles.
3           Q.    So are you saying that every last one of
4     those vehicles was unmarked?
5           A.    Every last one of them was unmarked.  No
6     white Rankin County trucks or vehicles -- no white
7     police vehicles nowhere.
8           Q.    Okay.
9                 So there were four or five vehicles that
10    pulled in.  And if they were unmarked, you don't
11    know necessarily if those were police or not?
12          A.    Uh-uh (negative response)
13          Q.    No?
14          A.    I don't know.
15          Q.    So if the Rankin County records show that
16    there were only two law enforcement, that may have
17    been correct because you don't know how many
18    vehicles were law enforcement that pulled in, right?
19          A.    Right.
20          Q.    I want you to draw from, with a line
21    starting with that X where Cassandra's car was,
22    where you ran to.  And then I want you to mark with
23    an X where you stopped.
24          A.    Right up in there.
25          Q.    My Sharpie going out of juice Let me see
```

Bobbie Adams 4/17/2025

```
 1    if I can see that.  We'll hand you a better Sharpie.
 2              At the top where you say you stopped, can
 3    you mark that with another X?
 4         A.   You say where I stopped at?
 5         Q.   Yes, sir.  All right.  Let me get that
 6    back.  Close it up.  And so --
 7              MR. DARE:  Off the record.
 8                    (An off-the-record discussion
 9                     took place.)
10         Q.   (By Mr. Dare)  Now, when you were running
11    across the street and into this wooded area on the
12    opposite side of Whitfield Road, did you have shoes
13    on?
14         A.   Yeah.
15         Q.   What kind of shoes did you have on?
16         A.   I had some Nikes, I think.
17         Q.   So full tennis shoes?
18         A.   Yeah.  Some house -- some slippers, I
19    think.  Yeah.  I think some slippers.
20         Q.   So slippers or slides essentially, yes?
21         A.   Yeah.
22         Q.   And what generally were you wearing?
23         A.   Some shorts, gym shorts.
24         Q.   T-shirt?
25         A.   Yes, sir.
```

Bobbie Adams 4/17/2025

```
 1          Q.   What color T-shirt?
 2          A.   I'm not for sure.
 3          Q.   Did the slippers fall off as you were
 4     running across Whitfield Road?
 5          A.   I kicked them off.
 6          Q.   When did you kick them off?
 7          A.   Before I got out the car.
 8          Q.   And so going back to my initial question:
 9     When you were running across Whitfield Road, did you
10     have shoes on?
11          A.   No.
12          Q.   You were completely barefoot?
13          A.   Yeah.
14          Q.   Had you ever been around that area and
15     into that little wooded area before?
16          A.   Uh-uh (negative response).
17          Q.   No?
18          A.   No.
19          Q.   Remember about the uh-huhs and uh-uhs.
20          A.   Yes, sir.  Yes, sir.  I'm sorry about
21     that.
22          Q.   That's why I asked you "yes" and "no."
23          A.   Yes, sir.
24          Q.   Did you know that there was a ditch there?
25          A.   Yeah.  Yes, sir.
```

Bobbie Adams 4/17/2025

1          Q.    When you were running across the road --
2    well, I'll tell you what, strike that --
3                What time of night was all this going on?
4          A.    I'm not for sure.  I think it's probably
5    about 8.  8, 9 o'clock, I think.  I'm not for sure.
6          Q.    It was completely dark, though; correct?
7          A.    Yes, sir.
8          Q.    And before you started running from
9    Cassandra's vehicle, had you opened up the door of
10   her vehicle?  Before you saw these cars coming in
11   did you open up Cassandra's -- the vehicle of
12   Cassandra's car?
13         A.    I was in the car fixin to go.
14         Q.    Oh, you were actually in the car?
15         A.    I was in the car fixin to go.  And when I
16   was -- yeah.  I was fixin to go.  They just swarmed
17   and jumped in front of -- their vehicles in front of
18   the car.  That's when I ran.  They tried to block me
19   in.
20         Q.    Was the vehicle backed in to the Outpost
21   or were you forward facing the Outpost?
22         A.    I think I was backed in the Outpost.  I
23   think I was backed in.  Yeah.  I was backed in the
24   Outpost, I think.  Yeah.  I think I had backed in
25   the Outpost then.  Yeah.  I did back in.  Yeah.  And

Bobbie Adams 4/17/2025

```
1    I was trying to get out while I'm trying to, you
2    know.
3         Q.   And you kicked the Nike slippers off while
4    you were inside of Cassandra's vehicle, right?
5         A.   Yes, sir.
6         Q.   Did you have to reach down to kick them
7    off or did you kick them off with your feet?
8         A.   No.  I just took them off.
9         Q.   When you say you "took them off," you
10   reached your hand down, took them off --
11        A.   Yeah.
12        Q.   -- left them on the floorboard of the
13   vehicle, right?
14        A.   Yeah.
15        Q.   And when you reached down to take the
16   slippers off, had you already been swarmed by the
17   vehicles?
18        A.   Uh-uh (negative response).
19        Q.   No?
20        A.   No.
21        Q.   So you would reach down to kick those off
22   because you were going to drive without them?
23        A.   I don't know.  I just -- no.  When I seen
24   them they blocked my vehicle in.
25        Q.   That's what I was asking.  Correct.
```

Bobbie Adams 4/17/2025

```
1          A.    When they blocked my vehicle in, I was
2     gonna get out and run.  Yeah.
3          Q.    So you were backed into your spot at the
4     Outpost?
5          A.    Yeah.
6          Q.    You had gotten fully in the vehicle;
7     correct?
8          A.    Fixin to pull off.
9          Q.    And you had shut the door; correct?  Yes?
10         A.    Yeah.
11         Q.    You still had your slippers on at that
12    point; correct?  Yes?
13         A.    Yeah.
14         Q.    And then you see vehicles pulling in in
15    front of you, right?
16         A.    Yeah.
17         Q.    It was at that point in time, you reached
18    down, you took off the slippers; correct?
19         A.    Yeah.
20         Q.    And then you got out of the vehicle and
21    took off.  And you followed the line that's
22    reflected in Exhibit 4; is that right?
23         A.    Right.  Ran across the street.
24         Q.    You ran across the street?
25         A.    Yeah.
```

Bobbie Adams 4/17/2025

```
 1          Q.    Why'd you run?

 2          A.    Shit, I'm scared.  I ain't know what they

 3    were trying to do.  You know, shit, I'm trying to

 4    track drugs involved.  I don't know what in that

 5    shit.  I don't know what's fixin to happen.  I'm not

 6    from around here.  I'm from Louisiana.  Yeah.

 7          Q.    Do you remember making a statement at the

 8    hospital after all this was said and done, that you

 9    ran because you had kids at home and you were trying

10    to make sure that you made it back there?

11          A.    Hell, no.  I ain't say no stuff like that.

12    No, I didn't say no stuff like that.

13          Q.    Have you been able to see the video that

14    was recorded of you in the hospital afterwards?

15          A.    I -- you say, have I was -- have I seen

16    the video?

17          Q.    Yes, sir.

18          A.    I would love to see the video.  I tried to

19    get him to record and take pictures of my injuries

20    and everything.  I tried to.  Yeah.

21          Q.    Are you saying that they refused to take

22    pictures of your injuries?

23          A.    Yeah.  Yeah.  They refused to.

24          Q.    I produced a copy of the video that was

25    taken in the hospital to your council, and I presume
```

Bobbie Adams 4/17/2025

```
1    you'll be able to see it at some point.
2            A.   I would love to see it.
3            Q.   I'm not able to bring recording devices or
4    anything else in here.  So we will certainly show
5    that to you.
6            A.   Okay.
7            Q.   I'm going to represent to you that you
8    said something along the lines of that you ran
9    because you got a kid at home -- you got kids at
10   home and, you know --
11           A.   My son in Louisiana.  My kid -- my child
12   in Louisiana.  And her kids stay there, but I don't
13   know if they was there or not.  No.
14           Q.   So that had no reason -- that had no
15   bearing on why you were running?
16           A.   No.  I ain't -- no, indeed.
17           MR. MOAK:  Let's go off the record just a
18       second.
19           MR. DARE:  Sure.
20                   (An off-the-record discussion
21                    took place.)
22           Q.   (By Mr. Dare)  So we went off the record,
23   you were saying that your kids had nothing to do
24   with you running?
25           A.   No.  Hell no.
```

Bobbie Adams 4/17/2025

```
 1          Q.   And making sure my question was clear, and
 2   I'm not re-asking this because I want to trick you,
 3   I want to make sure that the record's clear.
 4          A.   Yes, sir.
 5          Q.   And it's probably because I asked a bad
 6   question.  I'm going to make sure this one is direct
 7   and make sure your answer is clear.
 8               Did your kids have anything to do with you
 9   running?
10          A.   No, sir.
11          Q.   According to this line, the X on the
12   opposite side of the road appears as though you
13   stopped right about the ditch on the other side
14   where there's a tree line; is that right?
15          A.   Yes, sir.
16          Q.   Why'd you stop there?
17          A.   Why did I stop at the ditch?
18          Q.   Yeah.
19          A.   Just stopped there.
20          Q.   Did you fall in the ditch?
21          A.   No.  Uh-uh (negative response).  No.  I
22   stopped there shit off -- watch them pass me by.  I
23   didn't need to go farther when they were going the
24   opposite way.
25          Q.   My question was:  Did you stop in the
```

Bobbie Adams 4/17/2025

```
 1   ditch?
 2        A.   Yeah, I stopped.  Yes, sir.  I stopped in
 3   the ditch.  I'm hiding.  That's where I was hiding,
 4   in the ditch.
 5        Q.   Did you stop in the ditch because you
 6   broke your foot?
 7        A.   No.
 8        Q.   You didn't slip in at any point in time
 9   and hurt your foot --
10        A.   No.
11        Q.   -- while going into the ditch?
12        A.   No.  No.
13        Q.   And so you were hiding in the ditch,
14   right?
15        A.   Yes, sir.
16        Q.   You heard the dog get out, right?
17        A.   No.  I never heard --
18        Q.   Never heard the dog?
19        A.   I never heard a dog.
20        Q.   You never heard the dog barking?
21        A.   I never heard the dog.  Wasn't no dog even
22   nowhere around.  I never seen a dog nowhere.
23   Nowhere.  I never seen a dog until they got me, put
24   the dog on me.  I never seen the dog.
25        Q.   First time you saw the dog was when they
```

Bobbie Adams 4/17/2025

```
 1    got you?
 2         A.   Yeah.
 3         Q.   And that was when you were hiding in the
 4    ditch, right?
 5         A.   Yeah.  When I called and turned myself in,
 6    that's when they put the dog on me.  That's when the
 7    dog come up.  Yeah.
 8         Q.   You know that the dog was tracking you,
 9    right?
10         A.   No.  That dog wasn't tracking me.
11         Q.   Dog doesn't track?
12         A.   No.  They never had the dog out.  That
13    dog -- they never had that dog out.  That dog didn't
14    track me.  That's a lie.  That dog didn't track me.
15    I know that's a lie.
16         Q.   So you do realize that that dog was
17    specifically trained to track people, right?
18         A.   I know he specifically trained to track
19    me, but that dog --
20         Q.   But he didn't track you?
21         A.   No.  He didn't track me.  I turned myself
22    in.  I watched them pass by me.  They wouldn't have
23    never got me if I wouldn't have turned myself in.
24    If I would never opened my mouth, I wouldn't -- this
25    shit would have never happened to me.  I should have
```

Bobbie Adams 4/17/2025

```
 1    kept my mouth closed, let them motherfuckers go on
 2    about their business.
 3         Q.   You think if you had just stayed in that
 4    ditch and been quiet --
 5         A.   I'm watching them pass me by.  They would
 6    have never got me.
 7         Q.   When you say you were watching them pass
 8    you by, is that because they were running down the
 9    road?
10         A.   Yes.
11         Q.   And you didn't see the dog running down
12    the road?
13         A.   The dog?  No.  I didn't see no dog.
14         Q.   Okay.
15         A.   I didn't see no dog.
16         Q.   So there are -- there's audio recording
17    from dispatch, and I'm gonna represent to you times
18    of when that audio recording reflects that things
19    happened.  At the end I'm going to ask you if that's
20    accurate and comports with your recollection of
21    events.  I'm going to also represent you that the
22    dog's handler was Corporal Tony Shack.
23         A.   Shack Tony.  Yeah.
24         Q.   Do you remember Shack?
25         A.   Yeah.
```

Bobbie Adams 4/17/2025

```
1          Q.   And Shack was the one that was holding the
2     dog, right?
3          A.   I just --
4          Q.   Had the leash.
5          A.   I just know his name.  I don't really know
6     him.  I just know his name.  Shack Tony.
7          Q.   Tony Shack.
8          A.   Yeah.  Shack.  Yes, sir.  I just know
9     that.
10         Q.   So at 22:35:34, military time -- you
11    understand military time?
12         A.   Yeah.
13         Q.   What time is that?
14         A.   22, I think -- shit, at 11 -- I think
15    about 10 something.  9, 10 something.
16         Q.   All right.  So let's make sure to count so
17    we've got the right time.
18         A.   Yeah.  I had to write it down.
19         Q.   So 13, 14, 15, 16, 17, 18, 19, 20, 21, 22.
20         A.   So 10.
21         Q.   10.
22         A.   Right.
23         Q.   So at 10:35 and 34 seconds, all right,
24    Tony Shack keys up on the radio and says,
25    "Christian, come to me."  And that's when VooDoo,
```

Bobbie Adams 4/17/2025

