EXHIBIT 7A

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION


MICHAEL COREY JENKINS, et al.,

     Plaintiffs,

                        Civil Action

vs.                      No. 3:23-cv-374-DPJ-FKB

RANKIN COUNTY, MISSISSIPPI, et al.,

     Defendants.


DEPOSITION OF

STEVEN N. GODFREY


TAKEN ON
MONDAY, NOVEMBER 11, 2024
10:11 A.M.


578 HIGHLAND COLONY PARKWAY, SUITE 100
RIDGELAND, MISSISSIPPI 39157

NAEGELI
DEPOSITION & TRIAL
(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT

(800) 528-3335    NAEGELI DEPOSITION & TRIAL    NAEGELIUSA.COM
Established 1980

STEVEN N. GODFREY                November 11, 2024                                    2 to 5
79776

| | Page 2 |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | Appearing on behalf of Plaintiffs: |
| 4 | MALIK Z. SHABAZZ, ESQUIRE (Via Zoom) |
| 5 | Shabazz Law Offices |
| 6 | 6305 Ivy Lane |
| 7 | Suite 608 |
| 8 | Greenbelt, MD 20770 |
| 9 | (301) 513-5445 |
| 10 | (301) 513-5447 |
| 11 | attorney.shabazz@yahoo.com |
| 12 | -and- |
| 13 | TRENT WALKER, ESQUIRE |
| 14 | Walker Law Offices |
| 15 | 5255 Keele Street |
| 16 | Suite A |
| 17 | Jackson, MS 39206 |
| 18 | (601) 321-9540 |
| 19 | (601) 398-3918 (Fax) |
| 20 | trent@trentwalkerlaw.com |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

| | Page 4 |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | PAGE |
| 3 | EXAMINATION BY MR. SHABAZZ 7 |
| 4 | EXAMINATION BY MR. DARE 142 |
| 5 | FURTHER EXAMINATION BY MR. SHABAZZ 144 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES (CONTINUED) |
| 2 | |
| 3 | Appearing on behalf of Defendants: |
| 4 | JASON E. DARE, ESQUIRE |
| 5 | Biggs, Ingram and Solop, PLLC |
| 6 | 578 Highland Colony Parkway |
| 7 | Suite 100 |
| 8 | Ridgeland, MS 39157 |
| 9 | (604) 987-5307 |
| 10 | (604) 398-3918 |
| 11 | jdare@bislawyers.com |
| 12 | |
| 13 | ALSO PRESENT: |
| 14 | Tom Hazelhurst, NDT Technician |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

| | Page 5 |
|---|---|
| 1 | EXHIBIT INDEX |
| 2 | Plaintiff's Exhibit PAGE |
| 3 | 1 RESPONSES TO FIRST SET 49 |
| 4 | INTERROGATORIES |
| 5 | 2 ORGANIZATIONAL CHARTS 49 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

STEVEN N. GODFREY
79776

November 11, 2024

6 to 9

Page 6

```
1                DEPOSITION OF
2             STEVEN N. GODFREY
3                  TAKEN ON
4          MONDAY, NOVEMBER 11, 2024
5                 10:11 A.M.
6
7        THE REPORTER:  So we are on record.  The
8  time now is 10:11 a.m., and Mr. Godfrey, may I get
9  you to raise your right hand, please?
10       MR. GODFREY:  Yes, ma'am.
11       THE REPORTER:  Do you affirm under penalty
12 of perjury that the testimony you're about to give
13 will be the truth, the whole truth and nothing but
14 the truth?
15       THE DEPONENT:  I do, ma'am.
16       THE REPORTER:  Thank you.  All right.
17 Will each attorney please state your name and whom
18 you represent for the record?
19       MR. SHABAZZ:  Okay.  My name is Attorney
20 Malik Shabazz, S-H-A-B-A-Z-Z, and I'm an attorney
21 for the Plaintiff in this matter.
22       MR. WALKER:  Trent Walker, attorney for
23 the Plaintiffs in this matter.
24       MR. DARE:  Jason Dare.  I am representing
25 Rankin County and Sheriff Bryan Bailey in this
```

Page 7

```
1  matter.
2        THE REPORTER:  All right, Attorney.  You
3  may proceed.
4  STEVEN N. GODFREY, having been first duly affirmed
5  to tell the truth, was examined, and testified as
6  follows:
7  EXAMINATION
8  BY MR. SHABAZZ:
9        Q.  Okay.  Good morning, Mr. Godfrey.
10       A.  Good morning, sir.
11       Q.  Okay.  I am attorney for the Plaintiff in
12 this matter.
13       A.  Yes, sir.
14       Q.  And Attorney Trent Walker.  Michael
15 Jenkins and Eddie Parker.
16       A.  Yes, sir.
17       Q.  This is a civil rights matter brought
18 against Rankin County, Sheriff Bryan Bailey and six
19 other deputies that were involved in the incident of
20 January 24th, 2023.
21       A.  Yes, sir.
22       Q.  Okay?
23       A.  Yes, sir.
24       Q.  Okay.  I'm going to speak as clearly as I
25 can to you.
```

Page 8

```
1        A.  Yes, sir.
2        Q.  And straightforward, so that you can
3  understand my questions.  I'll speak as slowly as I
4  can.
5        A.  Yes, sir.
6        Q.  Then I'm going to wait and receive your
7  answers.
8        A.  Understood.
9        Q.  If there's anything that I state to you
10 that you can't understand or that's not clear, I'd
11 like you to just tell it to me, because I can repeat
12 it again.  And so that we get an accurate recording
13 of the record, I'll wait til you finish your answers
14 and -- so we can be clear.
15       A.  Yes, sir.
16       Q.  If you need a -- if you need a break at
17 any time, I want you to just let me know.  Now is
18 there anything that would impede you from
19 participating in this deposition, any -- any
20 medication or physical condition that might affect
21 your ability to answer these questions?
22       A.  Not to the best of my knowledge, sir.
23       Q.  Okay.  Now in preparation for this
24 deposition, did you prepare with your attorney?
25       A.  We met.  Yes, sir.
```

Page 9

```
1        Q.  Okay.  And did you review any documents
2  for this deposition?
3        A.  No, sir.
4        Q.  Okay.  Now I want to go over, start with
5  your education.  What's your educational background?
6        A.  I graduated in 1975 from Georgia Southern
7  College at that time, which is now Georgia Southern
8  University.  That's the extent of my -- well, I'm
9  sorry.  Probably 15 years ago I took up, I had
10 thought I might want to get a master's from the
11 University of Mississippi, possibly to teach after I
12 retired from the FBI.  I just never finished it up.
13 So I have a few hours of graduate work.
14       Q.  Okay.
15       A.  That's formal education.  I do have, of
16 course, certifications from various law enforcement
17 agencies.
18       Q.  Okay.  So where is -- what's the farthest
19 you formally went in your education?  What's the
20 furthest that you went?
21       A.  One year of grad school.
22       Q.  One year of grad school?
23       A.  Yes, sir.
24       Q.  Okay.  And what was your first law
25 enforcement position?
```

Page 10

1  A.   1975, after graduating for college, I went
2  to work for the BIBB, B-I-B-B County Sheriff's
3  Office in Macon, M-A-C-O-N, Georgia.  Of course, all
4  hired as start in the jail, and you work your way
5  through the dispatching into the road.
6       I worked there from 1975 to 1981.  In
7  1981, I applied to and was hired by the Georgia
8  Bureau of Investigation as a special agent for them.
9  I worked for them just under three years.  In 1984,
10  June 4th of 1984, I was sworn into the Federal
11  Bureau of Investigation as a special agent trainee.
12       I completed the FBI Academy, Quantico,
13  Virginia, and then was assigned to field work.  I
14  left the -- I left the FBI in 2010, May 31st of
15  2010, as I aged out at 57.  After that, worked as --
16  I did background investigations for the FBI on a
17  contract basis.  I also worked for the Mississippi
18  Bureau of Investigation for a period of 18 to 24
19  months on cold case homicides as a contract
20  investigator.  And then started working part-time at
21  --
22       Q.   Slow down for one second.  Slow down for
23  one second.
24       A.   Yes, sir.
25       Q.   Let's back up for a minute.

Page 11

1       A.   Yes, sir.  Sorry.
2       Q.   You said you worked for the MBI starting
3  in what year?
4       A.   That would have been -- I retired in 2010.
5  Possibly maybe the beginning of 2011.
6       Q.   Okay.  And what work did you do at the
7  MBI?
8       A.   They had a federal grant to work cold case
9  homicides.
10       Q.   Uh-huh.
11       A.   And so we were working cold case homicides
12  around the state of Mississippi.
13       Q.   Okay.  And you worked for them for one
14  year?
15       A.   No.  About 18 months, and again it was --
16  it was a contract, so I just worked and then I think
17  they lost funding for the contract and cut back.
18  And so I left there, and that's when I went to work
19  for the Sheriff's Office.  I'd actually been working
20  with them part-time also for a few months.
21       Q.   Okay.  So you say you left at the end of
22  the MBI.  You left because the contract ended?
23       A.   Yeah.  That's what I was told, yes.  The
24  contract had -- they didn't get the funding or
25  something along those lines.  So they kept, I think,

Page 12

1  one guy who happened to be a former trooper.  So I
2  kind of knew that I wouldn't be retained if they had
3  budget cutbacks.
4       Q.   Okay.  Prior to the MBI, when you -- when
5  you were with the FBI prior to 2010, why did -- how
6  did you end your employment there?
7       A.   I aged out.  57, mandatory retirement.
8       Q.   Aged out.  Okay.  And then you went on
9  with the MBI for 18 months?
10       A.   Yeah, close to about.
11       Q.   Okay.  What happened -- and then you say
12  the contract ended?
13       A.   Yes, sir.
14       Q.   And what happened after that?
15       A.   I still was doing some background
16  investigations for the FBI, but I also went out to
17  Rankin County.  They had asked me to come out there.
18       Q.   Okay.  What year was that?
19       A.   Give me a chance to do some month.
20       Q.   What month -- what month -- what month and
21  year was that?
22       A.   I think it was in February of 2012.
23       Q.   Now when you say "Rankin County asked you
24  to come out there," who was that in Rankin County
25  that asked you to come out there?

Page 13

1       A.   Bryan Bailey, the Sheriff.
2       Q.   Bryan Bailey.  Now when did Bryan Bailey -
3  - when did Bryan Bailey become the Sheriff at Rankin
4  County?
5       A.   Counsel, do you know?  It was before that.
6            MR. DARE:  You can testify as to -- as to
7  what you know.  I mean I can represent to you that
8  the roles and records would reflect that Bryan
9  Bailey first took office in January of 2012.
10            THE DEPONENT:  I thought it was his first
11  term.  That was his first term.  He had been
12  Undersheriff before then.
13  BY MR. SHABAZZ:
14       Q.   Okay.  So Bryan Bailey -- okay.  You said
15  that Bryan Bailey asked you to come to Rankin?
16       A.   Yes.  I'd been talking to Bryan for a
17  while.  I knew Bryan because I had seen him at the
18  National Academy when I was with the FBI.
19       Q.   Okay.  So when did you -- when did you
20  first meet Bryan Bailey?
21       A.   Ooh.  This was a WAG, boss, just a wild
22  ass guess.  Maybe three years before that.  As part
23  of what I did with the FBI was liaison with local
24  law enforcement.  So I knew a lot of the guys
25  around.  I lived in Rankin County.

STEVEN N. GODFREY          November 11, 2024                    14 to 17
79776

**Page 14**

1    I knew who he was. Went to chiefs
2 conferences, sheriffs conferences for several years.
3 That was part of my job with the FBI, was the
4 training coordinator, the National Academy
5 coordinator.
6    Q.   Okay. So what position was Bryan Bailey
7 before he became Sheriff?
8    A.   Undersheriff.
9    Q.   Okay.
10    A.   He was the Undersheriff when I sent him to
11 the National Academy.
12    Q.   When you sent him to the National Academy?
13    A.   When the FBI sent him. When I say "me," I
14 was the one was running that program at the time.
15 Yep. I should be --
16    Q.   All right. You've given me some
17 information, but at the outset of your law
18 enforcement career, can you describe the training
19 that you received?
20    A.   I started in `75 and you had something
21 like 18 to 24 months to be certified. So I was sent
22 to post-training Georgia in 1977, I think.
23    Q.   Okay. And after that, your training?
24    A.   You go to in-services school. I went to a
25 DUI and toxicological school. I went -- again,

**Page 15**

1 you're asking me to remember back 40, 45 years. I
2 occasionally go to classes that you'd want to go to,
3 interview and interrogation, stuff along those
4 lines. Of course --
5    Q.   Okay.
6    A.   -- when I -- when I left the Sheriff's
7 Office, I went to work at the Georgia Bureau of
8 Investigation. Had to go to their basic school,
9 which I think was eight weeks at that time.
10    Q.   Okay. What were you trained in?
11    A.   Just basic investigative techniques.
12 Okay. Their version of post peace officer standing
13 and training.
14    Q.   I understand.
15    A.   Yes sir.
16    Q.   Okay. After that, what did your training
17 consist of? I think you hit -- you went to the GBI
18 in `84; correct?
19    A.   No, sir. That was the FBI in `84. I went
20 to the GBI in `81.
21    Q.   `81?
22    A.   Yes, sir.
23    Q.   All right. So when you went to the FBI,
24 what was your -- what level of training did you
25 receive? What kind of training?