```
 1    the dog, had you.
 2            Okay?
 3        A.   Say that again.
 4        Q.   Says on the radio that VooDoo, the dog,
 5    had found you.
 6        A.   Yeah.
 7        Q.   And it says, "Christian, come to me."  All
 8    right?
 9        A.   Yeah.
10        Q.   Christian Dedmon.  Had you ever met him
11    before?
12        A.   Yeah.
13        Q.   Before this date?
14        A.   No.
15        Q.   So that was the first time that you had
16    ever met Christian Dedmon?
17        A.   Yeah.
18        Q.   And that was the first time that you ever
19    met Tony Shack, right?
20        A.   Yeah.
21        Q.   It says, "Christian, come to me".  At
22    22:35:45, eleven seconds later, they said you were
23    in custody, right?  Then at 22:39:08 R66, John
24    Lewis, arrives in his patrol car, which is marked,
25    which is the white patrol car that's got the sheriff
```

Bobbie Adams 4/17/2025

```
 1    symbol on it, drives up on Whitfield Road, and you
 2    are in the back of the vehicle by that time.
 3              You remember getting in the back of that
 4    white patrol car, right?
 5         A.   No.  I never got in the back of no patrol
 6    car.  That's a lie.  I got straight in the back of
 7    an ambulance.  I never got in no patrol car.
 8         Q.   You don't remember getting carried back
 9    over to the Outpost?
10         A.   No.  I walked over to the Outpost.  The
11    officer walked me from out that ditch on my
12    broken -- where the dog got me, walked me out up
13    that damn steep ass ditch, over to the hospital --
14    to the ambulance.  I never got in no police car.
15         Q.   All right.
16              Where you walked over to the Outpost about
17    the time that the marked vehicle came and parked on
18    Whitfield Road, was that about the same time?
19         A.   You said that the marked cars come up?
20         Q.   You remember the marked car that drove up
21    and had the blue lights going and parked on
22    Whitfield Road?
23         A.   Man, I know when I come out that ditch,
24    when I seen -- when they -- when I come out the
25    ditch, that's when I seen the ambulance.  That's
```

Bobbie Adams 4/17/2025

```
1    when it could get -- finally got that damn dog off
2    me, when the ambulance arrived.
3         Q.   And the question was:  Was the marked
4    vehicle already on Whitfield Road or was it pulling
5    up on Whitfield Road when they --
6         A.   It was pulling up --
7         Q.   Hang on.  When they were getting you up
8    out of the ditch?
9         A.   Yeah.  It was pulling up when they was
10   getting out.  That's when I saw it, the police car.
11   When I was getting out the ditch.
12        Q.   So it was just pulling up?
13        A.   Yeah, just pulling up.
14        Q.   And that's when they were pulling you out
15   of the ditch, right?
16        A.   Yeah.
17        Q.   Yes?
18        A.   That's when I was coming up out that
19   ditch, walking over to the house -- to the
20   ambulance.
21        Q.   Gotcha.
22             How many vehicles did you -- how many
23   marked vehicles did you see pulling up on Whitfield
24   Road?  Not in -- not at the Outpost, but on
25   Whitfield Road.  Was it just that one?
```

Bobbie Adams 4/17/2025

1        A.    No.  It's a lot of them then.  I'm talking
2    about at the end, a lot of them started coming up on
3    Whitfield Road.
4        Q.    When you were being pulled up out of the
5    ditch, was it just that one that was pulling up?
6        A.    A couple of them that I seen.  Yeah.  A
7    couple of them that I seen then when they -- coming
8    up out the ditch, I seen a couple of them then.
9        Q.    And were the other ones pulling into the
10   Outpost?
11       A.    I'm not sure.  I'm walking to the
12   ambulance.  I'm not for sure.  I'm headed to an
13   ambulance.
14       Q.    You just remember that when you were being
15   pulled out to the ditch, that first marked cruiser
16   was pulling up on Whitfield Road; correct?
17       A.    When I'm coming out the ditch, I'm
18   seeing -- when I'm coming -- when I'm coming up out
19   the ditch they got Rankin County lights --
20       Q.    Right.
21       A.    -- truck right there.  Right there.
22       Q.    And was it in the process of stopping?
23   Was that officer out --
24       A.    It's already stopped.
25       Q.    Was that officer out of the vehicle

Bobbie Adams 4/17/2025

```
 1    already?
 2          A.   Yeah.  Already out.
 3          Q.   Was he standing by his vehicle?
 4          A.   Yeah.  He's already outside his vehicle.
 5    Three of them was already out there.
 6          Q.   On the road?
 7          A.   Yes.  All around the road.
 8          Q.   How steep was this ditch?
 9          A.   It's a big, deep ass ditch.  Deep, deep,
10    deep, deep, deep ditch.
11          Q.   And you didn't know it was there when you
12    were running towards it, did you?
13          A.   Yeah, I knew it was there.  Cause I
14    passed -- I go that road -- I come through there
15    every day.  Yeah, I knew the ditch was there.
16          Q.   So you knew a ditch was there?
17          A.   I knew a ditch was there.  You can see it,
18    the trail.  I knew a ditch was there.
19          Q.   Was there any water in that ditch?
20          A.   A little bit.  I didn't know it was that
21    damp.  Yeah.  Yeah.
22          Q.   So it was -- had it rained earlier that
23    day?
24          A.   No.  I don't think it had rained.  It was
25    dry down there.  I don't think -- no, it didn't
```

Bobbie Adams 4/17/2025

```
 1    rain.
 2         Q.   So let me go back to my other question.
 3    Was there water in the ditch?
 4         A.   No.  Where I was up on the side, you know,
 5    like --
 6         Q.   So the sides were slippery?
 7         A.   No.  It's like -- no.  What I'm saying is,
 8    like, right up in here across the street, the ditch
 9    -- it's a ditch straight across.
10         Q.   Correct.
11         A.   And, like, right here on this side here,
12    have another ditch that run that way 12 miles.
13    There's a ditch right here, run across, and it's a
14    ditch right here.  Like the ditch that run 12 miles,
15    they got water in that ditch.  But, like, the ditch
16    right here where I'm in, ain't no water in that
17    ditch.
18              But the ditch right here you can see
19    water.  Like when you riding, coming on the road and
20    you look that way, you can see we got -- the water
21    in there.  But ain't no water in the ditch right
22    here where I was at.
23         Q.   How much of a drop off, let's say in feet,
24    was the ditch?  You said it was a deep ditch.
25         A.   You know when you just go down, it ain't
```

Bobbie Adams 4/17/2025

```
 1   like --
 2         Q.   If you stood up in that ditch, are you
 3   seeing over top of it?
 4         A.   No.  You ain't going to see over top of
 5   it.
 6         Q.   So it's taller than you?
 7         A.   It's taller than me.
 8         Q.   How tall are you?
 9         A.   6'1".
10         Q.   So would you estimate it's probably
11   anywhere from a 7ft to a 10ft ditch?
12         A.   Yeah.  I would say that.  You can say
13   that, like -- it's like -- it depends on where you
14   going down.  Like if you're going into this -- I
15   don't know.  You can say that.
16         Q.   Well, were the sides of the ditch sloped?
17         A.   Like where the people houses at -- like,
18   if you're coming up where the people houses are, the
19   side -- like if you're going to the ditch that way
20   it don't seem like it's deeper, but when you come
21   across the road and you're trying to go across it,
22   like, it's deep down that way.
23         Q.   And coming from the road, does it go
24   straight down or is it sloped down into the bottom?
25         A.   Sloped, like slanted like.
```

Bobbie Adams 4/17/2025

```
 1          Q.   Are there sticks and branches in there?
 2          A.   No.
 3          Q.   It's pretty clean?
 4          A.   It's clean when you're going down and
 5     whatever.
 6          Q.   So you say that you saw officers running
 7     down the road past you; correct?
 8          A.   Yes, sir.
 9          Q.   And then --
10          A.   They were heading toward my house.  They
11     thought I was going home.  And what I did, I just
12     did a little circle like a rabbit did.  And I
13     stopped.
14          Q.   Did they know who you were?
15          A.   No.  They didn't know who I was.
16          Q.   How did they know where you lived?
17          A.   They ran my tags to the thing, to the car.
18     104 Chinkapin Cove.  They gonna automatic come.  I'm
19     right around the corner from my house -- store right
20     around the corner from my house.
21          Q.   So you think that they -- do you know that
22     they keyed up and asked where you lived?
23          A.   No.  I'm just automatic gonna know -- I'm
24     knowing that once they run my -- this girl thing --
25     tags, it's gonna show I'm right around the corner.
```

Bobbie Adams 4/17/2025

```
1          Q.   Do you know that they ran your tags?
2          A.   I know.  They gonna do -- that's in that
3     law, you know when they pull you over, they gonna
4     run your tags.  That's common sense.  I know they
5     ran my tags.
6          Q.   All right.
7               So you're a hundred percent certain that
8     they ran your tags?
9          A.   Yeah.
10         Q.   And if it doesn't show up on dispatch that
11    they ran your tags --
12         A.   It showed up on dispatch.  It's on the
13    dispatch.  They ran my tags.  I got the paper.
14         Q.   Before?
15         A.   Huh?
16         Q.   Before you were taken into custody?
17         A.   You said before I was taken into custody?
18         Q.   Right.  Like right when you took off
19    running, they ran your tags?
20         A.   Oh no.  I'm talking about -- hold on.  You
21    said before I took off running?
22         Q.   Yeah.
23         A.   Before I took off running --
24         Q.   Or as you took off running and before you
25    were brought back to the --
```

Bobbie Adams 4/17/2025

```
 1          A.   I'm talking after I ran is when they run
 2     my tags.
 3          Q.   Let's make sure this is clear.  When do
 4     you think they ran your tags?
 5          A.   After I ran.
 6          Q.   Did you know that one of the officers was
 7     bit by VooDoo before you got bit by VooDoo?
 8          A.   Say that again.
 9          Q.   Did you know that one of the officers was
10     bit by the dog?
11          A.   Yeah.
12          Q.   Where was he bit?
13          A.   On the hand.
14          Q.   On the hand?
15          A.   Yeah.
16          Q.   Which hand?  Right hand or left hand?
17          A.   I'm not for sure.  I know that
18     motherfucker -- I mean, excuse my French.  I know he
19     was bit, cause he sent the dog on me and he hitting
20     the damn dog with a goddamn -- I mean, excuse my
21     thing, with the flashlight instead of beating the
22     dog.  Got what he deserved to see how I felt.  And
23     the dog locked on his ass.  Yeah.
24          Q.   All right.  Take that back.
25               When -- excuse me.  Who was hitting the
```

Bobbie Adams 4/17/2025

1    dog with the flashlight?

2        A.    The officer.

3        Q.    Which one, Shack or Dedmon?

4        A.    I think it was Dedmon.  The one hitting

5    him with the officer.  Dedmon.  I think it was

6    Dedmon that hitting him -- hitting him.

7        Q.    And you say that Dedmon was bit on the

8    hand because he was hitting him on the head -- he

9    was hitting the dog on the head with a flashlight?

10       A.    He tried to get the dog off me and

11   couldn't get him off me.  And that dog turned around

12   and got on him.  And they started hitting him with

13   the thing.

14       Q.    Let's go to when the dog gets on you.  You

15   say -- what did you say to alert the officers that,

16   hey, here I am?

17       A.    I seen him -- hey, Mr. Officer.  I

18   automatically threw my hands up.  Mr. Officer, here

19   I am.

20       Q.    And this was while you were in the ditch,

21   right?

22       A.    Yeah.

23       Q.    Was the dog the first one that came back

24   and got you?

25       A.    No.  You said was the dog the first one

Bobbie Adams 4/17/2025

```
 1    that got me?
 2         Q.    Yeah.
 3         A.    No.  The officers came and got me.
 4         Q.    So the officers came and got you --
 5         A.    The officers came and got me.  When they
 6    got me in the cuffs, the motherfucker, excuse my
 7    thing, come down that damn ditch with the dog and
 8    let that damn dog on me.  And that dog ate me up.
 9         Q.    So the dog -- it's your testimony that the
10    dog didn't first bite you until after you were
11    handcuffed?
12         A.    Yeah.
13         Q.    All right.
14               Who handcuffed you?
15         A.    One of the officers.
16         Q.    Which one?
17         A.    I'm not for sure.  I don't know which one
18    of them handcuffed.  One of them -- they handcuffed.
19    I don't know.  I don't know.
20         Q.    Did they -- did that officer walk up to
21    you from the side of the ditch, or did he jump down
22    in the ditch from the road?
23         A.    Man, like I told you, when you come down
24    the ditch, you had to come down the little thing.
25         Q.    Sure.
```

Bobbie Adams 4/17/2025

```
 1          A.    When he come down there, he come down
 2     there with the dog.
 3          Q.    And so the officer with the dog came down
 4     there?
 5          A.    Yeah.
 6          Q.    And so the first officer that came down in
 7     the ditch --
 8          A.    Put the cuffs on me.  When he put the
 9     cuffs on, that's when the dog --
10          Q.    Hang on.  Let me make sure I get my
11     question out.
12                The first officer that came down in that
13     ditch was the officer with the dog?
14          A.    No.
15          Q.    All right.  So --
16          A.    No.  No.
17          Q.    Let me go to the very first officer that
18     came down into that ditch.
19          A.    Yeah.
20          Q.    Where did he come from?
21          A.    Shit, off the road.  Off 468.
22          Q.    Off the road?
23          A.    Yeah.
24          Q.    What did he look like?
25          A.    Shit, I -- it was a white guy.
```

Bobbie Adams 4/17/2025

```
 1          Q.   Tall?  Short?
 2          A.   Man, I don't even remember.  Don't make me
 3     lie.  I don't remember.
 4          Q.   And did he come down in the ditch right
 5     where you were?
 6          A.   Yes.  Yes.
 7          Q.   And that was the deputy that put you in
 8     handcuffs?
 9          A.   That put me cuffs.  Yes.  And then another
10     guy officer come down with the dog.
11          Q.   And so the officer with the dog was the
12     second one?
13          A.   Was the second officer.
14          Q.   Now, when the dog bit you, were you
15     standing up or sitting down?
16          A.   Still sitting.  Still sitting.  Never got
17     up till I was going to the hospital.
18          Q.   Was the dog on a leash?
19          A.   Yes.  He dropped the leash.
20          Q.   He dropped the leash?
21          A.   Dropped the leash.
22          Q.   Was that when he was getting down into the
23     ditch?
24          A.   Yes.  On his way coming down to the ditch
25     with the dog.
```

Bobbie Adams 4/17/2025

```
1          Q.   And so he drops the leash, the dog comes
2     running up to you, and grabs onto your leg?
3          A.   Grabbed -- yes, sir.
4          Q.   Which leg?
5          A.   My left.  Grabbed my foot.
6          Q.   Your foot?
7          A.   Yes, sir.
8          Q.   So the very first thing that the dog grabs
9     is your foot?
10         A.   My foot.  I got -- yeah.  Grabbed my foot.
11         Q.   And is that when you feel -- did you feel
12    bones breaking in your foot?
13         A.   Yeah, man.  I was so -- man, yes.  Oh,
14    man.  I can't describe the pain, man.  Goddamn.
15         Q.   So now -- and you're saying that the two
16    scars, the parallel scars on your left foot, are
17    from a dog bite and not from surgery; is that right?
18         A.   You said scars?  Scars from
19    (indiscernible), but I got scars from the dog bite
20    and from the surgery.
21         Q.   All right.
22              So which -- and I wasn't able to ask you
23    questions before when we were sitting back there
24    taking pictures.  But where are the scars on your
25    foot from the dog bite?
```

Bobbie Adams 4/17/2025

```
 1          A.   You said where are they?