**Page 16**

1    A.   16 weeks -- 16 weeks in the FBI Academy.
2    Q.   Okay. Can you describe the training that
3 you received there?
4    A.   Everything. Physical training, firearms
5 training, defensive tactics training, interview and
6 interrogation, informant development. I'm sure I'm
7 leaving something out. But 16 weeks, the whole
8 time.
9    Q.   Okay. Anything else other than those
10 categories at the FBI?
11    A.   At the Academy? I'm sure -- I'm sure I'm
12 overlooking something, sir. Yeah, I think --
13    Q.   Okay. Did you have a copy of your
14 training records from that period?
15    A.   No. No, sir.
16    Q.   Okay. After that, you said you went to --
17 you were at the MBI; correct?
18    A.   Yes.
19    Q.   Now what training did you receive at the
20 MBI?
21    A.   No training from MBI. Again I was -- sir?
22    Q.   Okay. What were you going to say?
23    A.   I just said I was cold case homicide, so
24 there -- there was really nothing to be trained on.
25 Just when I tried to work up some old cases.

**Page 17**

1    Q.   Okay, at the MBI. And then that brings us
2 up to Rankin County; is that correct?
3    A.   Yes. Yes, sir.
4    Q.   Okay. Now what were you -- what were you
5 recruited to do at Rankin County by Sheriff Bailey?
6    A.   I had run the SWAT team for the FBI, the
7 local office team. I had -- was a tactical
8 instructor, a firearms instructor, things along
9 those lines. So I was brought over to -- to one is
10 the SRT team, the Special Response Team. I was
11 brought over to run the firearms program and
12 basically help with training and, of course, I
13 pretty much did anything he wanted me to do.
14    In fact, if somebody needed help on an
15 interview, I was glad to do that. Pretty much just
16 anything they wanted me to do.
17    Q.   Okay, okay. So you were brought in to do
18 SWAT, firearms and what positions -- how long did
19 you stay at Rankin County?
20    A.   Ten years.
21    Q.   How long did you --
22    A.   About at ten years, yes sir.
23    Q.   Okay. So you left in -- you left in what
24 year? When did you leave?
25    A.   Last November.

Page 18

1    Q.   November of 2023?

2    A.   Yes, sir.

3    Q.   Okay.  That seems to be about 13 years; is

4 that correct?

5    A.   No, sir.  I didn't go to work immediately

6 for Rankin again.  I started at MBI, and I was doing

7 --

8    Q.   February 2012?

9    A.   About 2012, but at first I was part-time

10 over there.  So I wasn't -- that was not accruing

11 PERS time, retirement qualifications.

12       So what I did was after I left MBI and I

13 stopped doing Bibbs, because I got tired of fooling

14 with federal rules and regulations, I went out there

15 as a -- I was designated full-time less than 40

16 hours.  That I guess a PERS designator.  So I could

17 -- that qualified me for retirement credits so --

18    Q.   Okay.  When did you come to full time at

19 Rankin County?

20    A.   Sometimes in 2012 maybe, 2013.  I accrued

21 enough -- I think you have to have ten hours at --

22 nine or ten to retire from PERS.  And so that's --

23 as soon as I got the time.  You've got to contact

24 Personnel in Rankin, and they could tell you when I

25 -- all these different things.

Page 19

1    Q.   Okay.  Now so you said you came in to help

2 with the SWAT Department?

3    A.   The tactical team, yes sir.

4    Q.   And with firearms?

5    A.   Yes, sir.  Running the program.

6    Q.   What other position did you hold in Rankin

7 County?

8    A.   I think if you're looking for a title,

9 it's probably Training Director, which is kind of

10 misnomer.  I mean there's really -- there's no

11 Academy, so to speak.  There is a -- they have an

12 Academy there that's basically they run a program at

13 Rankin for -- reserve, reserve officer program.

14       I didn't participate in that.  That was

15 already up and running by other people there, so I

16 didn't get involved in it and I helped a little bit

17 on Internal Affairs investigations.  Not many, just

18 one.  They would occasionally ask me to look into

19 some allegation.

20    Q.   Okay.  So did you ever serve as an

21 Internal Affairs officer for Rankin County?

22    A.   Again, I would do some.  I wouldn't -- I

23 wouldn't say I was the Internal Affairs

24 investigator.  They really at the time didn't have

25 one.

Page 20

1    Q.   They did not have one?

2    A.   To the best of my recollection.

3    Q.   They did not have an internal

4 investigation department -- Rankin did not have an

5 Internal Affairs Department during the time of your

6 tenure in Rankin, is that right?

7    A.   Not a department, no sir.  Nobody assigned

8 full-time to that position, no.

9    Q.   Okay.  So and -- and so just -- when were

10 you able to participate in certain investigations?

11    A.   When I asked to by the Sheriff.

12    Q.   Okay.  And when were those occasions?

13    A.   Once again you asked this.  It's over ten

14 years, and it's been a while.  I've worked several,

15 and most of them were just the Sheriff would say can

16 you look into this.  There's been an allegation of

17 this.  Can you look into it?  I would do a short

18 investigation, put some interviews together and I

19 would get the package back to the Sheriff.

20    Q.   Okay.  So is it fair to say that your

21 assignment was not formal in that regard but --

22    A.   Yeah, yeah.  That was probably be a good

23 statement.  Not formal, but I was asked to do them

24 on occasion.

25    Q.   Okay.  And do you recall the

Page 21

1 investigations that you did participate in?

2    A.   A few.

3    Q.   Do you recall those investigations?

4    A.   Sir?

5    Q.   Do you recall those investigations?

6    A.   A few of them.  You would have to ask me

7 specifics.  Generally, I remember one I did on a

8 correctional officer who was accused of having sex

9 with a trustee one time, and another one --

10    Q.   Do you remember that officer's name?

11    A.   No.  That was when I first started there.

12 That was probably back in about 2012.  He was a

13 sergeant in the jail is all I can tell you.

14    Q.   Do you remember the deputy's name?

15    A.   It was a sergeant in the jail.  That's all

16 I can tell you.

17    Q.   Okay.  And about how many, just because it

18 doesn't seem to be that many --

19    A.   Right.

20    Q.   But in your career, how many

21 investigations did you participate in?

22    A.   Eight, ten.  Some of them were just quick,

23 you know, turnaround things --

24    Q.   Okay.  Okay.  I'm sorry.

25    A.   No, that's fine.

STEVEN N. GODFREY
79776                         November 11, 2024                    34 to 37

Page 34

1 the persons that were joining the SWAT team? Was
2 there any investigation into their past conduct or
3 misconduct?
4    A.   Again, it's a small department. Everybody
5 knows everybody. You know.
6    Q.   Okay. So the answer would be no?
7    A.   If you -- if you choose to say no.
8 Everybody knew everybody. I mean that is an
9 investigation.
10   Q.   Okay. Now when you say "everybody knew
11 anybody," is that to say that -- that you knew
12 Christian Dedmon, Middleton, McAlpin, Opdyke and
13 Elward, that you knew all about them at the time
14 they were allowed to join the SWAT team?
15   A.   No. That's probably no. Absolutely I
16 don't know everything about them. I don't know
17 everything about anybody. I observe them in their
18 work and I talk to people who work with them, knew
19 whether they were a good worker or not.
20   Q.   Okay. But I mean you just earlier said
21 that you said it's a small department, and everybody
22 -- seems to be you said everybody knows everything
23 about everybody?
24   A.   No, sir. I didn't say everybody knows
25 everything. I said everybody knows these guys. I

Page 35

1 don't know everything about anybody sir, not even my
2 wife.
3    Q.   Okay. So, okay. So everybody knows these
4 guys. So you knew Dedmon, Middleton, McAlpin,
5 Opdyke and Elward. You knew them?
6    A.   Yes, sir.
7    Q.   You knew what kind of officers they were?
8    A.   Yes, sir.
9    Q.   Okay. And were you aware of past
10 incidents that they had been involved in, citizens,
11 past incidents that they have involved in with
12 citizens of Rankin County?
13        MR. DARE: Object to form. You can answer
14 if you know.
15        THE DEPONENT: No. Certainly, I don't
16 know every interaction they've had with people in
17 Rankin County, no.
18 BY MR. SHABAZZ:
19   Q.   I'm talking about incidents where -- where
20 possible excessive force or violations of the
21 Constitutions have occurred?
22   A.   No, I wouldn't say that. I didn't know
23 everything, no.
24   Q.   Okay. But what -- what did you know about
25 them?

Page 36

1    A.   Now you're getting kind of overly broad
2 here. You want to go in and talk about each deputy
3 or -- I knew these -- I knew all these guys in the
4 context of me working with them, being in training
5 with them and being around the office with them. I
6 didn't go out at night work with any of them,
7 anything along those lines.
8    Q.   Okay. Now did you do -- did you do
9 investigations on the SWAT team? While you were a
10 member -- while you were serving in -- as part of
11 the leadership capacity on the SWAT team?
12   A.   Yes, sir.
13   Q.   -- did you do investigations on the
14 conduct of the officers while you were on the SWAT
15 team?
16   A.   No, sir. That wouldn't be appropriate.
17   Q.   Can you explain?
18   A.   If I'm out on a situation with the
19 deputies and something happens, I'm not an impartial
20 arbiter. I am involved in it. So there's no way I
21 can conduct an investigation and give the appearance
22 of propriety.
23   Q.   Okay. But did you -- are you saying you
24 participated in every action that the SWAT team
25 conducted?

Page 37

1    A.   Most of them, yes sir.
2    Q.   Okay. When you say "most," roughly what
3 percent?
4    A.   Official operations? Almost all of them.
5 If it was -- if it was a planned operation I was
6 generally there, unless I was out of town.
7    Q.   Okay. And did -- and you said that you
8 did not investigate any allegations of misconduct by
9 them while they were on the SWAT team?
10   A.   No.
11   Q.   Okay.
12        MR. DARE: Do you need to go off the
13 record?
14        THE DEPONENT: Sir?
15        MR. SHABAZZ: What did he say?
16        MR. DARE: I didn't say anything.
17        MR. SHABAZZ: Okay.
18 BY MR. SHABAZZ:
19   Q.   Well, who was responsible -- who was
20 responsible for investigating allegations of
21 misconduct for SWAT team members?
22   A.   I don't know. I didn't.
23   Q.   Okay. Do you know?
24   A.   Sir?
25   Q.   Do you know who was responsible for

STEVEN N. GODFREY                November 11, 2024                22 to 25
79776

Page 22

1    Q.    Okay.  They were -- do you have
2  documentation that reflects your investigations?
3    A.    Not after, no sir.  I didn't keep anything
4  when I left.
5    Q.    Okay.  And did you participate in
6  producing documents and records of the
7  investigations that you did participate in?
8    A.    I would prepare a packet and give it back
9  to the Sheriff, yes.  It would mostly be -- it will
10  just be results of the interviews or anything else
11  that was involved.  Again, maybe eight, ten the
12  whole time I was there.
13    Q.    Okay.  And you did -- you did have written
14  documentation for those eight to ten investigations
15  you did?
16    A.    That would be hard to say.  Again, I gave
17  everything back to the Sheriff.
18        MR. DARE:  If I may, I think you are
19  asking if this witness personally has any, is that
20  right?
21        MR. SHABAZZ:  No, sir.
22        MR. DARE:  I want to make sure that the
23  record was clear.  Can you ask that question again,
24  counsel?
25  BY MR. SHABAZZ:

Page 23

1    Q.    Okay.  I'm just asking did he produce
2  documentation in reference to the eight to ten
3  investigations that he says he participated in?
4    A.    Again, eight to ten is WAG.  I did on
5  occasion, yes sir, if I thought it was necessary.
6    Q.    Okay.
7    A.    I'll give you a good example if I wouldn't
8  prepare a document, okay?  The Sheriff would come
9  and say this person called and said this deputy did
10  something.  Was ugly to them on the road, cursed at
11  or whatever.
12        If I called the person and they didn't
13  return my call, didn't answer my call or decided
14  they wanted to pursue it, didn't want to come in and
15  make full statement or anything like that, I would
16  just go back to the Sheriff and say they wouldn't
17  come in and make a statement type thing.
18    Q.    Okay.  So you wouldn't -- you wouldn't --
19  would you write anything formal when that happened?
20    A.    No.  Generally not, no.  Again, it was an
21  informal thing.  I was not assigned as the Internal
22  Affairs investigation.  There was no standard
23  operating procedure that I knew of how to handle an
24  Internal Affairs investigation.  I just tried to
25  find out what went on and let the Sheriff know.