 2          Q.   Yeah.  Where are they?  I see -- now, I

 3     saw the two parallel scars from the surgery, right?

 4          A.   Yeah.

 5          Q.   Where's the scars from the dog bite?

 6          A.   They on my foot.

 7          Q.   Where?

 8          A.   You have to look.

 9          Q.   You can feel free to take your shoe off

10     and look if you need to.

11          A.   You don't see the bite marks?

12          Q.   So you're saying on the inside arch of

13     your foot there's a bite mark?

14          A.   Man, the dog bit my foot just like this

15     right here.  Big part of my goddamn foot.

16          Q.   Now, is there -- are there any bite marks

17     on the outside of your foot?

18          A.   On the outside?

19          Q.   Yes, sir.

20          A.   I don't -- man, I don't know.  This has

21     been three years ago.  You know scar -- three years

22     ago.

23          Q.   Right.  My question to you is, are there

24     any scars on the outside of your foot?

25          A.   Yeah.  You don't see them scars right --
```

Bobbie Adams 4/17/2025

```
 1         Q.   No.  That's on the inside.  Outside.
 2         A.   On the outside?
 3         Q.   Yes, sir.
 4         A.   Right here?  Yeah.  You see them?  You
 5    don't see that?
 6         Q.   And you're saying that that scar that has
 7    the straight line and also has the staple marks,
 8    that's from the dog and not from the surgery?
 9         A.   No.  Well, this is what I'm gonna say.
10    I'm saying this right here.  If you -- I'm quite
11    sure if you go to -- I don't know.
12         Q.   So the scar that you were just pointing
13    to, the straight line with the dots on the outside
14    --
15         A.   That's the staple.  You can tell that's
16    from the surgery.
17         Q.   Right.
18         A.   Yeah.
19         Q.   That's from the surgery.
20         A.   Yeah.
21         Q.   I'm wanting to know not what's from the
22    surgery, I'm wanting to know what's from the dog.
23         A.   Shit, I -- you can tell.  Look.  How can
24    I -- look.
25         Q.   I'm looking.  Now, I see the stuff on your
```

Bobbie Adams 4/17/2025

1    leg, and that looks like -- the one up on your calf
2    a little bit, is that a skin graft?
3         A.   Oh, this one right here ain't got nothing
4    to do with the dog bite.
5         Q.   The one on the inside of your leg, what,
6    approximately a little less than a foot up from the
7    inside of your ankle.  Court reporter has to take
8    down about where it is.  That dark spot, though, it
9    has nothing to do with the dog, right?
10        A.   Yeah.  Wait, I'm talking about --
11        Q.   Wait, wait.  Yes or no.  Did that -- the
12   one on your calf right there.
13        A.   Right here?
14        Q.   Yes, sir.
15        A.   Oh, no.  No, sir.  This is not from the
16   dog.
17        Q.   What is that from?
18        A.   That's a burn mark.  That's a burn mark.
19        Q.   Did that happen before or after this
20   incident?
21        A.   That's way before.
22        Q.   Way before.  Okay.
23        A.   Yes, sir.  Way, way, way -- that was in my
24   younger days.
25        Q.   Gotcha.

Bobbie Adams 4/17/2025

```
 1          A.   Yes, sir.
 2          Q.   And so there's another scar coming up on
 3     your shin.  You see that where your finger is?
 4          A.   Right here?
 5          Q.   Yep.  Is that from the dog or no?
 6          A.   No, sir.  It ain't from the dog.
 7          Q.   All right.
 8               So lower left leg, show me anything where
 9     the dog bit.
10          A.   You said for my left leg?
11          Q.   Yes, sir.  Lower left.
12          A.   Just my foot right here.  And then --
13          Q.   And you're telling me that there are bite
14     marks somewhere on your left foot?
15          A.   Yeah.  I'm quite sure if you --
16          Q.   I've asked that a couple times.  As long
17     as you're saying you're -- and it was your left foot
18     that was initially bit by the dog?
19          A.   Yes, sir.
20          Q.   Now, the officer was getting down in the
21     ditch, you say dropped the leash.  Did anybody --
22     did you hear anybody tell the dog to come sic you or
23     come bite you or come get you or anything like that?
24     Or did the dog just come get you?
25          A.   Man, when he dropped -- he -- when he
```

Bobbie Adams 4/17/2025

1    ran -- walking the dog to me and dropped the leash,
2    the dog automatically do what it know.
3        Q.    My question was, did you hear him say
4    "sic," "bite," anything to indicate go hit --
5        A.    No.  No.  I ain't hear him say nothing.
6    No.
7        Q.    And after the dog started biting your leg,
8    how long was it after that initial bite that
9    Christian Dedmon started hitting the dog with a
10   flashlight to get him off of you?
11       A.    Man, they stood over there and watched
12   this dog wa -- tear my ass up before they even did
13   anything.  I'm talking stood over there and just --
14   I'm talking about stood there and watched that dog
15   just ripping plugs out me.  I'm talking about --
16   man, how can you just sit there and let a damn
17   animal do somebody like this?
18       Q.    My question was, how long was it after the
19   dog initially bit your left foot that Christian
20   Dedmon started hitting it with a flashlight to get
21   the dog off of you?
22       A.    Shit, that was after they find -- shit, at
23   the end.  When they tried to get the dog off, that
24   was at the end.
25       Q.    I'll represent to you that from the time

Bobbie Adams 4/17/2025

```
 1     that Tony Shack says that VooDoo found you, keyed up
 2     on the radio and calls to dispatch and says VooDoo
 3     found you, to the time that you were getting up out
 4     of that ditch, it was -- or that you were in
 5     custody, it was a total of 11 seconds.  Does that
 6     sound about right?
 7          A.    Eleven seconds and I was what?
 8          Q.    From the time that Tony Shack says VooDoo
 9     -- that "Christian come to me," that VooDoo had
10     found you, to the time that they said you were in
11     custody and they're going to say you were coming out
12     of the ditch was 11 seconds.  According to dispatch
13     audio.
14                And my question to you was, does that time
15     sound about accurate?
16          A.    I don't think that's accurate.
17          Q.    You think it's more than 11 seconds?
18          A.    Yeah.
19          Q.    A couple more seconds?  Do you think it
20     was more like 30 seconds?
21          A.    I think so.  I think it was a little bit
22     longer.  Yeah.
23          Q.    So does 30 seconds sound about right?
24          A.    I'd say about 30.  Yeah.
25          Q.    So in that 30 seconds, from the time that
```

Bobbie Adams 4/17/2025

```
1    VooDoo first bit your left foot to the time that
2    you're being pulled out of the ditch, how many
3    seconds did it take for Christian Dedmon to start
4    hitting VooDoo with the flashlight to get him off of
5    you?
6         A.   Can you say that again?  Say it one more
7    time.
8         Q.   From the time that VooDoo first bit you to
9    the time that you're getting out of the ditch, how
10   long did it take for Christian Dedmon to hit the dog
11   with a flashlight to get him off you?
12        A.   You say from the time the dog bit me --
13        Q.   First bit you.
14        A.   -- until the time --
15        Q.   That you were getting out of the ditch.
16        A.   Yeah.
17        Q.   And I want to make sure, we had that about
18   30 seconds, right?
19        A.   The time the dog bit me and the time I'm
20   getting out the ditch?
21        Q.   Yeah.  Is about 30 seconds?
22        A.   The time I'm getting bit and the time I'm
23   getting out the ditch was about 30 seconds.
24        Q.   Right.
25        A.   Okay.
```

Bobbie Adams 4/17/2025

1          Q.    And that's right; correct?

2          A.    Yeah.

3          Q.    Yes?

4          A.    Yes, sir.

5          Q.    And when Christian Dedmon hit the dog with

6    a flashlight to get him off of you, that was down in

7    the ditch too; correct?

8          A.    He hit the dog to get the dog -- he didn't

9    hit the dog to get him off of me.  When the dog --

10   he hit the dog to get him off of him.  Biting him.

11   Not me.

12         Q.    I misunderstood that.  I apologize.

13               Who got the dog off of you down in the

14   ditch?

15         A.    Shit, one of them officers did.

16         Q.    Well --

17         A.    The one that got bit.  The one that got

18   bit.  That's the one that got bit.

19         Q.    So Dedmon?

20         A.    Yeah.  That's -- yeah.

21         Q.    And is that when the dog bit him?

22         A.    Yep.  Trying to get -- trying to get it

23   off him.  When he finally decided to get the dog off

24   me, that's when the dog got on his ass.

25         Q.    So Dedmon was getting the dog -- Dedmon

Bobbie Adams 4/17/2025

```
 1    got the dog off of you --
 2          A.    Trying to get -- after they seen how the
 3    dog messed me up, and that's when he tried to get
 4    him off me.  And that's when the dog bit him.
 5          Q.    And that's when the dog bit him?
 6          A.    Yes, sir.
 7          Q.    And where did the dog bite him?
 8          A.    The dog just locked on him like this.
 9    Beating him with the flashlight, trying to get him
10    off him.
11          Q.    And you're saying -- you were grabbing
12    your left wrist.  Do you know if it was left or
13    right?
14          A.    I don't know.  I was sitting on -- like I
15    was sitting on -- and he -- I don't know for sure
16    which one, but I know he got bit.  I don't know
17    which one.
18          Q.    You don't know left or right, but you know
19    it was the hand area?
20          A.    No.  I'm just saying, cause I was -- yeah.
21    I don't know which hand he got bit, but I know he
22    got bit.
23          Q.    On the hand?
24          A.    Yes, sir.
25          Q.    And then you were walked back across
```

Bobbie Adams 4/17/2025

```
 1    Whitfield Road, right?
 2         A.   Yes, sir.
 3         Q.   And brought to --
 4         A.   The Outpost.
 5         Q.   -- the Outpost.  Did the dog bite you at
 6    any other times after you got out of the ditch?
 7         A.   I ain't see the dog no more after then.
 8         Q.   Do you think that it was Christian Dedmon
 9    that put you in handcuffs?  Was it the same guy that
10    got bit that put you in handcuffs?
11         A.   I don't think it's the same guy that got
12    bit, because he was lagging behind.  He was mad.  He
13    was mad.  He told me something, man.  After the dog
14    bit him, he did me so bad, talked to me so bad.  And
15    then made me walk up the damn thing.  Told me, said,
16    You don't hurry I'm gonna turn it off loose on you
17    again.  And made me shoot up that damn hill, man.
18         Q.   So based on your testimony thus far, there
19    were three guys out there?
20         A.   Man, it was a lot of police officers out
21    there.
22         Q.   How many were down in the ditch?
23         A.   Oh, it's about two to three of them in the
24    ditch.  Yeah.
25         Q.   Two to three?
```

Bobbie Adams 4/17/2025

```
 1          A.   Yeah.  But when I got up, there's a lot of
 2     them up there.
 3          Q.   Right.
 4          A.   Yes, sir.
 5          Q.   And that's what I want to make sure, how
 6     many were down in the ditch.  Was it the guy that
 7     initially had the dog on the leash that put you in
 8     handcuffs?
 9          A.   Yeah.  It's two, three of them in the
10     ditch.
11          Q.   Dedmon was in the ditch, right?  Because
12     he was the one that got the dog off of you, right?
13          A.   Yeah.  I think Tony was in there.
14          Q.   Shack was in the ditch?
15          A.   Yeah.
16          Q.   Because he was the one that had the dog?
17          A.   And another officer.
18          Q.   And the other officer?
19          A.   Yes, sir.
20          Q.   What did that third officer look like?
21          A.   I don't know.  Just a white guy.  I just
22     remember he was a white guy.
23          Q.   Older?  Younger?
24          A.   Younger.
25          Q.   Have a beard?
```

Bobbie Adams 4/17/2025