Page 24

1    Q.    Okay.  So did Rankin County in the times -
2  - in your tenure, did Rankin County have written
3  procedures for internal investigations?
4    A.    I'm sure there is one in the SOP, but it's
5  just general.  I couldn't quote it.
6    Q.    Okay.  Now you said that your --
7  that you at time to time did internal
8  investigations; correct?
9    A.    Yes, sir.  Yes, sir.
10    Q.    Okay.  Was there an Internal Affairs
11  officer during your tenure?
12    A.    I still don't think there's one full-time.
13  I think there's a guy that's assigned to do them now
14  in the Investigative Division.  A lot of times what
15  would happen is a complaint would come -- again
16  speculation, would come in, an allegation against a
17  patrol deputy that was rude to a person.
18        That would be passed to the Chief of
19  Patrol, who would handle it.  It would be passed to
20  the chief investigator to handle, those type of
21  things.
22    Q.    Okay.  Now you -- you left -- when you
23  left Rankin County, why did you leave Rankin County?
24    A.    I had enough time to retire.  It was time.
25  I'm 70 years old --

Page 25

1    Q.    Okay.
2    A.    It isn't what it used to be.
3    Q.    Okay.  You're familiar with the case of
4  Michael Jenkins and Eddie Parker; is that correct?
5    A.    Is this the shooting?  Yes, sir.  Yes,
6  sir.
7    Q.    Okay.  Did you participate in that
8  investigation?
9    A.    No, sir.
10    Q.    Okay.
11    A.    I did take the Garrity statements.  I took
12  Garrity statements from each of them at the request
13  of counsel and the Sheriff.
14    Q.    Okay.  Can you describe what that is?
15    A.    A Garrity statement?
16    Q.    Yes.  Can you describe what that is?
17    A.    It's when you interview -- you interview
18  the deputy and ask him what happened.
19    Q.    Okay.  So you did interview each deputy in
20  the -- in the Michael Jenkins/Eddie Parker matter?
21    A.    Yes, sir.
22    Q.    Okay.  When did you -- when did you
23  interview them?
24    A.    A week later, maybe.
25        MR. DARE:  And you can only testify as to

STEVEN N. GODFREY
79776

November 11, 2024

26 to 29

**Page 26**

1  what you specifically recall.
2  THE DEPONENT: Yeah. Maybe a week later,
3  five days later.
4  BY MR. SHABAZZ:
5  Q.  Okay.  And --
6  A.  I don't happen to know, sir.
7  Q.  Well, that's okay.  But did you produce --
8  A.  Yes, sir.
9  Q.  -- okay.  Did you produce records in
10  regards to your investigation?
11  A.  The interviews, yes sir.
12  Q.  Your interviews?
13  A.  Yes, sir.
14  Q.  Okay.  And Rankin County's in possession
15  of those, those records; is that correct?
16  A.  I have no idea.  I would assume they
17  would.
18  Q.  Okay.  So exactly what did you do with
19  those deputies?
20  A.  Did I do with the deputies?
21  Q.  Yeah.  When you --
22  A.  Nothing.  I had them come in, interviewed
23  them, gave the results to the Sheriff.
24  Q.  Gave the results to Sheriff Bailey.  Okay.
25  And you said maybe about a week or so after?

**Page 27**

1  A.  That's a guess again.  That's been several
2  years ago now, and I don't particularly remember.
3  Q.  Okay.  But were you asked to -- did you
4  reach any findings or conclusions or make any
5  recommendations based on your interview?
6  A.  No, sir.  Not my job.
7  Q.  Now when you were SWAT commander,
8  you say you were a SWAT commander?
9  A.  Yes, sir.  I was the overall commander,
10  team leader, whatever you want to call it for the
11  SRT team, yes sir.
12  Q.  Okay.  What year was that?
13  A.  From the time I started til the time I
14  left.
15  Q.  Okay.  So your entire tenure you were a
16  SWAT commander?
17  A.  Yes, sir.
18  Q.  Okay.  Now were any of the deputies that
19  were involved in the Michael Jenkins matter --
20  A.  Yes, sir.
21  Q.  I'm specifically speaking of Christian
22  Dedmon, Lieutenant Middleton.
23  A.  Yes, sir.
24  Q.  Brett McAlpin?
25  A.  No.  He was not on the team.  He was on

**Page 28**

1  the team to begin with, but he stepped off the team
2  when he became Chief Investigator.
3  Q.  Okay.  I'm going to ask you about each of
4  them and their involvement with the SWAT team.
5  A.  Yes, sir.
6  Q.  Okay.  Okay.  Well, let's just go down.
7  Was Dedmon a member of the SWAT team while you were
8  the commander?
9  A.  Yes, sir.
10  Q.  And was Middleton -- was Middleton a
11  member of the SWAT team while you were commander?
12  A.  Yes, sir.
13  Q.  Okay.  Do you recall the years for those
14  two, when they were SWAT team members?
15  A.  Middleton, I think, was on the team when I
16  got there.  Dedmon was not.  Dedmon tried out for
17  the team
18  after I was there, when he came over from Pearl.
19  Q.  Okay.  He tried out for the team.  About
20  what year was that?
21  A.  Anything I would tell you would be a
22  guess, sir.
23  Q.  That's okay.  I'm asking for your
24  recollection.
25  MR. DARE: I would only say don't

**Page 29**

1  speculate.
2  THE DEPONENT: Five years after I started,
3  six years.  I don't know when he came from Pearl.
4  BY MR. SHABAZZ:
5  Q.  Okay.  Mr. McAlpin, was he a member of the
6  SWAT team?
7  A.  He was -- yes sir, he was there.  He was
8  on the team when I got there.
9  Q.  Okay.  And how long did he serve on the
10  SWAT team, McAlpin?
11  A.  I think he stepped off when he became
12  Chief Investigator.
13  Q.  What year was that?
14  A.  I don't know, sir.
15  Q.  Approximately.
16  A.  Three years before.  When did I leave?
17  This is `20.  Maybe four years ago.
18  Q.  Roughly around 2019?
19  A.  I guess.  Again sir, I can't answer that
20  specifically.
21  Q.  That's okay.
22  A.  I understand.
23  Q.  That's okay.
24  A.  I understand.
25  Q.  We're putting some approximations here.

Page 30

1  Okay. So McAlpin served on the SWAT team up til
2  about 2019; correct?
3     A.  Possibly, yes sir.
4     Q.  Okay. And what about Deputy Opdyke?
5     A.  Yes, sir. He was on. He'd only been on a
6  couple of years, I think.
7     Q.  A couple of years?
8     A.  He was one of the newest members of the
9  team, yes sir.
10    Q.  When you arrived?
11    A.  No, sir. Before I left.
12    Q.  When you left?
13    A.  Yes, sir.
14    Q.  Okay. Okay. Well, what about Hunter
15  Elward?
16    A.  He was there. He was also on the team,
17  yes sir.
18    Q.  He was a member of the SWAT team?
19    A.  Yes, sir.
20    Q.  And what years was he a member?
21    A.  It would be about a year longer than
22  Opdyke, I think. Maybe two.
23    Q.  So, okay. Maybe roughly around 2019-2020?
24    A.  I guess. This is all -- should be all in
25  their personnel files.

Page 31

1     Q.  Okay. I think you said Dedmon had to --
2  did you say he had to qualify for the SWAT team?
3     A.  Had to try out. Yes, sir. Anybody that
4  comes in and wants to be on the team had to go
5  through a tryout. Unless you're on another team
6  that has the same standard operating procedures and
7  have been to the same schools that Rankin County
8  sends their guys to.
9     Q.  Okay. And so did -- were you -- were you
10  the person that determined the qualifications of the
11  deputy to join the SWAT team?
12    A.  We had come up -- basically, we had -- the
13  basic PT test was adopted from the one the FBI uses,
14  and then they do a few other things. Some team-
15  building exercises, some firearms, check their
16  firearms score, check their team-building skills,
17  and then the decision will be made mostly by the
18  whole team.
19    Q.  Okay. Well, what was the PT test?
20    A.  So you have to be outstanding. It's a --
21  consists of a mile and a half run, a 40 yard spring
22  with body armor carrying a weapon, a certain amount
23  of pullups wearing body armor, a shuttle run, and
24  that was about it.
25    Q.  Okay. Okay. In terms of what other

Page 32

1  qualifications --
2     A.  They certainly had to pass the firearms,
3  firearms scores.
4     Q.  Okay. What else?
5     A.  That was pretty much it to be -- to be
6  going to the interview and pass the interview that
7  was run by the whole team.
8     Q.  Okay. And you were -- were you the person
9  to determine whether they joined the SWAT team?
10    A.  No, sir. I certainly had a -- I had a say
11  in it, but it was a team decision.
12    Q.  Okay. Who was that team?
13    A.  The whole team.
14    Q.  Okay. Which was? Which --
15    A.  The whole team.
16    Q.  Okay. Who was the whole team?
17    A.  Whoever was on the team at that time when
18  they tried out. Because consistent --
19    Q.  Was Sheriff Bailey a part of that team?
20  Was Sheriff Bailey a part of that team?
21    A.  No.
22    Q.  Okay. So who would -- who would typically
23  be a part of that team?
24    A.  I'm trying to answer. It would be the SRT
25  team. The whole team would come out for the

Page 33

1  tryouts, observe and help put on the tryouts. We
2  would interview the candidate and then we would vote
3  on it.
4     Q.  Okay. Now you listed certain criterion to
5  join the SWAT team?
6     A.  That was to qualify to be interviewed, yes
7  sir.
8     Q.  Qualified to be interviewed. Was there
9  any review of the deputies' performance or past
10  performance in consideration for his admission to
11  the SWAT team?
12    A.  Of course. But I mean you didn't go in
13  and look at records. I mean the place is small
14  enough. You know everybody there. You know
15  everybody there, and you talk to people.
16    Most of the time, you wouldn't -- you
17  could not -- when I was there, you couldn't even
18  qualify to apply unless you had a year in, unless
19  you had some extenuating circumstance such as --
20  such as if you came from another department and
21  you'd been on their team, you could go ahead and
22  apply. You didn't have to wait the year.
23    But if you were a new deputy, you
24  generally had to wait a year.
25    Q.  Okay. Was there any investigation into

**Page 38**

1  investigating allegations against SWAT team members?
2  MR. DARE: I'm going to object to the
3  form, but you can answer if you know.
4  THE DEPONENT: No, sir. I don't ever
5  remember us being investigated. If it was an
6  officer-involved shooting, MBI came in and worked
7  it.
8  BY MR. SHARAZZ:
9  Q. Okay. But I'm saying other -- other
10  other allegations.
11  A. You have to talk to the Sheriff, sir.
12  Q. Okay. And so what was the Sheriff's role
13  in supervising the SWAT team?
14  A. On a day-to-day basis? Not much. I
15  generally handle the day-to-day workings of anything
16  that the SRT team did. Of course, on any callout,
17  emergency callout, the Sheriff was generally on
18  scene commander. He is the Sheriff.
19  Q. Okay. So now on a day-to-day basis, how
20  often -- how often did you all report to Sheriff
21  Bailey on the actions of the SWAT team?
22  A. I'm not really clear.
23  Q. How often did you meet with Sheriff Bailey
24  in terms of the actions of the SWAT unit?
25  A. Not many times at all. I mean again, it's

**Page 39**

1  a small -- the Sheriff would know if we've been out.
2  We would go in now and tell him what had happened or
3  something along those lines. The team was not that
4  active.
5  Q. Hold one second. Now you said the Sheriff
6  would know --
7  MR. DARE: He was in the middle of
8  responding to your earlier question. If you can
9  allow him to finish to your question, and then ask
10  your next one. Were you through?
11  THE DEPONENT: Yes.
12  MR. SHARAZZ: Go ahead.
13  THE DEPONENT: Just ask the next question,
14  counsel. Let me -- let me the rift off here just a
15  minute. The SRT team mostly was for high risk
16  situations, any kind of hostage situation, any kind
17  of barricade situation, fugitives, searches, stuff
18  along those lines, emergency situations.
19  The team was not active on a day-to-day
20  basis. It was not a full-time entry. The
21  assignment to the SRT was not a full-time position.
22  It was an ancillary duty. We may go out -- some
23  months we didn't do anything. Some months we may
24  have two or three callouts.
25  BY MR. SHARAZZ:

**Page 40**

1  Q. Okay. So you had an average of about two
2  or three callouts per month?
3  A. Maybe. We could go several months, excuse
4  me just a minute. Can I get a glass or a bottle of
5  water?
6  MR. DARE: Yeah.
7  THE DEPONENT: Can I step away?
8  MR. DARE: Let's go off the record real
9  quick.
10  THE REPORTER: We're off record. The time
11  now is 10:50.
12  (WHEREUPON, a recess was taken.)
13  THE REPORTER: The time is 10:53, and
14  we're back on record.
15  BY MR. SHARAZZ:
16  Q. Did you say FOAC before?
17  A. Yes.
18  Q. Did you tell -- what is FOAC?
19  A. It's called FOAC. It's Field Office
20  Administration and Communication. It was how to do
21  Bureau paperwork. The Bureau has a very rigid --
22  back in my day, it had a very rigid standard.
23  You had -- you had yellow copies and blue
24  copies and green copies, and you had to know the
25  flow of information. And so that was -- and that

**Page 41**

1  was actually one of the tougher things that we
2  studied, because it was so foreign to anything I'd
3  ever seen before.
4  Q. Okay. So it is a -- is it fair to say
5  that in your law enforcement career, that you were -
6  - you were not trained as an internal affairs
7  investigator?
8  A. That would be very correct, sir.
9  Q. Okay. Now did you -- are you familiar
10  with the case of Damien Cameron?
11  A. Not by name. If you could give me a
12  little detail.
13  Q. In 2021, Damian Cameron was involved in an
14  incident with Hunter Elward and --
15  A. I know what you're talking about.
16  Q. Did you investigate that case?
17  A. No, sir.
18  Q. Did you have any role in that case at all,
19  in reviewing that?
20  A. No, sir.
21  Q. Did Bryan Bailey review any of those -- of
22  that case with you?
23  A. You'd have to ask Bryan Bailey.
24  Q. Okay.
25  A. I have no idea.