```
 1          A.   Slim.  Younger guy.  Young.  He was way
 2     younger.
 3          Q.   Like really slim?
 4          A.   He's slim.  He's a younger guy.  He was
 5     one of the youngest ones that I dealt -- that I saw.
 6          Q.   And, you know, was he muscular?
 7          A.   Slim guy.  Kind of slim guy.
 8          Q.   How tall?  Over six foot?
 9          A.   No.  He wasn't that tall.  He was kind of
10     short.  Yeah.  He wasn't that tall.  Young -- young
11     guy.  Young guy.  Probably 20 -- 20.  No more than
12     25, 26.
13          Q.   Wearing a hat?
14          A.   No, sir.
15          Q.   What kind of hair did he have?
16          A.   I'm not for sure.  He was young.
17          Q.   Short cut?
18          A.   I'm really not for sure.
19          Q.   In other words, did he have long hair or
20     is it a buzz cut?
21          A.   It's a short cut.
22          Q.   Okay.  So buzz cut.
23          A.   It's a short cut.
24          Q.   All the way around?
25          A.   I'm not for sure.  I'm not for sure.  He's
```

Bobbie Adams 4/17/2025

```
 1    a young white guy.
 2         Q.   Blonde hair?
 3         A.   I'm not for sure.
 4         Q.   Brown hair?
 5         A.   I ain't for sure.
 6         Q.   So you don't really know what he looked
 7    like?
 8         A.   No.  I just know he's a white guy.
 9         Q.   And was that the one that put you in
10    handcuffs?
11         A.   I'm not for sure which one it was.
12         Q.   Well, do you -- are you for sure that you
13    were in handcuffs when Shack was coming down the
14    hill and let VooDoo go?
15         A.   Yeah.  Yeah.  Yeah.
16         Q.   Let's get back to that.
17              You said when VooDoo bit you, you were
18    sitting, right?
19         A.   Yeah.
20         Q.   So either Christian Dedmon or this other
21    deputy that we don't know who it was, and you don't
22    -- kind of not certain on the way he looked.  One of
23    those two put you in handcuffs, right?
24         A.   Yes, sir.
25         Q.   And you would agree with me that they had
```

Bobbie Adams 4/17/2025

1    to stand you up to put you in handcuffs?

2        A.    No.  I was al -- I was in cuffs on the

3    ground.  They put me in cuffs while I was sitting

4    down.  I wasn't -- no.  I was sitting down.  They

5    had me in cuffs.

6        Q.    So they got you in handcuffs as you were

7    sitting on the ground?

8        A.    Yeah.  Yeah.  They cuffed me when I was

9    sitting down.  Yeah.  They -- I wasn't standing up

10   when they cuffed me.

11       Q.    Were you sitting with your legs in front

12   of you?

13       A.    Yes.  Just like I am now.  Sitting down

14   like this right here.

15       Q.    And they got behind you and cuffed you as

16   you were sitting there, right?

17       A.    Yeah.

18       Q.    Cuffed you behind your back?

19       A.    I'm like this, right?  Cuffed me in front.

20       Q.    Cuffed you in front?

21       A.    Yeah.

22       Q.    Gotcha.

23             And was it difficult to see the other

24   guys?  I mean, in other words, is that why you don't

25   really know what he looks like, because it was dark

Bobbie Adams 4/17/2025

1    and it's difficult to see down there?

2          A.    Say that again.

3          Q.    Is it difficult to remember what the other

4    guy looked like?

5          A.    What the other officer looked like?

6          Q.    Yeah.  Because it was dark down there,

7    right?

8          A.    Yeah.

9          Q.    Did you still have any drugs on your

10   person -- hang on -- when you were being arrested?

11         A.    Did I have any drugs on me when I was

12   being arrested?

13         Q.    On your person.

14         A.    No, sir.  I got rid of everything.

15         Q.    And you put all of that in Cassandra's

16   car?

17         A.    There were no drugs in the car.  I got rid

18   of them.

19         Q.    Oh, you threw them as you were running?

20         A.    Yeah.

21         Q.    Did you have a knife or a gun or any

22   weapon in Cassandra's car?

23         A.    No.

24         Q.    Did you own a gun at that time?

25         A.    No.

Bobbie Adams 4/17/2025

```
 1          Q.   Did Cassandra?
 2          A.   I don't know.
 3          Q.   Well, you had lived there for a couple of
 4     months at least.  You don't know if she had a gun?
 5          A.   She don't own a gun.
 6          Q.   And did you have any kind of knives at the
 7     house?
 8          A.   Knives?
 9          Q.   Yeah, knives.
10          A.   No.
11          Q.   Did you have any knives in Cassandra's
12     vehicle?
13          A.   I don't tote no knives, man.  No.  I don't
14     tote no knife.
15          Q.   Well --
16          A.   I tote -- I tote a gun if I had to before
17     I go to -- nah.  If I had to.  No.
18          Q.   You would agree with me that selling drugs
19     can be a dangerous business sometimes?
20          A.   Yeah.  I wouldn't have -- I don't need no
21     gun.  Yeah.  You don't need no gun to sell drugs.
22     Nah.  Or no weapon.
23          Q.   So if somebody tried to rob you, you just
24     say, Take it?
25          A.   I'm just saying things happen.  But I
```

Bobbie Adams 4/17/2025

```
 1   ain't -- no.  I ain't going to lose my life or hurt
 2   nobody.
 3        Q.    Well, have you ever been robbed before?
 4        A.    Yeah.
 5        Q.    Did you have a gun on you when you got
 6   robbed?
 7        A.    No.  No.
 8        Q.    Let's say in May of '21, was there ever a
 9   time when you were hauling scrap or doing other
10   things that you were carrying a gun?
11        A.    No.  No.  Hell no I won't carry no gun.  I
12   know I ain't supposed to be around no gun.  No, I
13   ain't ever carry no gun.  No, indeed.
14        Q.    That's right.  You had a felony so you
15   couldn't have a gun?
16        A.    I couldn't have no gun.
17        Q.    Gotcha.
18        A.    Hell no.  I wasn't trying to do nothing to
19   come back to jail.  I was doing right out there.  I
20   just met this damn dude at the thing, and sure wish
21   I would have never met his ass, man.  I'm a
22   businessman.  I ain't no drug dealer.  I ain't been
23   in trouble in 20 something years, man.  I been made
24   my bad choice when I was younger, in my younger
25   days, man.  I'm 40 something years old.  42 years
```

Bobbie Adams 4/17/2025

```
 1    old, gonna be.
 2         Q.   So when you were getting back to the
 3    Outpost, ambulance was already there; correct?
 4         A.   Yes, sir.
 5         Q.   And you were taken straight to River Oaks?
 6         A.   Yes, sir.
 7         Q.   Merit?
 8         A.   Merit Health.
 9         Q.   Right.
10              They treated you for your injuries while
11    you were there, right?
12         A.   They did me bad while I was there.
13         Q.   They sewed you up?
14         A.   Held me down -- shit, did that too.  They
15    held me down and shoved a urine catheter inside of
16    me.  Well, Christian Dedmon and them did.  Yeah.
17         Q.   Christian put a catheter in you?
18         A.   Yeah.  He helped them hold me down and
19    they shoved that thing inside of me.
20         Q.   You remember pictures being taken of your
21    legs outside of when you were at the Outpost?
22         A.   No.  I don't remember no pictures being
23    taken.  I tried to get them to take some pictures.
24         Q.   And what did they say?  They refused?
25         A.   They refused.  I tried to get them to do
```

Bobbie Adams 4/17/2025

```
 1    it at the hospital, too.  When I saw -- when I
 2    looked and saw my bone and I seen I could see my
 3    bone, I told them, I said, Man, get some pictures of
 4    this.  They wouldn't -- they wouldn't even get no
 5    pictures.  I used to love Mississippi.
 6              MR. DARE:  I'm gonna mark this as in
 7         composite.  This is RC 22-49.  This will be
 8         Exhibit 5.
 9                   (Exhibit No. 5 was marked for
10                   identification.)
11         Q.  (By Mr. Dare)  I'm going to hand you
12    what's been marked as Exhibit 5 to your deposition.
13    You see how at the bottom of that it's got Bates
14    stamp numbers?
15         A.  Yes, sir.
16         Q.  There's little red numbers at the bottom.
17    Flip back to -- let's start with 36.  You see that's
18    an arm with some bite marks on it?
19         A.  Yeah.
20         Q.  Is that your arm?
21         A.  No.  Damn.
22         Q.  You notice the bite marks are nowhere
23    close to the hand, they're up by the elbow?
24         A.  Yeah.  Damn, they fucked him up.
25              MR. MOAK:  Which one are you looking at?
```

Bobbie Adams 4/17/2025

```
1              Sorry, Jason.
2                   MR. DARE:  36.
3                   MR. MOAK:  Thank you.
4         Q.   (By Mr. Dare)  And you saw that Christian
5    had been bitten by the dog, right?
6         A.   Yeah.
7         Q.   Yeah?  All right.  Flip to 37.
8         A.   Damn.  That my -- they did take pictures
9    of my damn thing.
10        Q.   Well, and I thought you said that they
11   didn't?
12        A.   They di -- I tried to give them to take
13   them -- they looked at -- I ain't know they took no
14   picture.  I begged them take pictures.  Damn.
15        Q.   So you remember I was, when I started out,
16   I asked you to only tell me what you know?
17        A.   Yeah.
18        Q.   And when you tell me they didn't take
19   pictures --
20        A.   Damn.  I begged them to take prison.
21        Q.   And obviously they did, didn't they?
22        A.   Yeah.  I see.  Can I get these when I -- I
23   mean, can I get these?
24        Q.   Your council's got them.  I can't leave
25   those with you, but your council does have them.  So
```

Bobbie Adams 4/17/2025

```
 1    37, what part of your body is that?
 2         A.    That's my thigh.
 3         Q.    Yeah.  Is that your right leg or your left
 4    leg?
 5         A.    Left leg.
 6         Q.    Is that the outside?
 7         A.    Yeah.  Damn.
 8         Q.    And that's going up on the outside of your
 9    quad muscle, right?  Your hamies; correct?
10         A.    Yes, sir.
11         Q.    So in other words, down here where the
12    number is, that's going down towards your foot, and
13    up towards the top of the page, that's going up
14    towards your waist, right?
15         A.    Yes, sir.
16         Q.    All right.
17               38, is that your right leg or your left
18    leg?
19         A.    I'm trying to see, shit.  Damn.  Damn.  My
20    right leg.
21         Q.    So 38 is your right leg.  39, is that your
22    right leg or your left leg?
23         A.    My left leg.
24         Q.    40 --
25         A.    Damn.
```

Bobbie Adams 4/17/2025

```
 1          Q.    -- is that your right leg or your left
 2     leg?
 3          A.    Shit.  My left -- right leg.
 4          Q.    Now, you see how it looks like some scrape
 5     marks on there?  It looks like you skidded on the
 6     asphalt a little bit.  Did that happen before or
 7     after --
 8          A.    Skid mark?
 9          Q.    Yeah.  You see -- we're on page 40, right?
10          A.    Yeah.
11          Q.    So you see the abrasion?
12          A.    Yeah.  Yeah.  Damn.
13          Q.    Now, that abrasion, was that caused by the
14     dog or was that caused by the asphalt?
15          A.    (Indiscernible) abrasion?
16          Q.    I'll step up and walk over there so I can
17     point it out to you.
18                Yes, sir.  This.
19          A.    Shit, I ain't fall.
20          Q.    Do you know what that abrasion was caused
21     from?
22          A.    Uh-uh (negative response).
23          Q.    No?
24          A.    I don't know.
25          Q.    Do you know if it was already there?
```

Bobbie Adams 4/17/2025

```
1              A.    No.  It wasn't already there.
2              Q.    And this will show that abrasion a little
3        bit better.  41.  So 41 was taken out at the scene,
4        right?  Yes?
5              A.    Yeah.
6              Q.    And you notice how you got mud on your
7        legs, right?
8              A.    Yeah.
9              Q.    At the very bottom.  How did you get mud
10       on there if that creek was dry?
11             A.    Shit, in the ditch.
12             Q.    Right.  So the ditch wasn't dry?
13             A.    Yeah, the -- shit.  Ain't no water in
14       there.
15             Q.    Well, where'd the mud come from?
16             A.    I mean, the ditch, but that don't mean --
17       there wasn't no water in there.  That's what I'm
18       saying.
19             Q.    You see the abrasion at the top of your
20       calf right there?
21             A.    Yeah.
22             Q.    Do you know where that came from?
23             A.    No, sir.
24             Q.    And is that your right foot or your left
25       foot at the bottom of it?
```

Bobbie Adams 4/17/2025

```
 1          A.    My right.

 2          Q.    That's your right?

 3          A.    Yeah.

 4          Q.    And you see that you didn't have shoes on,

 5    right?

 6          A.    I took them off.

 7          Q.    Making sure.  You still didn't have shoes

 8    on by that time.

 9                So there were pictures of your injuries

10    that were taken, both at the scene and at the

11    hospital; is that right?

12          A.    Yes, sir.

13          Q.    And it appears as though they took a

14    picture that the officers were trying to chronicle

15    every single bite mark that you had, right?

16          A.    Yes, sir.

17          Q.    Did they?

18          A.    Yes, sir.

19          Q.    You notice how there's not a picture of a

20    bite mark on your foot?