NAEGELI DEPOSITION & TRIAL
Established 1980
(800) 528-3335    NAEGELIUSA.COM

Page 42

1  Q.   Okay.  So I mean if in fact Bryan Bailey
2  said that you had some role in investigating that
3  case, what would your response be?
4      A.   I'd have to see the paperwork or you'd
5  have to enlighten me on it as to what I did, because
6  I do not remember it.
7      Q.   You don't recall being involved in that
8  case; correct?
9      A.   No sir, I do not.
10     Q.   And what -- okay.  Do you recall the
11 Pierre Woods matter?  Do you recall Pierre Woods?
12     A.   No, sir.
13     Q.   Okay.  Now, okay.  You're not familiar
14 with the Pierre Woods matter?
15     A.   No, sir.  If you could give me some
16 details, I might remember an incident.  I don't
17 remember names.
18     Q.   I think the SWAT team -- from my
19 understanding, the SWAT team was involved in Pierre
20 Woods' case, and Pierre Woods was shot and killed?
21     A.   In Pelahatchie?  Yeah.  Yes, sir.  I was
22 on scene.
23     Q.   You were on the scene in that case?
24     A.   Yes, sir.
25     Q.   Okay.  And did you participate in -- what

Page 43

1  was your role in the -- in the investigation of what
2  happened in that matter?
3      A.   Did not run anything on the investigation,
4  sir.  It was a OIS.  It was investigated by the
5  Mississippi Bureau of Investigation.
6      Q.   Okay.  One second.
7      A.   Yes, sir.
8      Q.   Okay.  Now in terms of your knowledge, how
9  did -- how did Rankin County review the internal
10 actions of its officers, to ensure that the
11 Constitution and Rankin County Department policy
12 were being followed?  How did Rankin County -- well,
13 how did they go about that?
14     A.   The Sheriff handled everything.  If he had
15 you do something he wanted to do, he told you.
16     Q.   Okay.  So you're saying that the Sheriff
17 handled all reviews of the internal actions of the
18 officers --
19          MR. DARE:  Objection.
20          MR. SHABAZZ:  -- to see whether or not
21 they were involved or compliant with the
22 Constitution?
23          MR. DARE:  Object to form.  That's not
24 what he said.
25 BY MR. SHABAZZ:

Page 44

1      Q.   Okay.  Well, explain that to me again, so
2  I can understand.  How did -- how did Rankin County
3  review the internal actions of its officers, to
4  assure that the Constitution and department policy
5  was being followed?
6      A.   I can't answer that question.
7      Q.   Okay.  But you said -- you can't answer
8  it?
9      A.   I didn't say I wouldn't.  I said I can't.
10 I don't know what the policy was, how it was
11 handled, that Rankin County handled it.
12     Q.   Okay.  Well, how did Bryan Bailey handle
13 it?
14     A.   You'd have to ask Bryan Bailey.
15     Q.   But just -- previously, you just said that
16 Bryan Bailey, Bryan Bailey handled all of that?
17     A.   He is the Sheriff, sir.  He supervises the
18 whole department.  If the Sheriff told me to do
19 something, I did it.  If he told someone else to do
20 something, I assume they did it.
21     Q.   Okay.  So if a deputy was accused of
22 beating a citizen, how did the Sheriff's Department
23 handle that matter?
24     A.   I was never asked to interview -- conduct
25 any investigation into the beating of anyone that I

Page 45

1  can recall.  So I can't tell you what was done.
2  Again, most of the time it was passed to the Chief
3  Investigator or the Chief Deputy in charge of Patrol
4  or anything along those lines.
5      Q.   Okay.  But there was nothing formal?  You
6  don't have a -- was there a formal procedure in
7  place?
8      A.   Not that I know of, sir.
9      Q.   Okay.  So pretty much you're saying that
10 whatever Sheriff Bailey said what happened, that's
11 what would happen?  Is that what you're saying?
12     A.   Yes.  He is the Sheriff.
13     Q.   Okay.  Now when you said that -- what was
14 the role of the special investigator?
15     A.   I'm not -- I'm not familiar with that term
16 "special investigator."
17          MR. WALKER:  Do you mean "Chief
18 Investigator"?
19          THE DEPONENT:  Chief Investigator?
20 BY MR. SHABAZZ:
21     Q.   Let me look at my chart.  Yeah.  What was
22 the -- I'm sorry, strike that.  What was the role of
23 the Chief Investigator?
24     A.   He supervised investigations and the
25 investigators.

STEVEN N. GODFREY                    November 11, 2024                    46 to 49
79776

---

**Page 46**

1   Q.   Okay.  What kind of investigations?
2   A.   Any investigation that came into the
3   Sheriff's Office.  Anything that required an
4   investigator, to the best of my knowledge.  Again, I
5   was not --
6   Q.   And that includes -- and that includes
7   violations of department policy?
8   A.   If the Sheriff asked him to or her to, I'm
9   assuming.
10  Q.   And that includes any and all violations
11  of the United States Constitution?  That would be
12  handled by the Chief Investigative Officer?
13  A.   It would be handled by whoever the Sheriff
14  told him to.
15  Q.   Okay.  So this was at the discretion of
16  Sheriff Bailey?
17  A.   I would assume so, since he is the head of
18  the law enforcement.
19  Q.   Okay.  I want to show you something.
20  A.   Okay.
21       MR. SHABAZZ:  I'm sharing something.
22       MR. DARE:  Counsel, are you putting
23  something up on the screen?  Because I can't see it.
24       MR. SHABAZZ:  I'm about to put it up here
25  now.  I'm going to show you what's marked as

**Page 47**

1   Plaintiff's Exhibit No. 2.
2        MR. DARE:  Nothing has been marked as an
3   exhibit to this deposition.  If you need something
4   marked, we can do it.  I'd ask for a copy of it, so
5   I can look at it while you're showing it to this
6   witness.  Is that what's going to be marked as
7   Exhibit 2?
8        MR. WALKER:  I presume so.
9        MR. SHABAZZ:  Yeah.  What it is -- well, I
10  can give it to you again.  I got it from you.
11       MR. DARE:  And what is it?
12       MR. SHABAZZ:  This is your -- hold on.
13  This is the flow chart.
14       MR. DARE:  And you want this marked as
15  Exhibit 2 to this deposition?  Counsel?
16       THE DEPONENT:  I would prefer to read this
17  --
18       MR. SHABAZZ:  Yes.
19       THE DEPONENT:  -- hard copy than try to
20  read it on this screen.
21       MR. DARE:  Yeah.  So what is Exhibit 1?
22       MR. WALKER:  Make the notice Exhibit 1.
23       MR. DARE:  Okay.
24       MR. SHABAZZ:  And I've pre-marked this,
25  but I went out of order.

**Page 48**

1        MR. DARE:  We don't have any -- anything
2   marked here.  And I don't mind going to making a
3   copy for you counsel, and giving a copy to the Court
4   Reporter.  But it would easier if this flow chart,
5   which is RC 1802 through 1805.  If you'd like for
6   that to be Exhibit 2, that's fine.  Let me go make a
7   copy and hand a copy to the witness, if that's okay.
8        MR. SHABAZZ:  That's fine.  Well, let me
9   just tell you that Exhibit 1 is going to be the
10  Defendant's First Response to Plaintiff
11  Interrogatories.
12       MR. DARE:  Do you have a copy?
13       MR. SHABAZZ:  Yeah.  I can email it all to
14  you right now.  I can.  I think you -- I can email
15  it to you, give it to you right now, as a matter of
16  fact.
17       MR. DARE:  And so you're going to email me
18  what you want marked as Exhibit 1, and you want me
19  to go print it off and then hand it to the witness?
20       MR. SHABAZZ:  Yes, sir.  Let me just load
21  it up here for you now.  To --
22       What I'm going to do is I'm just going to
23  -- I'm going to go to some other questions.  I'm
24  just going to send this to Attorney Trent Walker.
25  What he can do right now is just print this out, and

**Page 49**

1   then I can just come back to it, so we don't have to
2   stop and waste a lot of time on that.
3        MR. DARE:  Attorney Walker doesn't have a
4   printer here.
5        MR. WALKER:  Let's go off the record for a
6   minute.
7        THE REPORTER:  Okay.  We're off record.
8   The time now is 11:03.
9        (WHEREUPON, a recess was taken.)
10       THE REPORTER:  The time now is 11:23 a.m.,
11  and we are back on record.
12       MR. SHABAZZ:  Okay.  We're back.
13  Plaintiff has given to the witness and opposing
14  counsel Plaintiff's Exhibit No. 1, which is Rankin
15  County's Response to Plaintiff's First Set of
16  Interrogatories.
17       (WHEREUPON, Plaintiff's Exhibit 1 was
18  marked for identification.)
19       MR. SHABAZZ:  Exhibit 2, which is a
20  November 20th, 2023 flow of the Rankin County
21  Sheriff's Department, provided to us by opposing
22  counsel.
23       (WHEREUPON, Plaintiff's Exhibit 2 was
24  marked for identification.)
25       MR. SHABAZZ:  And Exhibit 3, which is --

STEVEN N. GODFREY
79776
November 11, 2024
50 to 53

**Page 50**

1 THE REPORTER: We don't have Exhibit 3.
2 MR. DARE: Yep. We don't have Exhibit 3.
3 MR. SHABAZZ: You don't have it?
4 MR. DARE: Nope.
5 MR. SHABAZZ: Do you have that?
6 MR. DARE: No.
7 MR. SHABAZZ: Okay. Well, I'll get back
8 to it. I'm not going to use it right now, anyway.
9 It would be Rankin County's Policies and Procedures
10 as of 2005 revision, but I'll get back to that.
11 Okay.
12 BY MR. SHABAZZ:
13 Q. Okay. Mr. Godfrey?
14 A. Yes, sir.
15 Q. Okay. Help me clarify. How did -- how
16 did somebody get on the SWAT team? How did they get
17 on the SWAT team?
18 A. Generally, they'd come by and ask how to
19 get on the team. They'd ask me or another team
20 member. We'd tell them the procedure. Put an
21 application in, send a short electronic
22 communication or a note they would like to try out
23 for the team.
24 Q. Okay. So there was an application
25 process?

**Page 51**

1 A. Again, a short memo to state I would like
2 to be considered for a position on the SWAT team, or
3 SRT team, I'm sorry.
4 Q. Okay. Was there a formal application to
5 get on the SWAT team?
6 A. No, no, no.
7 Q. And was there a formal review of the
8 officer's record to get on the SWAT team?
9 A. No.
10 Q. Okay. And but was -- was there something
11 written in all occasions when a person was to be
12 placed on the SWAT team? Was there some written
13 form of communication and affirmation if a person
14 was to be admitted to the SWAT team?
15 A. Not all the time, no. Not, no, no.
16 Q. And could a deputy be admitted to the SWAT
17 team orally?
18 A. Possibly.
19 Q. Just oral communication?
20 A. Again yes, possibly. I don't remember any
21 specifics if it ever happened. But if -- again, if
22 a guy came over, say get on the Brandon team or get
23 on the Flowood team or the Pearl team and he had
24 been to the two week basic SWAT school in DeSoto
25 County, and knew the standard operating procedures

**Page 52**

1 that we would use, he could come straight on the
2 team. It didn't happen often.
3 Q. Okay. And how did you -- how did you that
4 they met those qualifications you just described?
5 A. If we -- I mean you could call DeSoto
6 County. Generally, again it's a small place.
7 Everybody kind of knows who goes up there.
8 Q. Okay. But just saying in reviewing their
9 qualifications, did you have a formal procedure
10 which -- which you were able to review those
11 qualifications that just described?
12 A. No.
13 Q. Okay. Did the department -- did Rankin
14 County Sheriff's Department give you a criterion to
15 -- to determine who could be admitted to the SWAT
16 team?
17 A. No. The SOP stated you had to have a year
18 on and stuff along those lines. I don't have the
19 SOP in front of me. There was a basic SOP.
20 Q. Okay.
21 A. But we set up our own tryouts and
22 everything else. Training, tryouts.
23 Q. Okay. And do you have Christian Dedmon's
24 records, sir? When he joined the SWAT team, did you
25 -- did you compile any records in regards to --

**Page 53**

1 A. No. No, sir. There is no separate SWAT
2 file, other than we kept up with how often you
3 showed up at training and stuff along those lines.
4 Q. Okay.
5 MR. DARE: Just to make it easier on the
6 Court Reporter, if you could just wait until he
7 finishes the question before you answer?
8 THE DEPONENT: I'm sorry. Sorry.
9 MR. DARE: That's all right.
10 BY MR. SHABAZZ:
11 Q. Yeah. But you were the first person that
12 -- when you were the leader or commander of the SWAT
13 unit, you were the first person to interview a
14 person that was admitted to the SWAT team?
15 A. No. Not an individual interview, no.
16 Q. Okay. Who would that be?
17 A. There was no initial interview. Again,
18 somebody who express an interest. They would put in
19 a -- either an electronic communication or even a
20 handwritten note they might be considered. We would
21 set a tryout date. They would come to tryouts.
22 They would do the PT test, the FOMS
23 (phonetic) test. Sometimes we ran a practical
24 exercise, and then the team would meet and we would
25 vote on whether to let that operator continue on.