21          A.    Yeah.  What you saying?

22          Q.    Well, my question to you was, and I want

23    to make sure it's crystal clear, the officers tried

24    to take a picture of every single bite mark that you

25    have, right?
```

Bobbie Adams 4/17/2025

```
 1          A.   No, the officer -- I don't know.  I'm not
 2     for sure.
 3          Q.   And your medical records should reflect
 4     that there were bite marks on your feet, should they
 5     not?
 6          A.   Yeah.
 7          Q.   Because -- well, did the doctor stitch up
 8     any of the bites on your left foot?
 9          A.   Yeah.  I don't know what he did.  I don't
10     know.  I'm not for sure.  I don't remember what all
11     he did.
12          Q.   You don't know if you got stitches in your
13     left foot on May 1st --
14          A.   Yeah --
15          Q.   Hang on.
16          A.   They did something.  I don't know.  I'm
17     not for sure what all they did.  I don't know what
18     all they did.
19          Q.   My question was, did they put stitches at
20     any bite mark on your left foot?
21          A.   Yeah.  They put stitches.  I had stitches
22     everywhere.
23          Q.   On your left foot?
24          A.   I had stitches -- yeah.  I had stitches
25     everywhere.  My left foot, off my legs, everywhere.
```

Bobbie Adams 4/17/2025

```
 1          Q.   So that should be reflected in your
 2   medical records?
 3          A.   I guess.  I'm not for sure.  I guess.  I
 4   don't know.
 5               MR. MOAK:  Was that No. 5, compilation?
 6               MR. DARE:  Yeah.  Yeah.
 7          Q.   (By Mr. Dare)  When you were flipping back
 8   to the docket sheet for this criminal charge, you
 9   saw that you were charged as a habitual offender,
10   right?
11          A.   I ain't charged as no habitual.
12          Q.   You didn't have that enhancement?
13          A.   Uh-uh (negative response).
14               They need to put that damn dog to sleep.
15          Q.   And flip over to RC 45.  You notice at the
16   top, it's docket 51, it says "Habitual offender
17   sentencing enhancement."  You see that?
18          A.   Yeah.
19          Q.   What was that about?
20          A.   I don't know.  I don't know what that is.
21   That's what she listed and come up with.
22          Q.   That one explained to you by your
23   attorney?
24          A.   Uh-uh (negative response).  Man, that man
25   ain't know --
```

Bobbie Adams 4/17/2025

1        Q.    Were you told that while you were out on

2    the bond that you weren't supposed to be using any

3    drugs?

4        A.    No.

5        Q.    You weren't told that?

6        A.    No.  I wasn't on probation or parole or

7    nothing.  I can -- when I'm on -- ain't on probation

8    or parole I can do what I want to do.

9        Q.    So you were still using drugs while you

10   were out on bond?

11       A.    Yeah.  I smoke weed.  They didn't tell me

12   I couldn't smoke.  I wasn't on probation or parole.

13       Q.    Going back to the time that we -- that you

14   were down in the ditch and that interval between

15   when the dog bit you and when, you know, after

16   Dedmon got the dog off of you and you were brought

17   up onto the roadway.  Did you ever try to hit the

18   dog or kick the dog?

19       A.    I never hit that -- kicked that dog.  Not

20   one time.  Never.  Man, I never tried to get the

21   damn dog off of me.  I ain't do nothing.  I ain't

22   try to do nothing.  Nothing.  Nothing, man.

23       Q.    You were sitting still when the dog had

24   his mouth on you?

25       A.    Yes, yes, yes, yes.  I never swung.  I

Bobbie Adams 4/17/2025

```
 1   never did nothing.  I never did nothing.  I did
 2   nothing.  I never hit the dog, never kicked at the
 3   dog.  I would take the lie detector test.  I never
 4   did none of that.  They lied.
 5            They lied about the dope.  They lied about
 6   the money.  I got the money hid in this right now.
 7   I can take you and show you where the drugs at.  I
 8   can take you, show you where the money at.  I can.
 9   I can get out right now and go show you where that
10   money at right now in that ditch.  Buried in that
11   ditch.
12        Q.   The drugs are buried in the ditch, too?
13        A.   Yeah.  That's all there.
14        Q.   Well, go back to Exhibit 4.  Put a circle
15   on there where the money's buried and where the
16   drugs are hidden.
17        A.   I don't know where the drugs.  I can show
18   you.  I can show you.  Yeah.  I ain't able to show
19   you on there.  I can't show you on there.  Ain't no
20   way I can show you where the money at on there.
21        Q.   Why?
22        A.   Why?  I can just -- while I was sitting
23   there -- that's why I was there, over there by the
24   ditch.
25        Q.   How did you dig a hole?  With your hands?
```

Bobbie Adams 4/17/2025

```
1          A.   Shit, sitting right there.  Put the $100
2     bill right there.
3          Q.   So it was just one $100 bill?
4          A.   Yeah.  It was a $100 bill.  Wasn't no $200
5     bills.  It wasn't no -- they lied.  I mean -- they
6     lied.  Wasn't no $200 bill.  $100 bill.
7          Q.   And what drugs did you have that you threw
8     down there?  Was that the meth, the ice?
9          A.   Some weed.  Some weed and something else.
10    I think a couple X pills I probably had in there.  I
11    got rid of.
12         Q.   Ecstasy pills?
13         A.   One or two X pills probably.  One or two,
14    I think.  Yeah.
15         Q.   Where was the meth?
16         A.   Huh?
17         Q.   Where was the meth?
18         A.   I don't know where the meth at.  He must
19    have got the meth from the informant.  I don't know.
20    I don't know where the meth come from.  He lied.
21    Lied.
22         Q.   Well, you were trying to get the crystal
23    meth?
24         A.   Yeah.
25         Q.   And did you ever touch it with your hands?
```

Bobbie Adams 4/17/2025

1          A.    No.  No.  $200, man.  This man just lied
2     all the way around man.  I should have just been
3     kept quiet.  Shouldn't have said -- told him I was
4     in the ditch.  I wouldn't be --
5          Q.    You had an opportunity to bring up any
6     falsities at -- during sentencing, during trial,
7     during -- you had a chance to go to trial, right?
8          A.    I went to trial.  I had a mistrial.
9          Q.    You went to trial and had a mistrial, and
10    then after the mistrial, you pled guilty, right?
11         A.    I was going back to go have another trial.
12    I was going back again.
13         Q.    And at the mistrial, after you go through
14    that entire trial, did you talk about the dog at
15    all?
16         A.    Oh, we never got to that point.  We never
17    get to that point.
18         Q.    Why'd you get a mistrial?
19         A.    Because they tried to keep some evidence
20    from my lawyer.  Audio or something that they was
21    lying about.  Something they was lying about.  Yeah.
22    So I decided I'd go back the second time after I had
23    the mistrial.
24         Q.    There was some audio that you wanted to
25    get that they had kept from your lawyer?

Bobbie Adams 4/17/2025

```
1          A.   Something like that.  Something.
2     Something.
3          Q.   You had a good lawyer.  He made sure that
4     he got all the evidence before trial, right?
5          A.   I ain't gonna say, cause -- I don't know.
6     He didn't fight for me, man.  He --
7          Q.   And then you got a mistrial?
8          A.   Yes, sir.
9          Q.   And you didn't bring up anything about the
10    dog at that point, did you?
11         A.   Wouldn't have to do it.  Never made it to
12    that point.
13         Q.   And during sentencing, didn't bring up
14    anything about the dog, did you?
15         A.   They weren't trying to hear none of that.
16    They weren't trying to hear nothing but what
17    Christian Dedmon said.
18         Q.   And you had an opportunity to, at least
19    according to the order that's marked as Exhibit, I
20    think, 3 to your deposition, you had the opportunity
21    --
22         A.   To do what?
23         Q.   -- to say all of that?
24         A.   Man, it was -- I didn't have the
25    opportunity to do nothing.  These are the only -- go
```

Bobbie Adams 4/17/2025

```
1    in the courtroom and take 40 -- 40 years what they
2    try to offer me.  Either take that time or --
3         Q.   And you didn't get that?
4         A.   Shit, I had to take this.
5         Q.   You got 20?
6         A.   Yeah.
7         Q.   And how many to serve?
8         A.   Twelve to serve.  Yeah.  For nothing.  For
9    a lie.  A goddamn lie.
10        Q.   Now, it wasn't a lie, because you were
11   trying to sell?
12        A.   Yeah.  It's a lie.
13        Q.   You were trying to sell, right?
14        A.   Yeah.  Yeah.
15        Q.   Yeah.
16        A.   But it's a lie on everything -- it's a
17   lie.
18        Q.   On the amount of money?
19        A.   On everything.  The drugs and all is a
20   lie.  Everything they lied about is a lie.
21        Q.   So you didn't have any drugs?
22        A.   The drugs out there.  They didn't get no
23   drugs from me.  They didn't get no drugs from me.
24   They need to charge me where they got the drugs
25   from.  I didn't --
```

Bobbie Adams 4/17/2025

1          Q.   While you were in the Rankin County
2     Detention Center, the jail there in Rankin County,
3     did they already have the tablets or were you still
4     writing everything by hand?
5          A.   Yeah.
6          Q.   Did they have the tablets?
7          A.   No.  They didn't have them.
8          Q.   They didn't have the tablets yet?
9          A.   No.
10         Q.   And so the grievance procedure was the one
11    that you actually had to write it down on a piece of
12    paper and put it up into the little gray box, right?
13         A.   I didn't have access to no grievance form
14    or nothing when I was there.
15         Q.   Did you ever talk to anybody with Rankin
16    County about the dog or anything that was going on?
17         A.   Yes.  You said did I talk to who?
18         Q.   Anybody with Rankin County about the dog.
19         A.   Yeah.
20         Q.   Who?
21         A.   Shit, I tried to talk to the sheriff, the
22    lieutenant.  I tried talking to him.  A lot of
23    people.
24         Q.   Successfully did you talk with anybody?
25    Did anybody talk with --

Bobbie Adams 4/17/2025

```
 1          A.   Nobody want to talk to me.  Not even the
 2     sheriff.
 3          Q.   So the answer is, no, you never tried to
 4     -- you never talked to anybody?
 5          A.   Yes, sir.
 6          Q.   But you tried you said?
 7          A.   Yes, sir.
 8          Q.   You never submitted a complaint at any
 9     point in time from May of 2021 through about
10     August -- excuse me, April of 2024.  Is that right?
11          A.   I made complaints to so many people.  I'm
12     tel -- man, you --
13          Q.   In writing.
14          A.   I made in writing to so many people.  I
15     made to the attorney general, to everybody.
16          Q.   So the attorney general will have a copy
17     of stuff that you sent in?
18          A.   Everybody.  The AC --
19          Q.   Who else?
20          A.   The ACLU -- I believe the ACLU, the
21     attorney general, the MBI, the FBI.  I contact all
22     them, put all this in writing from everything.
23          Q.   Was that all done after the January 23
24     incident?
25          A.   January 23 incident?
```

Bobbie Adams 4/17/2025

1      Q.   Yeah.  That you've got all in the
2   complaint with Michael Jenkins and Eddie Parker.
3      A.   Oh no, I don't -- oh no.  This -- I was
4   talking about before what happened to me.  No.
5      Q.   Did you do -- did you submit stuff to MBI
6   and the FBI and every -- and the AG's office, did
7   you do it after January 23?
8      A.   Way before.  Before all the end of this
9   stuff happened.
10      Q.   When?
11      A.   I said I did all this before all the end
12   of this happened.
13      Q.   Right.  When?
14      A.   Shit, when it happened to me, after it
15   happened to me, that's when I started doing it.
16      Q.   Why didn't you write anything to the
17   sheriff?
18      A.   Man, I went up there, I called.  I did
19   all -- I wrote him a 12-page letter.
20      Q.   Where is it?
21      A.   Demetrius -- Lieutenant Demetrius got it.
22   I wrote his a 12-page goddamn letter let them know
23   what they did to me.  I done contact so many people.
24   I stayed right down the street from MBI.  I don't --
25   the Lynn Finch, whatever the lady called is --

Bobbie Adams 4/17/2025

```
1                    I don't -- NAACP, the ACLU, I don't --
2    man, I done filed complaints with all of them.  I'm
3    not -- talking about I done filed a complaint with
4    the attorney general -- I mean, attorney general,
5    the FBI, the ACLU.  That -- complaint with them.
6    All of them.  On paper.  Yeah.  A lot of people.
7    Yeah.  I done contact -- I got -- it's on -- I got a
8    paper trail.  A lot of people I done contact.
9         Q.   Do you have it here?
10        A.   No, sir.  No, sir.  I did.  That's when I
11   bonded out.  That's when I --
12        Q.   When you first bonded out?
13        A.   Yes, sir.
14        Q.   So you were able to keep copies of
15   everything, because you were free world?
16        A.   I'm talking about when I got bonded out of
17   Rankin County after they (sic) to me.
18        Q.   Right.
19        A.   That's when I started reaching out to
20   people and trying to (sic) me up though.
21        Q.   Right.
22        A.   Yeah.
23        Q.   And so you were free world?  You were
24   living with Cassandra at the time?
25        A.   Yeah.
```

Bobbie Adams 4/17/2025

1          Q.    And you could have kept copies of
2     everything, right, that you were sending out?
3          A.    Yeah.  I could have kept copy.  I just --
4          Q.    But you didn't?
5          A.    Well, I ain't going to say I could have
6     kept copy cause they -- who I was trying to contact,
7     they would tell me to -- they would send me a
8     complaint.  I just mail my complaint back to them,
9     you know, or whatever.  Like the ACLU, they mailed
10    me a complaint for them and I sent it back to them.
11    The NAACP, the -- a lot of people.  I don't --
12         Q.    Cassandra was a nurse, right?
13         A.    Yeah.
14         Q.    You ever hear the expression in nursing,
15    "if it's not documented, it didn't happen"?
16         A.    Oh, it's a lot of things that documented
17    it all.  It's documented, I just --
18         Q.    Where?
19         A.    I just gotta contact the people that I
20    know that's got -- the ACLU, I know it's --
21    document -- they got it.  I know they got it.
22    There's a few people I know for sure they still got
23    it.  I know the FBI got it.  I can't think of the
24    guy name that I spoke with.  The MBI, I know they
25    still got the stuff I sent them.  I'm quite sure

Bobbie Adams 4/17/2025