STEVEN N. GODFREY                 November 11, 2024                      54 to 57
79776

Page 54

1    Q.    And who is the "we" that voted?
2    A.    As I said about ten times sir, it was the
3 team.  The team at the time.
4    Q.    Okay.  Who would that consist of?
5    A.    I don't know how to answer that, sir.  The
6 team.  The people that were on the team.
7    Q.    Okay.  Let me ask you -- let me ask you
8 this.  You said here that Christian Dedmon came on
9 after you -- after you were there; is that correct?
10 Christian Dedmon.
11   A.    Yes, sir.
12   Q.    Okay.  Okay.  Who was the team that
13 decided whether Christian Dedmon would be accepted?
14   A.    I can't --
15       MR. DARE:  Asked and answered.
16       MR. SHABAZZ:  That's not true.  I didn't
17 ask him about --specifically about Christian Dedmon.
18       THE DEPONENT:  I don't know.  I don't
19 remember exactly when he came in, so I don't know
20 who was there at that time.  Team members come and
21 go.
22 BY MR. SHABAZZ:
23   Q.    Okay.  But did you keep records of when
24 Christian Dedmon came on?
25   A.    Not that I can remember, other than

Page 55

1 putting him on the team roster.  I mean I don't
2 really --
3    Q.    Okay.
4    A.    We did not have a separate file for SRT
5 members.  It was they had their personnel file.
6    Q.    Okay.  I'm talking about them being
7 accepted on SRT.  Being accepted on SRT by the team
8 you described, and did this team keep any records or
9 notes of the people they admitted to the SRT team?
10   A.    No, no, no.
11   Q.    No records were kept?
12   A.    No
13   Q.    Okay.  In terms of Michael Jenkins and
14 Eddie Parker, what was your purpose of interviewing
15 officers involved?
16   A.    I was told by the Sheriff and counsel to
17 conduct a Garrity interview.
18   Q.    Okay.  And did you reach any findings or
19 conclusions from your interview?
20   A.    Conducted the interview, wrote down their
21 statement, provided it to the Sheriff.
22   Q.    And did you -- did you compile any other
23 reports as to your views or opinions about what had
24 happened?
25   A.    No, sir.  I wasn't asked to do opinions or

Page 56

1 anything along those lines.
2    Q.    Are you -- are you saying that you took --
3 you took the reports on it?
4    A.    Not the report.  Their statement.
5    Q.    You took their statement only and made a
6 report?
7    A.    I took their statement, compiled them and
8 gave them to the Sheriff or to you.  I don't -- I
9 mean I passed them on to the Sheriff or the counsel.
10 I don't remember exactly.
11   Q.    Okay.  Do you know -- were you the first -
12 - were you the first official in Rankin to interview
13 these deputies?
14   A.    Not to my knowledge.
15   Q.    Okay.  Who was the first?
16   A.    I don't know, sir.  Again, I was not
17 involved in the investigation.
18   Q.    Okay.  Well, you just -- you stated that
19 you -- you interviewed the officers?
20   A.    Yes, sir.
21   Q.    As part of the -- as part of the
22 investigation?
23   A.    I conducted a Garrity interview with each
24 individual deputy.  I did not --
25   Q.    That is -- that is part of the

Page 57

1 investigation, isn't it?
2    A.    If you'd like to call it that, yes sir.
3    Q.    Okay.  And you say you were not the first
4 to interview them?
5    A.    I don't know if I was.  I don't think so.
6 I would imagine the people who were on the scene
7 that night interviewed them.
8    Q.    Okay.  And you made no reports to Sheriff
9 Bailey on your assessment of these interviews that
10 you did?
11   A.    I did not provide an assessment.  I took
12 their statement and provided a statement for the
13 Sheriff.
14   Q.    Okay.  Then --
15   A.    I was not asked what I thought.
16   Q.    All right, okay.  I understand.  All
17 right.  Let me show you what's been marked as
18 Plaintiff's Exhibit 1.  I'm going to put it up on
19 the screen and --
20   A.    Is this the lawsuit?
21   Q.    This is the interrogatories provided by
22 Defendant in this lawsuit.
23   A.    Yes, I see it.
24   Q.    Okay.  Can you -- I want you to -- can you
25 turn your attention to page number eight of what we

Page 58

1  have marked as Exhibit No. 1.
2          THE REPORTER:  Noted.
3          THE DEPONENT:  Page eight.  Yes, sir.
4  BY MR. SHABAZZ:
5      Q.    Okay.  I'm going to go down a list of
6  cases and matters, to see whether or not you're
7  familiar with these cases or matters, okay?
8          The first one is Easterling v. Mississippi
9  Correctional Services.  Are you familiar --
10     A.    I'm not familiar with this.
11     Q.    Okay.  Jones v. Williams?
12     A.    No, sir.
13     Q.    Okay.  Wilson v. Apoftolidis?
14     A.    No, sir.
15     Q.    Okay.  Curtis v. Doe?
16     A.    No, sir.
17     Q.    Johnson v. Bailey?
18     A.    No, sir.
19     Q.    Patty Paige v. Rankin County?
20     A.    No, sir.
21     Q.    De LaCruz v. Rankin County?
22     A.    No, sir.
23     Q.    Okay.  Barrett v. Pelahatchie?
24     A.    Pelahatchie?  No, sir.
25     Q.    Well, that's the Pierre Woods case.

Page 59

1      A.    I'm not familiar with the legal
2  proceedings or anything along those lines.
3      Q.    I mean you were -- you were on the scene
4  for Pierre Woods?
5      A.    Okay.
6      Q.    Okay.  So what was your -- was your
7  involvement?  Other than being on the scene, what
8  was your involvement in that case?
9      A.    Was trying to run the tactical operation.
10     Q.    Okay.  Was that matter investigated?
11     A.    Mississippi Bureau of Investigation.
12     Q.    Okay.  Giles v. Dedmon?
13     A.    Sir, if you're going to try to flip back
14  on me and trip me with these things, just you have
15  to give me details, because the names don't ring a
16  bell.
17     Q.    I'm not trying to trick you with anything.
18  I'm just -- I'm asking you just about the cases.
19     A.    Okay.  Again, I don't know the names.  If
20  you think I know something about it, if you'll tell
21  me some of the details that may refresh.  Again, I
22  looked down the list as you were talking.  I'm not
23  familiar with any of them, to my knowledge.  If you
24  can give me some details.
25          I did not investigate any of these.  I may

Page 60

1  have some passing knowledge just from overheard
2  conversations or something may have been talked
3  about in a staff meeting or something along those
4  lines.
5      Q.    Okay.  But you do know about Jenk.  We
6  just talked about Jenk, Jenkins v. Rankin County, so
7  you know about that.
8          MR. DARE:  Jenkins.  That's the one we're
9  here on today.
10         THE DEPONENT:  The one we're here on
11  today.  Yes sir, I know about the situation, but I
12  was not there, and I conducted Garrity interviews.
13  BY MR. SHABAZZ:
14     Q.    Okay.  So you did participate in that
15  investigation?
16     A.    Giving counsel.
17     Q.    All right.  Okay.  So none of them.
18  You're saying the rest.  McWarren v. Davis, Carson
19  v. Rankin County, Adams v. Bailey, Reddell v. Rankin
20  County, Mack v. Rankin County.  You're not familiar
21  with those cases.  Is that what you're saying?
22     A.    If you -- again, if you'll go to some
23  detail, it may refresh my memory as to what
24  happened.  But I did not
25  -- was not involved in any of those investigations.

Page 61

1      Q.    Okay.  And again, all of the
2  investigations that you did for Rankin County, you
3  said that -- that those -- the records of your
4  investigation and your finding would be in the
5  possession of Rankin County; is that correct?
6      A.    I would -- I would hope so.
7      Q.    Okay.  And in all the investigations you
8  did over the years, you do have written
9  documentation of your work on those investigations
10  you did participate in?
11     A.    The ones I produced I gave to the Sheriff,
12  sir.  I have no idea what may have happened to them.
13     Q.    Okay.  And did you conduct -- and in every
14  case that you did investigate, you did have written
15  --
16     A.    Not necessarily.  Not necessarily.  Again,
17  if it was a minor -- something minor or found to be
18  unfounded, I may just go on and tell the Sheriff it
19  was nothing to that or whatever.
20     Q.    Okay.  And but you wouldn't formally
21  document that there was --
22     A.    Not necessarily.
23     Q.    Okay.  All right.  Now in -- what caused
24  you in November of 2023 to leave the department?
25     A.    Again, I had time -- enough time in to

STEVEN N. GODFREY          November 11, 2024                    62 to 65
79776

Page 62

1  retire. It was just time to go.
2      Q.   Okay. Were you involved in any way in the
3  restructuring of the Rankin County Sheriff's
4  Department?
5      A.   After that time?
6      Q.   Yes.
7      A.   No. I was no longer employed there.
8      Q.   I'm talking about prior to you leaving.
9  Were you involved in the restructuring of the
10 department?
11         MR. DARE: Object to the form. You can
12 answer if you know what --
13         THE DEPONENT: To my knowledge, there was
14 no reformation before I left.
15 BY MR. SHABAZZ:
16     Q.   And when you stated that there was no
17 Internal Affairs Division?
18     A.   Right.
19     Q.   While you were there; correct?
20     A.   Correct, correct.
21     Q.   Up til November `23; correct?
22     A.   Correct.
23     Q.   There was no Internal Affairs Division?
24     A.   Not to my knowledge.
25     Q.   Okay. I want to show you what's marked as

Page 63

1  --
2      A.   Exhibit 2?
3      Q.   Plaintiff's Exhibit No. 2.
4      A.   Yes, sir.
5      Q.   Okay. This is a -- a flow chart of Rankin
6  County structure. Are you familiar with this flow
7  chart?
8      A.   No, sir.
9      Q.   You never -- have you ever seen this flow
10 chart?
11     A.   No, sir. If you'll look at the date on
12 it, effective November 2023 I was no longer at the
13 Sheriff's Office.
14     Q.   Okay. So did you all have a flow chart of
15 the structure of Rankin County Sheriff's Department
16 while you were serving there?
17     A.   Possibly. I don't know.
18     Q.   Well, possibly. I mean is it yes or no?
19     A.   Not to my knowledge.
20     Q.   You never saw a flow chart, an
21 organizational flow chart --
22     A.   Nothing.
23     Q.   Okay. While you were there?
24     A.   Not to my knowledge, no. I'm sure there's
25 probably one that exists somewhere.

Page 64

1      Q.   Well, why would you assume that?
2      A.   Most departments have them.
3      Q.   Did Rankin have one?
4          MR. DARE: Asked and answered.
5  BY MR. SHABAZZ:
6      Q.   Okay. Okay. Indulge me for a second.
7      A.   Yes, sir.
8      Q.   Okay. You said that you were -- you
9  supervised training at Rankin during your roughly
10 decade-long tenure; is that correct?
11     A.   Yes. You could say that, yes sir.
12     Q.   Okay. Could you -- could you describe
13 your -- your duties and responsibilities in general,
14 outside of SRT, your training responsibilities
15 internally?
16     A.   Mostly maintain the training records.
17     Q.   Okay. You just maintained the records?
18     A.   Yes, sir.
19     Q.   Okay. Did you -- did you conduct the
20 training?
21     A.   Firearms or something like that. Maybe we
22 would have something small like that, yes sir. But
23 I never -- I never was -- never participated in any
24 department-wide instruction as an instructor.
25     Q.   Okay. When you began, who was in -- who

Page 65

1  actually did the training? Who was in charge of the
2  training when you came on in Rankin?
3      A.   Who's the guy that's -- the counsel.
4          MR. DARE: I can't give you answers.
5  You've got to testify --
6          THE DEPONENT: Okay. There was a guy who
7  was an off -- in-house counsel. He kind of ran the
8  training program then too. I'm just drawing a blank
9  now. I'm sorry. At 71, I have a little trouble --
10 BY MR. SHABAZZ:
11     Q.   So what now? Tell me that -- tell me that
12 again?
13     A.   When I started there, the in-house counsel
14 also ran the training program.
15     Q.   You're talking about an attorney?
16     A.   Yes, sir. That would be in-house counsel.
17     Q.   Okay. Who would that be?
18         MR. DARE: If you don't recall the name
19 just --
20         THE DEPONENT: I don't. I mean I know it.
21 I just can't bring it up right now.
22 BY MR. SHABAZZ:
23     Q.   Okay. In-house counsel or lawyer ran the
24 Rankin training up until when?
25     A.   Til he left. Well, no. Kind of after I

STEVEN N. GODFREY
79776

November 11, 2024

66 to 69

**Page 66**

1 got there and got my feet on the ground, kind of --
2 I was in charge of training. Six months maybe, a
3 year maybe.
4   Q.   Okay.  And but you don't recall his name?
5   A.   It will come to me, and in fact I'll
6 probably interrupt you in a minute when it pops into
7 my brain.
8   Q.   Okay.  That's fine.  We can come back to
9 it.  Okay.  So after that person, who was in charge
10 of the training?
11   A.   I was nominally in charge of it.
12   Q.   Okay.  For how long?
13   A.   Until I left.
14   Q.   And so you were in charge of the training
15 of the officers, of all of the Rankin deputies for
16 your -- from when that in-house counsel left up to
17 the end of your tenure?
18   A.   I think I said that.
19   Q.   Okay.  Now a moment ago, you said that --
20 that you were reviewing.  That means that you
21 participated in the firearms aspect of the training?
22   A.   Well, I ran the firearms program.  Yes,
23 sir.
24   Q.   Okay.  But now when you say that you were
25 in charge of the training for your entire tenure,