```
 1    they got it.  MBI, the FBI, the ACLU, NAACP,
 2    attorney general.  I contact so many people trying
 3    to get help, man.
 4                        (Exhibit No. 6 was marked for
 5                        identification.)
 6         Q.   (By Mr. Dare)  I've had marked as Exhibit
 7    6 to your deposition the first complaint that you
 8    filed.  This is 3:24-cv-207.  Got it?  Take that and
 9    we're going to go off the record for a second.  Look
10    after that real quick.
11                        (An off-the-record discussion
12                        took place.)
13         Q.   (By Mr. Dare)  So had marked as Exhibit 6
14    to your deposition an earlier lawsuit styled Bobbie
15    Adams versus Bryan Bailey, 3:24-cv-207.  This is a
16    Prison Litigation Reform Act Complaint that you
17    filed against Sheriff Bailey and Christian Dedmon
18    and Tony Shack.  Is that right?
19         A.   Yes, sir.
20         Q.   Is all this your handwriting on here or
21    did you have somebody else in the facility write
22    this?
23         A.   I had somebody else write it.
24         Q.   Who?
25         A.   I ain't gonna call his name.  I ain't
```

Bobbie Adams 4/17/2025

```
 1    gonna call my boy.
 2         Q.   He's not in any trouble for writing it.
 3         A.   No.  They don't like him right around
 4    here.  They don't like him.
 5         Q.   So suffice it to say it's a writ writer
 6    that's in the South Mississippi Correctional
 7    Institute, right?
 8         A.   Sir?
 9         Q.   It's a writ writer that's incarcerated in
10    the facility we're currently in?
11         A.   I don't know.  He might be gone.  I don't
12    know.  But yeah.
13         Q.   At the time he was incarcerated here?
14         A.   Yes, sir.
15         Q.   Is anything on pages 1 through the end of
16    this document, your handwriting?  Anything
17    whatsoever?
18         A.   I think I -- no.  Right here.
19         Q.   Which one are you pointing to?
20         A.   The affidavit.
21         Q.   So the only thing on there is, that's your
22    handwriting, is the affidavit?  Yes?
23         A.   Yes, sir.
24         Q.   The signature on -- strike that.
25              So on Page 11 of 11, and see how it's
```

Bobbie Adams 4/17/2025

```
 1    dated 4/7/24?  And you see it's got your name there,
 2    but you didn't even sign that, did you?
 3         A.   No.
 4         Q.   Well, was everything in this complaint
 5    that you filed, was that all true, accurate, and
 6    correct?
 7         A.   Yeah.
 8         Q.   And you noticed that you only wanted to
 9    sue three folks, right?
10         A.   No.  More than that.
11         Q.   No.  It's only three in there.
12         A.   No.
13         Q.   Well, I'm sorry.  Let's -- it was four,
14    including Sheriff Bailey.
15         A.   I thought it was more than that.  I
16    thought it was more than that.
17         Q.   Did you pay this writ writer to put this
18    together for you?
19         A.   No.
20         Q.   No?
21         A.   No, sir.
22         Q.   Make sure you speak up, too, when you say
23    no.
24         A.   Yes, sir.
25         Q.   And you notice on this document said that
```

Bobbie Adams 4/17/2025

```
 1    you hadn't gone through a grievance procedure before
 2    filing this complaint; is that right?
 3         A.   You said I haven't gone through a --
 4         Q.   Had not.
 5         A.   No.
 6         Q.   And you had not submitted a grievance
 7    either through the MDOC system or through the Rankin
 8    County system, grievance system, prior to filing
 9    that suit, right?
10         A.   I did something.  Not for sure.  No.  No.
11    I don't think I filed a grievance -- I don't think I
12    did a grievance.
13         Q.   Right.
14              And you've got in here that you didn't
15    file a grievance.  It's on Page 7.  And you know
16    that prior to being able to file a claim under the
17    Prison Litigation Reform Act, you got to file a
18    grievance?
19         A.   Grievance first.
20         Q.   Yeah.
21              You notice also on here for your claim of
22    relief that you were seeking $1,000 in compensatory
23    damages --
24         A.   No.  That's the wrong amount.
25         Q.   -- and a thousand -- let me finish.  And
```

Bobbie Adams 4/17/2025

```
1      $1,000 in punitive damages.  Is that what you put on
2      here?
3           A.   That was -- that was a mistake.
4           Q.   Well, that's at least what you were
5      seeking in relief on this complaint, right?
6           A.   No.  No.  Yeah.  That wasn't no -- that
7      ain't supposed to be no 1,000 -- that ain't $1,000.
8           Q.   That is a $1,000.
9           A.   That look like a 1,000.  That's supposed
10     to be a million dollars.  That's supposed to be a
11     million dollars.
12          Q.   But it's not?
13          A.   It's -- to me.
14          Q.   Well, no.  It's not on this document.
15          A.   Okay.
16          Q.   Right?
17          A.   Yeah.
18          Q.   Now, the punitive damages.  Are you on
19     Page 5 of 11 there?  You see for the punitive
20     damages, it's 1,000, but with three zeros in the
21     cents?
22          A.   Yeah.  I see what you're saying.
23          Q.   You're saying all of that was a mistake
24     anyway?
25          A.   Yes, sir.
```

Bobbie Adams 4/17/2025

1          Q.   Have you paid for any medical expenses out
2     of your own pocket?
3          A.   No, sir.
4          Q.   The stitching up your legs, that was paid
5     for by Rankin County, right?
6          A.   I guess.
7          Q.   Where was the surgery done?
8          A.   UMMC.
9          Q.   And Rankin County paid for that as well?
10         A.   I'm not for sure.
11         Q.   Don't know.  But you didn't?
12         A.   No.  That's (indiscernible).
13         Q.   And did you have health insurance at that
14    time?
15         A.   No, sir.
16         Q.   Do you have any reason to suspect or do
17    you have any factual knowledge that the officers did
18    this to you because you're an African American?
19         A.   Can you say that one more time?  Repeat
20    that.
21         Q.   Do you have any reason to suspect or do
22    you have any factual information that would lead
23    somebody to believe that the officers did this
24    because you're black?
25         A.   I ain't gonna just say that.  I was just

Bobbie Adams 4/17/2025

```
 1    gonna say that.
 2         Q.   Do you think this had anything to do with
 3    race whatsoever?
 4         A.   Yeah.  In a way I do.  But in a way, you
 5    know -- a way I do and a way I don't.
 6         Q.   Based on what?
 7         A.   Huh?
 8         Q.   Based on what?  In a way you do, in a way
 9    you don't.
10         A.   I'm trying to see how I say this right.  I
11    say -- I don't know how to say it, man.
12         Q.   Did the officers chase you because you're
13    black?
14         A.   I can't say that.  I can't say that.
15         Q.   And did the officers have a dog there
16    based on your color?
17         A.   I can't say that.  I can't say that.
18         Q.   And the dog didn't bite you based on your
19    color?
20         A.   No.
21         Q.   Because he bit the officer, and the
22    officer was white?
23         A.   Yes, sir.
24         Q.   Right?
25         A.   Yeah.
```

Bobbie Adams 4/17/2025

```
 1          Q.   The dog wasn't racist?
 2          A.   No, sir.
 3          Q.   Did the officers tell you anything, say
 4     anything to you to make you believe that they were
 5     racist?
 6          A.   Man, yeah.  That night they did.
 7          Q.   What did they say?
 8          A.   All kinds of shit, man.  All kinds of
 9     shit.  The dope, black motherfucker.  All this shit.
10     All kinds of shit.
11          Q.   Well, now you've been cussing, too?
12          A.   I'm talking about all kind -- oh, man.  He
13     said some shit.  Yeah.  Oh, excuse my French.
14     Excuse me, ma'am.  But yeah.
15          Q.   Yeah.  I mean -- and just the way
16     sometimes people talk?
17          A.   Express yourself.
18          Q.   Yeah.
19               So just because they were cussing doesn't
20     mean they're racist?
21          A.   No.  But the way they did, you know.
22          Q.   Do you think that they arrested you
23     because you were black?
24          A.   No.  I think they arrested me to try to
25     have what he did to me.
```

Bobbie Adams 4/17/2025

```
 1              Oh, I forgot to tell you this.
 2         Q.   Hang on.  Is it something that I asked you
 3    before?
 4         A.   No.
 5         Q.   Okay.  Well, I only want you to answer the
 6    questions --
 7         A.   Okay.
 8         Q.   -- that I ask of you.  Your council may be
 9    able to clean up something afterwards.  And I'm sure
10    there's going to be a question about that.
11              So let's go back down into the ditch when
12    the dog is holding on to you.  And we've already
13    established the timeframe and what generally was
14    happening.  Was the dog biting you in repeated
15    motion or was the dog holding on to you?
16         A.   Holding it.
17         Q.   It was holding on to -- well, now you've
18    got your arm.  It didn't bite you on your arm?
19         A.   No.  I'm just holding it and just ripping.
20    Just pulling and pulling.
21         Q.   Just holding on?
22         A.   And biting and ripping.  Yanking.  Trying
23    --
24         Q.   Do you know what side did the dog approach
25    from?  Your right or your left?
```

Bobbie Adams 4/17/2025

```
 1          A.    Tell him to come at me first?

 2          Q.    When it initially came at you.

 3          A.    Yeah.  To my -- my right side a little

 4    bit.

 5          Q.    From your right side?

 6          A.    Yeah.

 7          Q.    And Shack released the leash as he was

 8    coming down that ditch, right?

 9          A.    Yes, sir.

10          Q.    Did the dog bite you half the time on the

11    left leg and then half the time on the right leg, or

12    did it primarily spend more time on one leg versus

13    the other?

14          A.    Stayed on one.  Stuck to one leg at a

15    time.  Hit my left -- my foot, got up to my -- to my

16    thigh.  Once it got to that side, he started on this

17    side over here to my right side.

18          Q.    Where was the deputy that had handcuffed

19    you when the dog bit you?

20          A.    Watching the dog.  Just standing there

21    watching him.

22          Q.    Where?

23          A.    Who?

24          Q.    Where?

25          A.    You said where?
```

Bobbie Adams 4/17/2025

```
1          Q.   Yeah.  Where was he?

2          A.   In a ditch.  I don't know.  Watch the dog

3     eat my -- eat me up.

4          Q.   In front of you or behind you?

5          A.   Man, I don't know.  He was -- they was

6     over -- standing over me watching the dog eat me up.

7     Standing over me.

8          Q.   How wide is this ditch?

9          A.   It's enough for a big space.  Big space.

10    It's a big space.  It's a nice space.  You had to

11    see it.

12         Q.   So you're saying there was enough space

13    for you to be sitting there and three deputies to be

14    standing beside you?

15         A.   No.  I said over me.

16         Q.   Over top of you?

17         A.   Yes, sir.  Like over --

18         Q.   Were they standing on the hill?

19         A.   Like over me.  While I'm sitting down,

20    like, standing over me.  I'm sitting right here,

21    they standing over me.

22         Q.   And what actions were they taking as that

23    dog was biting on you?

24         A.   Just sitting there watching that dog do me

25    like that.  And I guess when they seen how the dog
```

Bobbie Adams 4/17/2025

```
 1    just messed me up, and that's when they finally just
 2    tried to get him off me.  And that's when the dog
 3    locked on the police officer.
 4         Q.   Now, it was dark in there, right?
 5         A.   Yeah.
 6         Q.   And did you hear the officer saying
 7    anything?
 8         A.   Did I hear him say anything?
 9         Q.   Yeah.  While you're down in the ditch and
10    the dog's on you.  Did they say -- did you hear them
11    say anything?
12         A.   No, sir.
13         Q.   And did all three of them have
14    flashlights?
15         A.   I don't know.  It was -- I don't know.
16         Q.   At least one of them had a flashlight,
17    right?
18         A.   Yeah.
19         Q.   And could you see what any of those
20    deputies were doing as that dog was biting you?
21         A.   Man, standing over watching.
22         Q.   So, yes, you could actually see what they
23    were doing?
24         A.   Yeah.
25         Q.   Even though the flashlight was on you?
```

Brooks Court Reporting
1-800-245-3376

Bobbie Adams 4/17/2025

```
 1        A.   Yeah.  I know they ain't trying to help
 2   me.  They weren't trying to get him off.  They were
 3   watching.
 4        Q.   You knew that they weren't trying to get
 5   the dog off, right?
 6        A.   Yeah.
 7        Q.   But do you know what they were doing?
 8        A.   No.
 9        Q.   And you know that they weren't saying
10   anything?
11        A.   No.
12        Q.   Correct?  They did not say anything?
13        A.   My main focus is on this dog.  This dog
14   tearing me up, man.  I can't -- I ain't think about
15   nothing else.  I know these people ain't trying to
16   get this dog off me.  I can't get the dog -- I'm
17   scared to try to do anything.  I can't do nothing.
18   I'm just helpless, man.  That dog messed me up, man.
19        Q.   How long did it take once they got the dog
20   off of you to get you up and then start getting you
21   out of the ditch?  Was that almost pretty much
22   immediate?
23        A.   Yeah.  It took him a minute for them to
24   get the dog off me.  But when they finally did, they
25   got me up there and -- yeah.
```

Bobbie Adams 4/17/2025

```
 1        Q.   Well, how long did it take -- all right.
 2   So we've got from the time that the dog started
 3   biting you to the time that you getting out of the
 4   ditch at around 30 seconds, right?
 5        A.   Yeah.
 6        Q.   How long did it take for them to get the
 7   dog off of you?
 8        A.   Man, they got the dog off me by the time
 9   the ambulance started to pull up.
10        Q.   You said it took a while for them to get
11   the dog off you.  About how long did that take?
12        A.   Man, it's a long time.
13        Q.   Felt like a long time?
14        A.   Yes.  By time -- yeah.  It's a long time.
15        Q.   So that I want to make crystal clear, from
16   the very first bite when you say that dog bit your
17   foot to the time that you're out of the ditch is 30
18   seconds; correct?  That's where we've gone through
19   that now five times, and you said that was about the
20   right amount of time.
21        A.   From me getting bit to getting out the
22   ditch?
23        Q.   Right.
24        A.   Okay.  Say about 30 seconds?
25        Q.   Yes.
```

Bobbie Adams 4/17/2025

```
 1          A.    Okay.