**Page 67**

1 could you give me a further description on your
2 duties and responsibilities there?
3      MR. DARE:  Object to form.  You can
4 answer.
5 BY MR. SHABAZZ:
6   Q.   What were your duties -- I'll repeat it.
7 What were your duties and responsibilities as the
8 training officer?
9   A.   I kind of kept up with the records, and
10 that was about it.
11   Q.   Okay.  But who conducted the trainings?
12   A.   What kind of training are you talking
13 about?  I mean that's -- that's a -- that runs a
14 wide gamut.  We sent people outside the department.
15 The last couple of years I was there, we contracted
16 with the Virtual Academy, which is a private entity,
17 to provide online training.
18      If they needed DUI training, they went to
19 any academy that was offering such.  A lot of
20 training offers would be sent through me.  I would
21 get in an email this course is being offered, that
22 course is being offered, and I would send it out to
23 the department.  Anyone interested, please let me
24 know.
25      But generally, the Sheriff or the

**Page 68**

1 Undersheriff made the decision who would go.  I was
2 mostly just a conduit for that.
3   Q.   Okay.  And what training -- other than the
4 firearm training, what trainings did the deputies in
5 Rankin receive?
6   A.   Again, if you wanted to go to a training.
7 If you as an individual deputy, if you were
8 interested in something and you heard about or saw a
9 course being offered, they might ask me to go to
10 something.  They may go to the Sheriff and ask.
11 They may go to the Undersheriff and ask, and it
12 would be approved and they would be sent to the
13 training.
14   Q.   Okay.  What about specifically for
15 excessive force training?
16   A.   I think they had --
17   Q.   Emphasis on excessive force.
18   A.   I don't remember.  I know I never put on
19 any kind of in-house personally training on
20 excessive force.  They covered that in basic, I'm
21 assuming, and I think Jeff Artis came in and put on
22 a Color of Law school once.
23   Q.   Okay.
24   A.   Again, this -- I kept records, sir.  I
25 didn't set up most of the training.

**Page 69**

1   Q.   Okay.  But you would have the records of
2 any trainings that the deputy received on use of
3 excessive force; correct?
4   A.   I haven't, no sir.
5   Q.   No.  I'm just saying you're aware of those
6 records, right?  You would be aware --
7   A.   And if they went -- if they went to get
8 training and got a certificate, a copy was placed in
9 their training file.
10   Q.   Okay.  But I mean -- I mean I'm just
11 saying, are you aware of any specific training on
12 excessive force --
13   A.   Personally, I am not.
14   Q.   You're not aware of that?
15   A.   I'm not aware of any.  I'm not saying they
16 didn't.  I am not aware of it.  I can't say "on this
17 date they went here," no.
18   Q.   Okay.  Now I'm going to ask you about --
19 let's go down the deputies, just outside of SRT.
20   A.   Okay.
21   Q.   I want to see if for the investigations
22 that you did conduct, I want to ask you each
23 of these individuals and did you conduct an
24 investigation into any of these deputies' activities
25 at any time in your tenure, okay.  I'm going to ask

STEVEN N. GODFREY
79776
November 11, 2024
70 to 73

**Page 70**

1  you about it, that in the course of your tenure did
2  you investigate any of these deputies for any
3  matters in the course of your tenure in the
4  department, okay?
5       Okay.  Christian Dedmon.  Did you ever
6  investigate him at all at any time for anything?
7   A.  Not personally, no.
8   Q.  Okay.  Jeffrey Middleton.
9   A.  Not personally, no.
10  Q.  Okay.  But did you ever investigate at any
11  time for any matter Brett McAlpin?
12  A.  Not to the best of my recollection.
13  Q.  Okay.  At any time, did you interview -- I
14  mean pardon me, investigate Deputy Opdyke?
15  A.  Not to the best of my recollection.
16  Q.  Okay.  At any time, did you investigate or
17  look into any allegations regarding Hunter Elward,
18  at any time?
19  A.  Not to the best of my recollection, sir.
20  Q.  Okay.  And is it true that the matters you
21  were asked to investigate, that Bryan Bailey bring
22  these matters to you?
23  A.  I'm not clear on that question.
24  Q.  Was the source of -- the matters you did
25  investigate, was the sole source of your

**Page 71**

1  instructions to investigate these matters coming
2  from Bryan Bailey?
3   A.  Probably, yes.  I mean the Chief
4  Investigator may say "hey, we had this.  Would you
5  mind looking at it?"  But as far as formal --
6  opening a formal investigation, it would come
7  through the Sheriff.  Someone may come say "The
8  Sheriff wants you to do this" and "The Sheriff wants
9  you to do that."
10  Q.  Okay.  But did you initiate any
11  investigations into misconduct on your own?
12  A.  No.
13  Q.  Okay.  All right.  One second.
14  A.  Yes, sir.
15  Q.  Okay.  For your investigations, I want to
16  ask you  are you familiar with a citizen by the name
17  of Allen Smith?
18  A.  Not personally.  If you could give me some
19  how I should know him, I might be able to remember
20  something along those lines.
21  Q.  Allen Smith was abused and attacked by
22  Rankin County deputies in December of 2022.
23  A.  That's alleged, right?
24     MR. WALKER:  No.
25     MR. SHABAZZ:  No.  That's a fact, sir.

**Page 72**

1  That's actually a fact.
2       MR. DARE:  Objection, argumentative.  But
3  if you want to ask your question.
4  BY MR. SHABAZZ:
5   Q.  Well, he wanted to know more about it, so
6  I'm just asking you.
7   A.  Okay.
8   Q.  You were at the department til November
9  2023, right?
10  A.  That's when I resigned.  I'm trying to
11  think.  Or not resigned, I just retired.  No.  In
12  November of 2023?
13  Q.  You were there in December of 2022;
14  correct?
15  A.  Yes.
16  Q.  Yes, okay.  And Allen Smith is a part of
17  the case against the -- what they call the Rankin
18  County Goon Squad.
19  A.  Okay.
20  Q.  Are you familiar with the Rankin County
21  Goon Squad?
22  A.  Yes, sir.
23  Q.  Okay.  When did you first become aware of
24  the Rankin County Goon Squad --
25  A.  Maybe six months before.  The Goon Squad

**Page 73**

1  is not what the public thinks the Goon Squad is.
2  The Goon Squad was a nickname that Jeffrey
3  Middleton's squad had.  It's just a name of their
4  night shift operation.  They had a coin made.  It
5  was a camaraderie-building thing.
6   Q.  Okay.  How do you -- how did you come to
7  know about that?
8   A.  It wasn't -- it was an apparently well-
9  known fact.  I had a coin and everything.  Middleton
10  had him made, and it was his --
11  Q.  How did you get one?
12  A.  Okay.  Middleton gave me one.
13  Q.  And when did Middleton give you that coin?
14  A.  Some time in the fall, maybe.  It was at
15  firearms training one day or maybe SRT training one
16  day.  He had -- he had said "hey, I'm getting some
17  coins made.  I'll give you one."  I said that's
18  fine, you know.
19  Q.  Okay.  And this was a coin that designated
20  the Goon Squad?
21  A.  Yeah.
22  Q.  And did this coin have the Rankin County
23  Sheriff's Department emblem on the --
24  A.  It did.
25  Q.  -- other side?

STEVEN N. GODFREY
79776

November 11, 2024

74 to 77

**Page 74**

1     A.    It did.

2     Q.    Okay.  When was that shown to you?

3     A.    Again, some time in the fall as best I can
4  remember, shortly after he had them made.

5     Q.    Fall, but fall of what year?

6     A.    Times are running together, counsel.  Some
7  time in the fall of 2023 I assume.  I have trouble
8  remembering what year it is now, sir.  I don't work
9  anymore.

10     Q.    You left in -- you left in the fall of
11  2023.  Was it the year you left or the year before
12  you left?

13     A.    It was before the incident.  So three --

14     Q.    So before --

15     A.    Within three or four months, something
16  along those lines.

17     Q.    Okay.  Three or four months before the
18  Jenkins incident, you were shown the Goon Squad coin
19  by Deputy Middleton?

20     A.    Right.  Uh-huh.

21     Q.    It had the Goon Squad on one side?

22     A.    Yes, sir.

23     Q.    And it had the Rankin County Sheriff's
24  Department on the other side?

25     A.    Yes, sir.

**Page 75**

1     Q.    Okay.  And what was your response to
2  Jeffrey Middleton showing you that coin?

3     A.    It's just a coin.  It was just his -- his
4  shift's coin.

5     Q.    Okay.  And so to you, it was just a coin?

6     A.    Yes, sir.  I mean that's just what they
7  call themselves, his shift.

8     Q.    Okay.

9     A.    They work at night and it's kind of just
10  what they call themselves.

11     Q.    Okay.  Did you follow up and ask Mr.
12  Middleton about the purpose of his squad represented
13  by his coin?

14     A.    No.

15     Q.    And what did you ask Jeffrey Middleton?
16  What did you say to Jeffrey Middleton when he showed
17  you the coin?

18     A.    Not much.

19     Q.    Did you tell Sheriff Bailey that Jeffrey
20  Middleton had a coin, a Goon Squad --

21     A.    No.  I had assumed the Sheriff had one.  I
22  don't -- I don't know.

23     Q.    Okay.  Now why did you assume the Sheriff
24  had one?

25     A.    They were passing them around.

**Page 76**

1     Q.    Okay.  Who was passing them around?

2     A.    Middleton, and I guess the people on his
3  squad.  They paid to have them made.

4     Q.    Okay.  They paid to have them made.  So,
5  and how did you know they were being passed around?

6     A.    You would see them around.  People would
7  have one.

8     Q.    In the department?

9     A.    Yes, sir.

10     Q.    Okay.  Like where, for instance?

11     A.    In the office.  Sir, can I ask you a
12  question?  Are you familiar with just challenge
13  coins in general?  It's very common in law
14  enforcement.

15     Q.    Sir, I'm asking the questions.

16     A.    Go right ahead.

17     Q.    Thank you, sir.  Okay.  So these coins
18  were being passed around the Rankin County Sheriff's
19  Department in the -- you say in the fall of 2022?

20     A.    To the best of my recollection, counselor.

21     Q.    Okay.  And could you describe how these
22  coins were being distributed around?

23     A.    No, sir.  I cannot.  I cannot.

24     Q.    Well, you just said that -- so tell me how
25  -- tell me how it happened?

**Page 77**

1     A.    Somebody would have a coin.

2     Q.    Okay.  Like who would have a coin?

3     A.    A deputy.

4     Q.    Okay.  Tell me example.  When the times
5  that you saw the coin being passed around, can you
6  explain what happened?

7     A.    No.  I just -- I have a coin.  Somebody
8  said "Have you seen Middleton's coin?"  Yeah, I saw
9  it.  I mean that was just it.

10     Q.    Okay.  So is it fair to say that it was
11  common knowledge in the Rankin County Sheriff's
12  Department that there was a Goon Squad operating --

13     A.    I can't.  I can't say it was common
14  knowledge.

15     Q.    Okay.  But you can say that this Goon
16  Squad coin was being -- coins, plural, were being
17  distributed around the office?

18     A.    I know some people had one.  I don't know
19  if they were being distributed.

20     Q.    Did Sheriff Bailey have one?

21     A.    I do not know.

22     Q.    Okay.  And did you ever discuss this with
23  Sheriff Bailey?

24     A.    Saw no reason to discuss it.

25     Q.    You saw no reason to discuss the Goon

Page 78

1  Squad coin with Sheriff Bailey?

2      A.   No, sir.

3      Q.   Okay.  And so later on, when you found out

4  what happened with Michael Jenkins and Eddie Parker,

5  do you still hold the same position, that the Goon

6  Squad is not important, that the coin wasn't

7  important?

8      A.   I don't know what you're asking now.

9      Q.   After the incident with Jenkins and

10  Parker, you found out that this Goon Squad had been

11  involved in these serious incidents.  Did you still

12  maintain the position that the coin and the

13  organization -- the Goon Squad was of no importance?

14      A.   Again, the Goon Squad coin and the

15  incident had nothing to do with each other, in my

16  opinion, because it wasn't Middleton's squad.  It

17  was Middleton and several people on his squad, but

18  there were also several people who were not in his -

19  - at the incident that were on his squad.

20      Q.   Now did you institute or take any actions

21  to investigate Middleton and his organizing of the

22  Goon Squad?

23      A.   He didn't -- the Goon Squad was his squad,

24  the men that were assigned to him.  Now the Goon

25  Squad was later adopted by the media to me

Page 79

1  incorrectly, because it was not his shift that did

2  this.  Do you see the difference?

3      Q.   You said what?  Well, explain me the

4  difference.

5      A.   Not everybody on his shift was at that

6  incident, to my knowledge.

7      Q.   Not everybody on his shift was at the

8  incident?

9      A.   To my knowledge.

10      Q.   Okay.  Who -- how do you know the

11  structure of the Goon Squad?  How do you know who's

12  on it and wasn't on it?

13      A.   I've been reading the news for the last 18

14  months.

15      Q.   I'm saying while you were in the

16  department, how do you know who was on it and who

17  wasn't on it?