 2          Q.    And that's correct, right?  Yes?

 3          A.    Yes.

 4          Q.    And you said -- now, did the dog hold on

 5     to your foot or was it holding on to your leg?

 6          A.    Man, it hold on to my foot, too.  Man --

 7     yes.

 8          Q.    So how long did it hold on to your foot?

 9     You don't know?

10          A.    No.  Just biting and shaking.  And shaking

11     this leg and hit me right there.

12          Q.    And then hit you on your thigh?

13          A.    Yes, sir.  Hit me right there and started

14     yanking in the middle --

15          Q.    And then shook?

16          A.    Yeah.

17          Q.    And then grabbed your other leg and then

18     shook?

19          A.    Yeah.

20          Q.    And that's when they were able to -- they

21     started getting the dog off?

22          A.    When they seen how bad I was, they finally

23     got him off.  Tried to and that's when he hit him.

24          Q.    Do you know it was Dedmon that hit him

25     with the flashlight?
```

Bobbie Adams 4/17/2025

```
1          A.   I don't know.  I don't know.  I just know
2     that the officer got bit on the -- bit and it --
3     they hit him.  They hit the dog.
4          Q.   You seem like you're cold?
5          A.   No.  I need a cigarette, man.  I ain't
6     been this long without no cigarette.
7          Q.   Give me five minutes.  I'm gonna go
8     through my notes.  I think I'm about done.
9                         (An off-the-record discussion
10                         took place.)
11         Q.   (By Mr. Dare)  Have you ever spoken with
12    Sheriff Bailey before?
13         A.   I tried to.
14         Q.   That wasn't my question.
15         A.   No, sir.  No, sir.
16         Q.   Do you know what Sheriff Bailey looks
17    like?
18         A.   Yeah.
19         Q.   You see him walk around the jail at all
20    before?
21         A.   Yes, sir.
22         Q.   Were you there for Thanksgiving or
23    Christmas one --
24         A.   Yeah.
25         Q.   So you saw Sheriff Bailey walking around
```

Bobbie Adams 4/17/2025

```
 1    with presents during Christmas, right?
 2         A.   Yes, sir.
 3         Q.   And were your kids able to get presents
 4    through Sheriff Bailey?
 5         A.   He blessed my family.  Yes, sir.
 6         Q.   Do you have any reason to know that
 7    Sheriff Bailey knew that the dog or the handlers,
 8    Dedmon or Shack, did anything wrong relating to you?
 9         A.   Say that again.
10         Q.   Do you have any facts that would
11    support -- do you have any reason to believe that
12    Sheriff Bailey knew something wrong happened to you?
13         A.   Do I have any facts?  You asked me, do I
14    have any?
15         Q.   Well, I'll make it a little bit more
16    direct.  You never told Sheriff Bailey what happened
17    to you because you were never able to talk to him,
18    right?
19         A.   Nah.  I had wrote a letter trying to let
20    him know.
21         Q.   And you gave that to Dimitri?
22         A.   Yeah.
23         Q.   And do you know if that ever made it to
24    the Sheriff?
25         A.   No.
```

Bobbie Adams 4/17/2025

```
 1          Q.    And do you know when that letter was
 2    written?
 3          A.    I don't remember.  Right before I left
 4    Rankin County.
 5          Q.    When was that?
 6          A.    That was -- ooh wee.  That was a long
 7    time.  Whenever I was there.  I can't think when I
 8    was there.
 9          Q.    That was the time that you were getting
10    sentenced, right?
11          A.    Yeah.  September -- August.  It was August
12    or September.
13          Q.    And when were you sentenced?
14          A.    August or September.
15          Q.    Of?
16          A.    '22.
17          Q.    '22.  So you wrote a letter about a year
18    after this incident and gave it to the jail?
19          A.    No.  Not a year.
20          Q.    This happened in May of '21?
21          A.    In May of '21.  That's when I bonded out.
22    Right before I bonded out I wrote him a letter.  I
23    think.  Yeah.
24          Q.    And where'd you put it?  Did you hand it
25    to Dimitri?
```

Bobbie Adams 4/17/2025

```
1           A.   Dimitri had got it.  Yes, sir.  He read
2    it.  He said, Man, wow, man.  Let me know he felt
3    the letter or whatever.  Yeah.  I wrote 12-page
4    letter.
5           Q.   But you never specifically spoke with
6    Sheriff at all?
7           A.   I called, tried to reach out to him.
8    Wasn't ever there.
9           Q.   When you were free world?
10          A.   Yes, sir.  Yeah.
11          Q.   And you came -- did you say you went up
12   there?
13          A.   To the station.  Yes, sir.
14          Q.   You went up to the sheriff -- you went up
15   to the jail in the sheriff's department --
16          A.   Yeah.
17          Q.   -- to go and talk to him?
18          A.   Yeah.
19          Q.   And was he in when you were trying to talk
20   to him?
21          A.   He wasn't in.
22          Q.   Did you file any complaints with the front
23   desk and to let them know what was going on?
24          A.   No.
25          Q.   You were just told he wasn't there and
```

Bobbie Adams 4/17/2025

1    then you left?

2         A.    Yeah.   Then I went to the MBI down the

3    street from the house.

4         Q.    Who'd you talk to there?

5         A.    Some guy.  I can't remember his name.  I

6    can't remember his name, but -- I'm trying to see.

7         Q.    Did you file anything with them?

8         A.    Yeah.  I wrote down complaint paper.  I

9    can't think of the guy name.  Yeah.  I can't think

10   of his name.  But he got an office right in the

11   back.  I think he the head man over the -- over the

12   homicide thing.

13        Q.    You say in your complaint that Defendant

14   Bryan Bailey was directly aware of some of these

15   incidences, complaints were at times made directly

16   to him.  This is something drafted by your council.

17   I understand that you didn't draft this.  But you

18   never made a complaint directly to Sheriff Bailey,

19   did you?

20        A.    No.  I don't think I did.  I don't think I

21   did.  I'm not for sure.  I did so many though, I'm

22   not for sure.

23        Q.    According to you, how long after the

24   deputy got you in handcuffs, and as you say you were

25   seated, handcuffed in front of you, how long after

Bobbie Adams 4/17/2025

```
 1    that was it that the dog was down and bit you?
 2    Couple of seconds?
 3         A.    Yeah.  When he brought the dog.  When he
 4    brought that dog over there.
 5         Q.    Right.
 6         A.    Yeah.
 7         Q.    But from the time that you got the
 8    handcuffs on, was it pretty quick that the dog was
 9    down there?
10         A.    Shit, it was -- it was -- after he --
11    after he put me in cuffs it was probably about -- it
12    was right after that come down there with that
13    goddamn dog and let that dog loose on me.
14         Q.    So he was coming down the hill as you were
15    getting the handcuffs?
16         A.    Yeah.  Coming down and let that damn dog
17    on me.
18         Q.    But it was pretty instantaneous?
19         A.    Yeah.  I ain't even think about that shit,
20    man.
21         Q.    The officers that you saw there that were
22    down in the ditch, you said you think that there
23    were three, right?
24         A.    Yes, sir.
25         Q.    Were they all with Rankin County?
```

Bobbie Adams 4/17/2025

```
1              A.    All them Rankin County officers.
2              Q.    The folks up at the Outpost, whether it be
3       medical, whether it be the EMTs, or the deputies up
4       there, the separate deputies, they do anything to
5       you?  Like, once you got up to the Outpost, did
6       anybody hit you, kick you, or do anything wrong to
7       you?
8              A.    No.  I was -- when I got finally made up
9       there, man, I ain't gonna lie, I felt myself -- feel
10      like I was fixin die.  I remember telling the -- oh,
11      and I remember the officer that walked me up there.
12      I remember asking, I was like -- man, I was just so
13      messed up.  I said, man, how -- I asked him, I said,
14      Man, do you have any kids?  That's what I asked him.
15      I said, Sir, you have any kids?  He never would
16      answer.  And he finally answered me and said
17      something.  I said, Man, how can you do me -- how
18      can y'all do me like this and you got kids?  How can
19      you do a person like this?  Man.  Yeah.
20             Q.    While you were down in the ditch, none of
21      the deputies hit or kicked you at all, did they?
22             A.    No, sir.
23             Q.    So they didn't tase you, right?
24             A.    No, sir.  I didn't do none of that.  The
25      dog did all the damage.
```

Bobbie Adams 4/17/2025

```
1        Q.   That was what I was about to ask.
2             The only officer that did any damage was
3    the K9?
4        A.   Yes, sir.
5        Q.   Thank you.
6             MR. DARE:  I tender the witness.
7    EXAMINATION BY MR. MOAK:
8        Q.   I have a few questions.  Okay?
9        A.   Yes, sir.
10       Q.   Not a lot so you can get to your smoke.
11            Going all the way back.  You said you
12   really didn't know when you were transported here,
13   meaning this facility?
14       A.   Yes, sir.
15       Q.   But the record, whatever that is, that
16   will clear that up, right?
17       A.   Yes, sir.
18       Q.   Because you -- I think you responded about
19   six months.
20       A.   Who?
21       Q.   About when you first responded to Jason's
22   question it was you'd been here about six months,
23   but the record will clear any of that up.
24       A.   Okay.
25       Q.   Is that correct?
```

Bobbie Adams 4/17/2025

```
 1              A.   Yes, sir.
 2              Q.   Because you weren't too good at
 3      recalculating time on that properly; correct?
 4              A.   Yes, sir.
 5              Q.   All right.
 6                   Here's -- well, since we're at the
 7      incident, let's talk about the incident for a
 8      second.  So you have always said there were more
 9      than two deputies there; correct?
10              A.   Yes, sir.
11              Q.   And you can refer back to it if you need
12      to.  Right on Exhibit 5.  Exhibit 5 is what I'm
13      referring to.  Bates marked 022 at the bottom.
14      Okay?  And in the second paragraph, this appears
15      that Christian Lee Dedmon is the author.  And in the
16      second paragraph, second sentence -- third sentence,
17      he says, "Myself and other marked deputies moved
18      in."
19                   See that sentence?
20              A.   Seven other marked deputies?
21              Q.   Second paragraph, third sentence, that's
22      "Myself and other marked deputies moved in."
23              A.   Yes, sir.
24              Q.   If -- and we don't know how he writes, but
25      if he said "other marked deputies," does that tell
```

Bobbie Adams 4/17/2025

```
1    you there's probably more than just he and one other
2    person?
3         A.   Yes, sir.
4         Q.   Which would -- that would be more than
5    two.  Then on the next page, 023, this doesn't tell
6    us who the author is, but it does say that this is
7    Deputy J. Lewis.  See it at the very top?
8         A.   Yes, sir.
9         Q.   "I Deputy J. Lewis."  And what he did is
10   he went back and he says he found that $200 that you
11   had left there at the site where you were.  And that
12   he gave that back to Investigator Dedmon and turned
13   it over for money for evidence.
14              Since y'all been going back and forth on
15   your prior case, was that $200 ever brought up as
16   evidence in that case?
17        A.   He lied.  He lied.
18        Q.   Wait, that's not my question.
19              Was that ever brought up --
20        A.   No.
21        Q.   -- to your knowledge?  Okay.
22              And since Deputy Lewis, he also -- go back
23   up first.  He said he assisted Investigator Dedmon
24   and the K9 unit.  So if you had Deputy Lewis,
25   Dedmon, and Shack, and if you want to count the dog,
```

Bobbie Adams 4/17/2025

```
 1    you had three human beings and one dog at least
 2    there with you; correct?
 3         A.   Yes, sir.
 4         Q.   So that kind of lines up with what Dedmon
 5    was saying in that first 022 about "myself and other
 6    marked deputies"?
 7              MR. DARE:  Leading.
 8         Q.   (By Mr. Moak)  It appears there were more
 9    than two people there --
10         A.   Yes, sir.
11         Q.   -- at your arrest that night; correct?
12         A.   Yes, sir.
13         Q.   Based on what would have been given to us.
14              Now, there also was given to you a -- in
15    that same Exhibit 5 it's on 025.  Keep going.  025.
16    025 is a dispatch report that's been referred to.
17              MR. MOAK:  Off the record just a second.
18                      (An off-the-record discussion
19                      took place.)
20         Q.   (By Mr. Moak)  When we look at that --
21    you're looking at it?
22         A.   Yes, sir.
23         Q.   Okay.
24              It says that you were in custody at 10 --
25    10:33, and 20 -- 10:33 and 24 seconds; correct?  At
```

Bobbie Adams 4/17/2025

```
 1    the very top.
 2         A.   Yes, sir.
 3         Q.   See that where it says "1x in custody"?
 4         A.   Yes, sir.
 5         Q.   We're making the assumption that that is
 6    you.  As you go on down in the report at 10:44:05,
 7    and that is -- see, I didn't mark yours up.  Let me
 8    see where I found that.  10:44:05 it says, "This
 9    message was sent from page manager.  Adult male,
10    needs medical attention."
11              See that?
12         A.   Yes, sir.
13         Q.   Okay.
14              And that was approximately eight minutes
15    after it said you were in custody; correct?
16         A.   Yes, sir.
17         Q.   As we're going down into this dispatch
18    sheriff's report, if you'll look down because --
19    well, first of all, let me back up.  What they had
20    done, they had run the car; correct?
21         A.   Yes, sir.
22         Q.   It's on this report.  Shows that it
23    belongs to one Cassandra Armstrong?
24         A.   Yes, sir.
25         Q.   As you go on down below that, on that same
```

Bobbie Adams 4/17/2025