18      A.   To my knowledge, when the coin was made

19  and passed out, it was Jeffrey Middleton's shift,

20  his deputies assigned to him.

21      Q.   Okay.  And is -- is it anywhere in the

22  Rankin County policies where you're allowed to

23  create other sub-organizations within the Rankin

24  County Sheriff's Department?

25      A.   I wouldn't consider the Goon Squad to be

Page 80

1  sub-organization and no, I don't know of any policy.

2      Q.   Okay.  What do you consider the Goon

3  Squad?

4      A.   At that time?

5      Q.   Yes, at that time.

6      A.   His shift.  His shift.

7      Q.   The night shift?

8      A.   His night shift.

9      Q.   But you considered the Goon Squad to be

10  the entire night shift?

11          MR. DARE:  Object to the form.

12  BY MR. SHABAZZ:

13      Q.   Okay.  But you said -- you said "his

14  shift"?

15      A.   Yeah.

16      Q.   Okay, which was the night shift; correct?

17      A.   Correct.

18      Q.   How many years did Jeffrey Middleton run

19  the night shift?

20      A.   I can't -- I don't know.

21      Q.   How many years in which you were in

22  the Department was he in charge of the night shift?

23      A.   I don't know.  I don't know when he got

24  promoted to that position.  I think he had a day

25  shift for a while, and I think he switched over to a

Page 81

1  night shift or something along those lines.  They

2  shift responsibilities fairly regularly.

3      Q.   But he was in charge of the shift;

4  correct?

5      A.   When the Goon Squad coin was made, yes

6  sir.

7      Q.   Okay.  How did you know he was in -- how

8  did you know he was in charge of the shift?

9      A.   He was the lieutenant in charge of the

10  shift.

11      Q.   Okay.  When did that begin, though?

12      A.   I don't know.  I can't give you a date as

13  to --

14      Q.   Do you have any idea?  Have any idea, just

15  any idea?

16      A.   No.  I just know he was -- he's been a

17  lieutenant for four-five years, maybe.  I don't

18  know.

19      Q.   Okay, okay.  And you found no reason to

20  follow up, to look into this Goon Squad once you

21  became aware of it?

22      A.   No, he told me.  He said "Hey, our shift,

23  they call us the Goon Squad."  They had been to a

24  class, one of them had been to a class or something

25  and he said that the goons were the people who got

Page 82

1  the ass jobs, you know, that nobody else wanted to
2  do and stuff along those lines is the only thing I
3  know.  I mean it was just -- again, I think it was a
4  camaraderie-building thing with his team.  The
5  latest thing --
6      Q.   And you saw --
7      A.   Go ahead.
8      Q.   You saw no reason to be concerned about
9  this Goon Squad, didn't you?
10     A.   Not at that time, no sir.
11     Q.   Okay.  Did you hear about -- okay.  And is
12 it -- is it -- is it fair to say from your
13 description that the Goon Squad consisted of the
14 entire night shift at the Rankin County Sheriff's
15 Department?
16         MR. DARE:  Object to the form.  You can
17 answer again, but --
18         THE DEPONENT:  I'm trying to figure out
19 where you're going with this, sir.  Again, the coin
20 was made for Jeffrey Middleton's shift.
21 BY MR. SHABAZZ:
22     Q.   Right.
23     A.   Right.
24     Q.   Okay.
25     A.   Very good.  We've got that.

Page 83

1      Q.   But this coin, did this coin represent the
2  entire night shift of the Rankin County Sheriff
3  Department?
4      A.   At the time it was produced, it was about
5  Jeffrey Middleton's shift.
6      Q.   Okay.  About how many deputies are
7  typically on the night shift?
8      A.   On each shift?  Each --
9      Q.   On the night shift.  About how many
10 roughly run on the night shift?
11     A.   Seven, eight, something like that.
12     Q.   Seven-eight deputies total on the night
13 shift?
14     A.   As a -- as a WAG.
15     Q.   Okay.  Now who was responsible for -- for
16 supervising Middleton and the night shift?
17     A.   That would be the Chief of Patrol.
18     Q.   Chief of Patrol.  Well, who was that at
19 the -- who was that at the time you left?
20     A.   When I left or when the incident occurred?
21     Q.   First of all, when you left.
22     A.   Kool-Aid was the Chief of Patrol when I
23 left.  His name is -- well, I'll call him Kool-Aid.
24 That's his nickname.  He's the Chief -- he's the
25 Chief of Patrol now.  When the incident occurred, it

Page 84

1  was Dwayne Thornton.
2      Q.   Okay.  What happened to Mr. Thornton?
3      A.   Got promoted.
4      Q.   Okay.  And he's holding.  Now his position
5  is what now?  I'm trying to get --
6      A.   Now today, I do not know now.  He was --
7      Q.   Before he was promoted.  When he was
8  supervising the night shift, what was his position?
9      A.   He was the Chief of Patrol.  Chief Deputy
10 of Patrol, yes sir.
11     Q.   Okay.  And at the time of the incident.
12 When was he promoted?
13     A.   Can't answer that.
14     Q.   Well, you said he was promoted, right?
15     A.   Yeah.
16     Q.   Okay.  When?
17     A.   I don't know.  I can't give you a name.
18     Q.   It was after -- it was after the incident,
19 right?
20     A.   He was moved from Chief of the Patrol to
21 the Chief Deputy.  I mean to Undersheriff, I'm
22 sorry.
23     Q.   Thornton went to Undersheriff.  Okay.
24     A.   Yes.
25     Q.   Now this happened -- this happened between

Page 85

1  January of 2023 and between the time you left in the
2  fall?
3      A.   Yeah, right.
4      Q.   Okay.  So about how long after the
5  incident?  Two months, four months?
6      A.   WAGing it, two months to four months.
7      Q.   Okay.  And the night shift is where the
8  violations occurred against Jenkins and Parker;
9  correct?
10         MR. DARE:  Object to the form.  You can
11 answer.
12         THE DEPONENT:  It happened at night, I
13 think sir.  Yes, sir.  It was --
14 BY MR. SHABAZZ:
15     Q.   Okay.  Okay.  And Thornton was promoted --
16 and Thornton was then supervisor?
17     A.   He was the Chief of Patrol.  You asked me
18 about -- I guess you can say --
19         THE REPORTER:  May I remind y'all to speak
20 one at a time?
21         THE DEPONENT:  I'm sorry.  I guess you can
22 say he supervises every patrol deputy, if you want
23 to take it that far.  But he -- you asked me who
24 Middleton -- supervised Middleton, and that's how
25 this conversation started.

Page 86

1  BY MR. SHABAZZ:
2      Q.   Okay.  So after the Jenkins and Parker
3  incident, did you -- did you have any meetings at
4  the -- with Sheriff Bailey about what happened?
5      A.   Yeah, yeah.  We had staff meetings, of
6  course.
7      Q.   Can you -- can you tell me when did those
8  -- when did those meetings occur?
9      A.   The staff meeting every -- every day.
10     Q.   You met every day about this incident?
11     A.   No.  We have staff meeting every day.
12     Q.   Okay.  But you met about the incident with
13  Jenkins and Parker?
14     A.   I was in on -- the only time I can
15  remember that I was in a meeting specifically about
16  the incident was when Adam Smith from the FBI came
17  over to talk was the first time.  That was the only
18  incident-specific meeting I remember being in.  It
19  may have come up, or I'm sure it came up at several
20  times during staff meetings.
21     Q.   Okay.  In the meeting with the FBI, can
22  you tell me what happened in that meeting?
23     A.   He just asked a few questions, and that
24  was about it.  I don't really remember, because I
25  didn't have anything particularly directed toward

Page 87

1  me.
2      Q.   What kind of questions was he asking?
3      A.   I can't really recall.
4      Q.   Now this wasn't that long ago.
5      A.   A year and a half.
6      Q.   This seemed like an important meeting.
7  This was an important meeting.
8      A.   Not for me.  Not for me.  I wasn't
9  involved in it, sir.
10     Q.   But are you saying that the incident that
11  involved Michael Jenkins and Eddie Parker, where
12  Michael Jenkins was shot in the mouth, it had become
13  a -- you're saying that this was not an important
14  event to you?
15     A.   I didn't say it wasn't an important event.
16  I had no involvement, so I didn't really follow the
17  line of questioning since I was not questioned
18  directly.
19     Q.   But you -- you helped investigate this
20  incident?
21     A.   No sir, I did not.  I took Garrity
22  statements and that is all I had to do with that
23  incident, at the direction of the Sheriff.
24     Q.   And taking an -- taking an investigative
25  statement, taking a statement is participating in an

Page 88

1  investigation; correct?
2      A.   That limited -- that limited my
3  involvement with the investigation.
4      Q.   That is involvement.  That's important
5  involvement.
6      A.   Counsel, I gave you that at least a dozen
7  times.
8      Q.   No, you haven't.  I'm asking about --
9      A.   Yes, I have.
10     Q.   -- the importance of it.  You said it
11  wasn't important.  I'm speaking on the importance of
12  it, because
13  -- because you said that you couldn't recall what
14  the FBI said in a critical meeting just a year ago.
15     A.   No.
16     Q.   Well, just recently.  Before you left, you
17  said the FBI was involved and they came to ask
18  questions, and you can't remember what happened --
19     A.   That's correct.
20     Q.   -- at the meeting, because it wasn't that
21  important to you?
22     A.   I didn't say it wasn't important.  I said
23  it wasn't directed toward me.  I had -- no questions
24  were directed toward me, so I don't remember
25  specific questions.

Page 89

1      Q.   Okay.  But do you remember what happened
2  in that meeting with the FBI?
3      A.   He sat down and met with us a little while
4  and left.
5      Q.   Okay.  And do you remember what y'all
6  talked about?
7      A.   No, not the particulars.
8      Q.   Okay.  Do you have any records from that
9  meeting?
10     A.   No.
11     Q.   So why are you taking offense to that
12  question?
13     A.   I don't --
14          MR. DARE:  Counsel, if you've got a
15  question, you can ask a question.  I think the -- I
16  think the witness is just getting frustrated by you
17  repeatedly asking the same question over and over
18  and over again.  So if you've got a question, ask
19  your question and let's move on.
20          MR. SHABAZZ:  No, no, no.  I haven't asked
21  over and over again.  I'm just getting to what
22  happened in a critical FBI meeting, and I'm just
23  getting into that.  I think I'm getting my non-
24  answer, okay.  Okay.
25  BY MR. SHABAZZ:

STEVEN N. GODFREY
79776

November 11, 2024

90 to 93

---

Page 90

1     Q.   What happened in -- what were the other
2 meetings that you participated in after the Jenkins-
3 Parker incident?
4     A.   I did not attend any specific -- any
5 specified meeting about that case, to the best of my
6 recollection. Again, it would come up in staff
7 meetings, which we held every day.
8     Q.   Okay. And when it came up in the staff
9 meetings, what was discussed?
10    A.   Just what was going on, what they had
11 heard.
12    Q.   Okay. The officers that I've been talking
13 about, Dedmon, Middleton, McAlpin, Opdyke and
14 Elward, they continued on at the Sheriff's
15 Department, didn't they?
16    A.   I think they were suspended.
17    Q.   Okay. Could you tell me what happened to
18 them?
19    A.   They were suspended.
20    Q.   Okay. When? Which? Can you -- what
21 about Dedmon. Tell me what happened with Mr.
22 Dedmon?
23    A.   Don't know. I mean they were suspended
24 and weren't allowed -- didn't come to work, to the
25 best of my knowledge.

Page 91

1     Q.   Okay. When was Dedmon suspended?
2    A.   I don't know.
3    Q.   He was on your SRT team; correct?
4    A.   Yes, sir.
5    Q.   Do you recall when he was suspended?
6    A.   No, sir. Shortly after the incident. Any
7 OIS, generally the deputies involved are suspended
8 until the MBI investigation comes back, in general.
9    Q.   Now tell me -- can you explain OIS,
10 please?
11    A.   Officer-involved shooting.
12    Q.   Okay. Okay. So Dedmon. What about Mr.
13 Middleton? He was on your SRT team?
14    A.   Yes.
15    Q.   When was he -- okay. When --
16    A.   Again, I can't give you a date.
17    Q.   Now you're the supervisor, right?
18    A.   No, sir.
19    Q.   Of the SRT?
20    A.   I run the SRT team.
21    Q.   Isn't he a team member?
22    A.   Yes, sir.
23    Q.   Middleton is a team member, right?
24    A.   Yes, sir.
25    Q.   And do you recall when he was suspended?

Page 92

1     A.   Again, no. Shortly after the incident.
2    Q.   We're getting a little closer now --
3    A.   Shortly after the incident.
4    Q.   Is that -- you say "shortly after" for
5 Middleton?
6    A.   Shortly.
7    Q.   And what about Brett McAlpin?
8    A.   Shortly after.
9    Q.   Okay. Deputy Opdyke?
10    A.   Shortly after.
11    Q.   And Deputy Elward?
12    A.   Shortly after.
13    Q.   Okay. And did you participate in their
14 suspensions?
15    A.   No, sir.
16    Q.   Okay. Well, what -- as the SRT
17 supervisor, what role did you play in these
18 officers' -- in their suspension?
19    A.   None.
20    Q.   Okay. Let me go back here to -- okay. So
21 Allen Smith. Allen Smith, did you investigate his
22 claims?
23    A.   I think I answered that once, but no.
24    Q.   No, okay.
25    A.   Don't even know the incident.