```
 1    page, see where it says "Sacramento, California"?
 2         A.   They check on me.
 3         Q.   See right there where it says, "Update, K9
 4    VooDoo was released"?
 5         A.   Yes, sir.
 6         Q.   What do you think that means?
 7              MR. DARE:  Object to form.
 8         Q.   (By Mr. Moak)  What's your opinion?  What
 9    do you think that --
10         A.   They let the dog go.
11         Q.   They let the dog go.  You think they let
12    the dog go on you, or they let the dog go home?
13         A.   They let him off on me.
14         Q.   Okay.
15              Now, when we -- you said, and briefly and
16    I really won't get into it, but you said briefly
17    there was some derogatory language used concerning
18    blacks.  Were there any other black folks there
19    besides you and the three deputies at that time that
20    that was said?
21         A.   Oh, no.  No.
22         Q.   So you felt that was directed at you?
23         A.   Yeah.
24         Q.   Okay.  I'm just hitting and missing a few
25    little things.  We're going that way in order to try
```

Bobbie Adams 4/17/2025

```
 1    to get this quickly.
 2              There are some medicals at both Merit
 3    Health and UMMC that you have not paid for; correct?
 4         A.   Yes, sir.
 5         Q.   You don't know whether Rankin County has
 6    paid for those medicals or not?
 7         A.   No, sir.
 8         Q.   Only that you have not?
 9         A.   No, sir.
10         Q.   Okay.
11              And you were also asked, have you ever met
12    Bryan Bailey, the Sheriff?
13         A.   No, sir.
14         Q.   Do you know him to be the Sheriff of
15    Rankin County?
16         A.   Yes, sir.
17         Q.   What about his deputies?  Do you believe
18    they're under his control as their boss?
19         A.   Yes, sir.
20         Q.   Did you believe that whatever happened
21    that night, they would let their boss know?
22         A.   Yes, sir.
23         Q.   Do you have any reason to know how he
24    trains those people?
25         A.   No, sir.  I don't know.  I have no idea.
```

Bobbie Adams 4/17/2025

```
 1        Q.   But the training as it occurred to you
 2   that night, a dog was released on you?
 3        A.   Say that again.
 4        Q.   The training that occurred that night, it
 5   appears a dog was released on you while you were
 6   handcuffed?
 7        A.   Yes, sir.
 8        Q.   With your prior testimony.
 9             So you also said you wrote a 12-page
10   letter to the Sheriff?
11        A.   Yes, sir.
12        Q.   Was that letter praising him or was it
13   talking about the things that occurred to you?
14        A.   What happened to me.
15        Q.   And was that complaining?
16        A.   Yep.  Complaining.
17        Q.   Now, you said while you were there that it
18   would be Officer Shack, he dropped the leash.
19        A.   Yeah.
20        Q.   Do you know if dropping a leash is a
21   command control by Officer Shack?
22        A.   Is it a command control?
23        Q.   Let me back up and give an example without
24   leading because council opposite had mentioned that
25   before.
```

Bobbie Adams 4/17/2025

```
 1                "Get him."  "Go after him."  Do you have
 2    any knowledge that dropping a leash is a command
 3    control that could be used by the dog handler?
 4         A.    Yes, sir.
 5         Q.    Do you know how this dog was trained?
 6         A.    No, sir.
 7         Q.    And do you know where this dog was
 8    purchased from?
 9         A.    No, sir.
10         Q.    Do you know if this officer had hand
11    signals that he could give the dog without speaking
12    to attack?
13         A.    No, sir.  None that I know of.
14         Q.    But you know that when you were sitting
15    there --
16         A.    Yes, sir.
17         Q.    -- cuffed, that he simply dropped the
18    leash --
19         A.    Yes, sir.
20         Q.    -- and the dog came to you?
21         A.    Yes, sir.
22         Q.    And at that point, I believe your
23    testimony was, he grabbed you by the left foot
24    first?
25         A.    Yes, sir.
```

Bobbie Adams 4/17/2025

```
 1           Q.   You said he was pulling and shaking?
 2           A.   Yes, sir.
 3           Q.   And we have seen -- we have seen the
 4      photographs that are also listed in evidence in
 5      Exhibit 5, I believe, or one of them.
 6                The shaking, that was a tearing mechanism
 7      by the dog?
 8           A.   Yes, sir.
 9           Q.   And as we saw, all of those photographs in
10      that same list of exhibits --
11           A.   Yes, sir.
12           Q.   -- there were no photographs taken of your
13      foot; is that correct?
14           A.   Yes, sir.
15           Q.   You were not the one taking the
16      photographs?
17           A.   No, sir.
18           Q.   You didn't not know if those photographs
19      are a full compilation of everything?
20           A.   No, sir.  I don't know.
21           Q.   You do not know if the person who took the
22      photographs only took limited photographs?
23           A.   No, sir.  I don't know.
24           Q.   Okay.
25                Now, when you were taken to Merit Health,
```

Bobbie Adams 4/17/2025

1    you started to get into it a little bit.  That was
2    the first hospital you went to?
3          A.    Yes, sir.
4          Q.    You said Officer Dedmon held you down?
5          A.    Him and the hospital staff held me down.
6          Q.    Why did they hold you down?
7          A.    They asked me for some urine.  I told
8    them -- I told them, I said I couldn't give them
9    none then due to all the pain I was in.  I told him,
10   I said, Man, just cut the water on in the sink, you
11   know, thinking that that would help me just go.  And
12   he told me, he said, Man, you don't give me no urine
13   in five minutes, we're gonna hold you down and shove
14   that catheter in you.  I begged, I pleaded, I --
15   like, man, just cut the water on in the sink, man.
16   It's right on the edge, you know, but I can't go due
17   to all the pain I'm in.
18         Q.    Is that what they did?
19         A.    Yes, sir.  I begged them.  And man, they
20   held me down.  They had one hand -- talking about
21   cup down.  They held me down and, man, they shoved
22   that thing up inside of me, man.  And that shit,
23   man, feel worse than the dog, man.
24         Q.    They put a catheter up in you?
25         A.    Man, it felt worse than the dog.  And to

Bobbie Adams 4/17/2025

```
 1    this day, man -- I say about a couple weeks, man,
 2    it's the second time I've had, like, sharp pains
 3    where I can't -- like, my groins hurt, man.  I ain't
 4    even start having that until they did that.
 5         Q.    Okay.
 6               Were the officers there at the time you
 7    were at that hospital?
 8         A.    Yes, sir.
 9         Q.    Do you know who may have told the hospital
10    staff that you were there for a drug overdose?
11         A.    I don't know.  That's for sure.  They said
12    I said I overdosed on some drugs.
13         Q.    Who said that?
14         A.    They said I told the people in the
15    ambulance that I overdosed on drugs.
16         Q.    But the hospital had a belief that you --
17         A.    Overdosed on --
18         Q.    -- were there because of a drug overdose?
19         A.    A drug overdose.
20         Q.    And the sheriff's deputies were there?
21         A.    Yes, sir.
22         Q.    Okay.
23               One other thing, it's very small.  But the
24    photograph that shows something on your leg --
25         A.    Yes, sir.
```

Bobbie Adams 4/17/2025

```
 1        Q.   -- was referred to by council opposite as
 2   mud.
 3        A.   Yes, sir.
 4        Q.   Can you take a look at that photograph
 5   again, please?  That would be in that same list of
 6   exhibits that you just had, those photographs.  Go
 7   right on through there.  They're down.
 8        A.   Okay.
 9        Q.   They're -- 41.  Number 41 at the bottom.
10        A.   That one?
11        Q.   That one right there.
12        A.   Yeah.
13        Q.   So see that -- see that brown stuff up
14   there?
15        A.   Yes, sir.
16        Q.   Well, yeah.  That right there on the side?
17        A.   Yes, sir.
18        Q.   Is that mud?
19        A.   Yes, sir.
20        Q.   Or is it dirt?
21        A.   Dirt.
22        Q.   Was it -- I guess it's just an all who --
23   I don't know.  So the ditch you were sitting in, was
24   it wet?
25        A.   It wasn't wet.
```

Bobbie Adams 4/17/2025

```
 1          Q.   It was not wet?
 2          A.   No.
 3          Q.   So whatever it is, mud or dirt, the amount
 4     of wetness that's on the ground at that time would
 5     declare whether it was mud or dirt?
 6          A.   Yes, sir.
 7          Q.   They're not big balls of mud up there on
 8     you, are there?
 9          A.   No, sir.
10          Q.   And while we're looking at that, there's
11     also a reference made to those two little marks up
12     there above that looks like some little scrape.
13          A.   Yeah.
14          Q.   You testified you didn't know where you
15     got those from?
16          A.   No, sir.
17          Q.   Could you have gotten them from this deep
18     ditch you were in?
19          A.   No.  I didn't fall in the thing.
20          Q.   You didn't fall?
21          A.   No, sir.
22          Q.   So you just know -- they just -- they're
23     just showing up --
24          A.   Yes, sir.
25          Q.   -- on the photograph.  At some point --
```

Bobbie Adams 4/17/2025

```
 1        A.   Yes, sir.
 2        Q.   -- they happen, but you don't know where
 3   it happened?
 4        A.   No, sir.
 5        Q.   Okay.
 6             MR. MOAK:   That's all the follow-up I
 7        have.
 8   EXAMINATION BY MR. DARE:
 9        Q.   Mr. Adams, are you a certified dog
10   handler?
11        A.   No, sir.
12        Q.   Have you ever trained a dog to be a
13   working dog for a law enforcement department?
14        A.   No, sir.
15        Q.   Suffice it to say you don't have any idea
16   what a command control is for a dog that is trained
17   to work in law enforcement, do you?
18        A.   No, sir.
19        Q.   Who put the catheter in you?
20        A.   The hospital employees.
21        Q.   Nurse or the doctor?
22        A.   It was -- it wasn't a doctor, it was a
23   nurse.  Oh, man.
24        Q.   Catheters hurt, don't they?
25        A.   Man, I'd rather get shot in the head.
```

Bobbie Adams 4/17/2025

```
1    Man, I'd rather get shot.  Man, that thing -- when
2    they shoved it, didn't put no grease or nothing on
3    there.  Just shoved it in me, and they got the
4    urine.  They ripped it out and that did me bad.  On
5    camera.
6         Q.   Catheter almost hurt worse than getting
7    bitten by the dog, huh?
8         A.   Yes, indeed, man.
9         Q.   And all Christian Dedmon did was help hold
10   you down to get the catheter in, right?
11        A.   Yeah.
12        Q.   Not sure if I've got the Pafford records.
13   Did you say that you had told folks with Pafford or
14   the EMTs that you had taken drugs earlier that day?
15        A.   No, sir.  That's a lie.
16        Q.   Didn't tell anybody that?
17        A.   No, sir.
18        Q.   I was just wanting to make sure to clarify
19   that.
20        A.   No, sir.  I never told nobody that.
21        Q.   On May 1, 2021, had you done any drugs
22   that day?
23        A.   No, sir.
24        Q.   Not even weed?
25        A.   No, sir.  I wouldn't smoke -- the only --
```

Bobbie Adams 4/17/2025

```
 1    when I -- I wasn't doing no drugs then.  I didn't
 2    start smoking until I knew I was going to come to
 3    jail.  That's when I started smoking weed.  I
 4    didn't -- I wasn't smoking then.  I had just started
 5    smoking.
 6         Q.    Well, who were you buying the crystal meth
 7    for?
 8         A.    Say that again.
 9         Q.    Who were you buying the ice for?
10         A.    Me.  I'm talking about I wasn't smoking
11    marijuana then.
12         Q.    But you hadn't earlier that day?
13         A.    Yeah.
14         Q.    Okay.
15              MR. DARE:  Read and sign?  Are you going
16         to try to?
17              MR. MOAK:  No.  We're not even going to
18         attempt to.
19              THE COURT REPORTER:  And would you like a
20         copy?
21              MR. MOAK:  Yes.
22                  (Time Noted:  1:42 p.m.)
23                      SIGNATURE WAIVED
24
25    ORIGINAL:  JASON DARE, ESQ.
```

Bobbie Adams 4/17/2025

1    COPY:  BOBBY MOAK, ESQ.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bobbie Adams 4/17/2025

```
 1              CERTIFICATE OF COURT REPORTER
 2              I, Kaitlyn Etherton, Court Reporter and
 3    Notary Public, in and for the State of Mississippi,
 4    hereby certify that the foregoing contains a true
 5    and correct transcript of the testimony of BOBBIE
 6    ADAMS, as taken by me in the aforementioned matter
 7    at the time and place heretofore stated, as taken by
 8    stenotype and later reduced to typewritten form
 9    under my supervision by means of computer-aided
10    transcription.
11              I further certify that under the authority
12    vested in me by the State of Mississippi that the
13    witness was placed under oath by me to truthfully
14    answer all questions in the matter.
15              I further certify that, to the best of my
16    knowledge, I am not in the employ of or related to
17    any party in this matter and have no interest,
18    monetary or otherwise, in the final outcome of this
19    matter.
20              Witness my signature and seal this the 1st
21    day of May, 2025.
22
23              _____
                   Kaitlyn Etherton, CCR #1963
24
      My Commission Expires:
25    October 11, 2027
```