Page 93

1     Q.   You don't even know it?
2    A.   No, sir. Not unless you can again give me
3 some details where this thing happened. I might
4 have a recollection of a passing conversation.
5    Q.   Okay. In the case where Rankin deputies,
6 these members of the night shift who are called the
7 Goon Squad, where they pled guilty, part of their
8 guilty pleas were not only the actions that they
9 conducted against Jenkins and Parker, but it also
10 includes the actions that they took against Allen
11 Schmidt (sic), which includes Dedmon shooting the
12 gun off near his head and them committing a number
13 of constitutional violations against Mr. Schmidt on
14 the side of a road and --
15    A.   Okay, yeah. Now I know what you're
16 talking about.
17    Q.   Are you familiar with that case?
18    A.   Heard little snippets here and there.
19    Q.   Okay. But did you -- did you investigate
20 that?
21    A.   No. No, sir.
22    Q.   Do you know who -- do you know who did?
23    A.   No, sir.
24    Q.   Okay. When was the first time you heard
25 about Allen Schmidt?

STEVEN N. GODFREY
79776

November 11, 2024

Page 94

1    A.    Probably would have been after the
2  shooting.
3              MR. WALKER:  Which shooting?
4              MR. DARE:  The Jenkins-Parker.
5              THE DEPONENT:  The Jenkins shooting.
6  BY MR. SHABAZZ:
7    Q.    Are you sure it was after?
8    A.    No, I'm not sure.  To the best of my
9  recollection.
10   Q.    It could have been -- it could have been
11 before?
12   A.    To the best of my recollection, it could
13 have been, yes.
14   Q.    Okay.
15   A.    I don't think it was, though.
16   Q.    Okay.  What about -- let me ask you about
17 a couple of others during your tenure.
18   A.    Okay.
19   Q.    Samuel Carter.  Are you familiar with him?
20   A.    Details?
21   Q.    Sir?
22   A.    Details?  What, when, where?
23   Q.    Well, in June of 2026, he alleges specific
24 abuses by Rankin deputies who were members of your
25 SRT team.

Page 95

1              MR. WALKER:  June of `18.
2              MR. DARE:  Yeah.  2026 hasn't happened
3  yet.
4  BY MR. SHABAZZ:
5    Q.    Sorry.  2016.  Sorry.
6    A.    Okay.
7    Q.    2016 of June, Samuel Carter alleges abuses
8  by the Rankin County Sheriff's Department against
9  him -- against him, and this involves certain
10 members of your SRT team.
11   A.    Okay.  Was it an SRT operation?
12   Q.    I don't think so.
13   A.    Well then I wouldn't know about it.
14             MR. DARE:  And counsel, if you could help,
15 when did he -- when did he allege those?
16             MR. SHABAZZ:  I said June 2016.
17             MR. DARE:  No.  But like when did he bring
18 those allegations?
19             MR. SHABAZZ:  That's not my question.
20 That's not the question I'm going to ask.
21             MR. DARE:  Oh, I know.  I was going to say
22 if this might help refresh the witness's
23 recollection.  I apologize.  You can ask what you
24 want to.
25             MR. SHABAZZ:  Let me ask -- let me ask --

Page 96

1  that's okay.
2  BY MR. SHABAZZ:
3    Q.    Let me ask you this.  Were all of the --
4  you said roughly in your tenure, you investigated --
5  you conducted about ten investigations, is that
6  right?
7    A.    Roughly, maybe yeah.
8    Q.    Okay.  Were all of them involving SRT
9  operations or --
10   A.    No.
11   Q.    Okay.  So, okay.  So you wouldn't -- some
12 of them did not involve SRT investigations?
13   A.    I don't think any of them involved SRT
14 operations, to the best of my recollection.
15   Q.    Okay.  Okay.  So, okay.  So are you
16 familiar with Mr. Rick Loveday?
17   A.    Not by name.  If you can again relate what
18 supposedly happened.
19   Q.    I'll come back to that.  Let me just ask
20 you about these names.  See if they ring a -- see if
21 they're one of the -- some of the ten that you
22 investigated.
23   A.    I can just about assure you there are
24 none.
25             MR. WALKER:  I need to go off the record.

Page 97

1              MR. DARE:  Okay.  Hey, we're going to go
2  off the record for a sec.
3              THE REPORTER:  We are off the record.  The
4  time now is 12:16 p.m.
5              (WHEREUPON, a recess was taken.)
6              THE REPORTER:  The time now is 12:25 p.m.,
7  and we are back on record.
8  BY MR. SHABAZZ:
9    Q.    All right.  Okay.  Thank you for your
10 patience and cooperation.  You've been very helpful
11 today.  Okay.  So I want to ask you, did you -- did
12 you ever read the New York Times or Mississippi
13 Today article on the Rankin County Goon Squad?
14   A.    Yes.  I read that.  I think the Times.
15   Q.    And you read the article?
16   A.    Uh-huh.
17   Q.    Okay.  And when you read that article,
18 which alleges extensive actions of deputies in the
19 Rankin Sheriff's Department, some of which were
20 under your direct command in SRT, what did you think
21 when you read the New York Times article?
22             MR. DARE:  I'm going to object.  One on
23 hearsay, two on this witness is here to provide
24 facts as per your notice, and not opinions.
25             MR. SHABAZZ:  Okay.  What was your

STEVEN N. GODFREY                    November 11, 2024                    98 to 101
79776

Page 98

1  response when you read the New York Times article on
2  the Rankin County deputies and the Goon Squad?
3      MR. DARE: Same objection. You can
4  answer.
5      THE DEPONENT: I can answer? I was
6  devastated.
7  BY MR. SHABAZZ:
8      Q. Okay. And why was that?
9      A. I'm 71. I was 69 and 70 during that time.
10  Opdyke, Elward and a couple of those kids were young
11  enough to be my children. I trusted them, I loved
12  them and they just broke my heart.
13      Q. Okay. Well I mean -- were you shocked
14  that all of this could have been occurring while you
15  were in supervisory position in the department?
16      A. Again, I didn't supervise them on the
17  shift. Only on SRT operations. But it just was
18  terrible.
19      Q. Okay. But were you surprised this had
20  been occurring in the Rankin Sheriff's Department?
21      MR. DARE: Object to form.
22      THE DEPONENT: I don't know how you
23  couldn't be that.
24      THE REPORTER: Will you repeat your
25  answer?

Page 99

1      THE DEPONENT: I don't know how you could
2  not be surprised. I was devastated.
3      MR. SHABAZZ: Okay. And if that was true,
4  how could all of this have occurred if the Rankin
5  County Sheriff's Department was being properly
6  supervised?
7      MR. DARE: Object to form. Now you're
8  getting into absolute opinions. This witness is
9  here to testify about facts. If you've got a
10  question about facts going on at the time, you can
11  ask it.
12      MR. SHABAZZ: Oh, I can ask any -- I can
13  ask.
14      MR. DARE: This witness does not have to
15  provide you any opinion.
16      MR. SHABAZZ: You can make -- you can make
17  your objection, but he can answer that question.
18      MR. DARE: And I will say --
19      MR. DARE: You've made your objection.
20  Answer that question.
21      THE REPORTER: One at a -- one at a time
22  please, so I can report properly.
23      MR. DARE: The witness does not have to
24  provide any opinions. I am not instructing the
25  witness not to answer, but I am objecting and saying

Page 100

1  that he does not have to provide any opinions if he
2  does not so choose. I would also note that counsel
3  knows that this is not an expert deposition.
4      MR. SHABAZZ: I can ask about the article.
5  BY MR. SHABAZZ:
6      Q. Okay. So you said you were surprised?
7      A. Absolutely.
8      Q. Okay and --
9      A. Disappointed's more the proper word,
10  probably.
11      Q. Why was that?
12      A. I was disappointed in them. You just
13  don't do those things.
14      Q. Okay. Now were you surprised that -- well
15  first of all, were you -- were you -- in the New
16  York Times article, were you aware of any of the
17  allegations that came out in that article?
18      A. Yeah. What? I don't understand what
19  you're asking now.
20      Q. Outside of Michael Jenkins and Eddie
21  Parker, that article named a number of incidents
22  that have been alleged against Rankin County
23  deputies over the years.
24      A. I'm not -- I'm not personally familiar
25  with them. I mean in the line of work we're in, you

Page 101

1  get a lot of allegations. Most people who end up
2  going to jail have an allegation of innocence.
3      Q. Right. But these were allegations of
4  torture and abuse by Rankin deputies?
5      A. I don't remember any torture and abuse
6  allegations.
7      Q. Do you remember that in the article?
8      A. Basically, yes I read it.
9      Q. Okay. So you -- even in the article,
10  there were -- there were many things alleged against
11  the deputies that are similar to what in the Jenkins
12  and Parker?
13      MR. DARE: Object to form.
14  BY MR. SHABAZZ:
15      Q. I mean, did you read that?
16      A. I read the article, sir. Third time I've
17  answered it.
18      Q. Okay, and when you looked back at your
19  position in the department, how do you -- how do you
20  -- did you ask yourself how did I miss all of this
21  while I was in the department?
22      MR. DARE: Object to form. Same
23  objection. Go ahead. I mean if you can answer, you
24  can answer. Again, doesn't have to provide any
25  opinions.

STEVEN N. GODFREY
79776
November 11, 2024
102 to 105

Page 102

1      MR. SHABAZZ: Okay.
2 BY MR. SHABAZZ:
3    Q.   When you read that article, when you read
4 that, did you look back and assess your own job
5 performance?
6    A.   No, no. These guys knew what -- no.
7 These guys what -- these guys knew what they did was
8 wrong.
9    Q.   Okay. But how come you didn't find out?
10    A.   Because I didn't follow them around at
11 night. Was not my job. I trusted these kids.
12    Q.   Okay. Did you supervise them properly?
13    A.   I was not their supervisor. Only on SRT
14 operations did I manage them.
15    Q.   Okay. Did the Rankin County Sheriff's
16 Department supervise them properly?
17      MR. DARE: Object to form again. I think
18 he's answered as to the facts as he knows them.
19      MR. SHABAZZ: I got that. Objection
20 noted. Did the Rankin County Sheriff's Department
21 properly supervise these deputies?
22      MR. DARE: And again, that's an opinion
23 question that I -- I'm not going to instruct the
24 witness not to answer, but he's not required to.
25 BY MR. SHABAZZ:

Page 103

1    Q.   Sir, you have to answer the question sir.
2    A.   Ask the question.
3    Q.   Did the Rankin County Sheriff's Department
4 properly supervise the deputies that you read about,
5 that committed these alleged actions in that New
6 York Times article that you read?
7      MR. DARE: All right. So he can answer
8 the question whether he did. You're asking him his
9 opinion on whether Rankin County did anything else,
10 even though he may not have knowledge of what's --
11 other supervision. And that is why I'm repeatedly
12 objecting here, because I don't think your question
13 is proper. But again, I'm going to let -- I'm not -
14 - I'm going to let him answer the question, even
15 though it is improper and based off of hearsay.
16      MR. SHABAZZ: I got you.
17 BY MR. SHABAZZ:
18    Q.   Go right ahead, sir.
19    A.   I don't know.
20    Q.   I believe you do know. You were working
21 there.
22      MR. DARE: Asked and answered,
23 argumentative. You don't have to answer again.
24 BY MR. SHABAZZ:
25    Q.   How could -- if those allegations are true

Page 104

1 in that article, how could those deputies have
2 gotten away with what they got away with in that
3 department?
4    A.   Sounds like they didn't get away with
5 anything, I don't think.
6    Q.   Okay. But what about all the -- what
7 about the numerous other allegations in that
8 article?
9      MR. DARE: That's not a question.
10      THE DEPONENT: I'm not familiar with them.
11 BY MR. SHABAZZ:
12    Q.   But you read the article, right?
13    A.   Fourth time, yes.
14    Q.   Okay. So I mean this is a simple
15 question. I mean a simple question.
16    A.   I'm not familiar with the individual
17 incidents. I cannot put a lot of stock in many
18 allegations made against law enforcement in general.
19 I was in law enforcement for 48 years. A lot of
20 allegations.
21      As you know as a defense counsel, one of
22 the first things you do is take focus off of the
23 defendant and put it on the law enforcement. So I'm
24 a cop. I'm sorry.
25    Q.   Okay. So you said you don't take a lot of

Page 105

1 stock in allegations against police officers? Is
2 that what you said?
3    A.   They're always to me require further
4 investigation.
5    Q.   Okay. All right. So the people that I'm
6 talking about are in that article. That's why I
7 asked, because when you said --
8    A.   Again, I don't know the specifics of each
9 -- I have no knowledge of what happened, what the
10 investigations found. It's the New York Times,
11 boss.
12    Q.   I mean I understand that. But I just want
13 to know were they part of these ten investigations?
14    A.   No. I've answered that at least a dozen
15 times. No. I had no personal knowledge, nor did I
16 investigate these incidents.
17    Q.   Well, you say you've investigated ten.
18 You investigated ten.
19    A.   I said "maybe."
20    Q.   You say you can't even name the ten.
21    A.   Give me details.
22    Q.   I'm talking about which ten.
23      MR. DARE: And I think he's answered the
24 question to the best of your ability. He has
25 answered the question now, I can't even tell you how